# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF MASSACHUSETTS

## EASTERN DIVISION

| | |
|---|---|
| **In re**<br><br>**CHARLES STREET AFRICAN METHODIST EPISCOPAL CHURCH OF BOSTON,**<br><br>                        **Debtor** | **Chapter 11**<br>**Case No. 12-12292-FJB** |
| **CHARLES STREET AFRICAN METHODIST EPISCOPAL CHURCH OF BOSTON,**<br><br>        **Plaintiff-in-Counterclaim**<br><br>**v.**<br><br>**ONEUNITED BANK,**<br><br>        **Defendant-in-Counterclaim** | **Adversary Proceeding**<br>**No. 14-1138** |

### MEMORANDUM OF DECISION ON
### OBJECTION TO PROOF OF CLAIM AND COUNTERCLAIM

In the chapter 11 case of the Charles Street African Methodist Episcopal Church of Boston ("Charles Street" or "the Church"), OneUnited Bank ("OneUnited" or "the Bank") has filed a proof of claim for amounts due on two loans it made to Charles Street, one for construction of a community center (the "Construction Loan") and the other to refinance an existing credit facility (the "Church Loan"). In the adversary proceeding now before the Court, Charles Street objects to OneUnited's proof of claim and, in furtherance of that objection, asserts two counterclaims against OneUnited, both under Mass. Gen. Laws ch. 93A. The first is for wrongful origination of the Construction Loan: the Church alleges that OneUnited's underwriting of this loan was unfair in that OneUnited knew when it made the loan that the construction project was underfunded and, consequently, that the Church would be unable to complete it and would inevitably default on the loan. The second is for unfair and deceptive

use of foreclosure process:  Charles Street alleges that OneUnited threatened to foreclose on the

properties that secured the Church Loan, including the church building itself, ostensibly to enforce the

Church Loan, when in fact OneUnited had no intention of completing the foreclosure but was simply

using the pretext of foreclosure as leverage for collection of the Construction Loan. Charles Street

asserts both counterclaims for purposes of setoff, as defenses to OneUnited's claim, and it also asserts

the pretextual foreclosure count—but not also the wrongful underwriting count—as a basis for

affirmative recovery. After a six-day trial, the Court now enters the following findings of fact and

conclusions of law.

**PROCEDURAL HISTORY**

On September 2, 2010, OneUnited filed a complaint against Charles Street in Massachusetts

Superior Court to enforce the promissory note given in conjunction with the Construction Loan, which

by then was in default.  With the answer it filed in that action, Charles Street asserted five counterclaims

the "State Counterclaims"). These included a count under MASS. GEN. LAWS ch. 93A for wrongful

origination of the Construction Loan, for which Charles Street sought treble damages and attorneys' fees

and costs.  OneUnited moved to dismiss the counterclaims, and, on January 5, 2012, the Superior Court

granted the motion as to all five counterclaims.  Charles Street promptly appealed the dismissal to a

Single Justice of the Massachusetts Appeals Court who, on February 27, 2012, reversed the Superior

Court and reinstated the counterclaims.

The Superior Court action remained pending when, on March 20, 2012, Charles Street filed a

petition for relief under chapter 11 of the Bankruptcy Code.  The petition commenced the bankruptcy

case in which this adversary proceeding arises.

In this bankruptcy case, OneUnited has filed a proof of claim, asserting secured claims based on

the two loans made by OneUnited to Charles Street on October 3, 2006: the Church Loan and the

Construction Loan (together with the Church Loan, "the Loans").  OneUnited claims that the balances on

the petition date were $1,188,562.90 on the Church Loan and $3,815,795.70 on the Construction Loan,

including "default/maturity interest" of $792,425.92 on the Construction Loan and $58,416 on the

Church Loan. In addition to the prepetition balances, OneUnited also asserted entitlement to "post-

petition interest, attorney's fees and costs, pursuant to 11 U.S.C. § 506(b)."  Charles Street objected to

the default/maturity interest component of OneUnited's claim.  After an evidentiary hearing, the Court

sustained that objection; OneUnited appealed, and on September 30, 2013, the District Court affirmed;

a further appeal to the Court of Appeals was dismissed by agreement.

At the commencement of the case, the Church Loan was secured by three parcels of real

property owned by Charles Street, and the Construction Loan was secured by another three parcels of

real property owned by Charles Street.  Charles Street has since sold one of the properties that secured

the Construction Loan and two of those that secured the Church Loan; each sale was free and clear of

OneUnited's mortgage on the property. The proceeds of each sale are subject to OneUnited's security

interest to the same extent, and with the same validity and priority, as OneUnited's mortgage earlier

attached to the property in question.  The proceeds of each sale have not been paid to OneUnited but

instead are being held in escrow.

On April 30, 2014, Charles Street filed a second objection to OneUnited's Proof of Claim (the

"Second Objection"). The Second Objection essentially interposed, by way of setoff, three counterclaims

against OneUnited—including the two being asserted in this adversary proceeding—that, if successful,

would reduce or wholly eliminate OneUnited's claim.

On July 11, 2014, Charles Street filed a document entitled Objection to Proof of Claim and

Counterclaim, which commenced this adversary proceeding.  It reiterates the objections to OneUnited's

proof of claim that were asserted in the Second Objection and also asserts counterclaims.[1]

---

[1] A counterclaim to a claim filed in a bankruptcy case is a demand for relief of a kind specified in Fed. R. Bankr. P. 7001. F.R. Bankr. P. 7001(1) (specifying that, with limited exceptions, "a proceeding to recover money or property" is an "adversary proceeding" and, as such, is governed by the rules of Part VII of the Federal Rules of Bankruptcy

The Objection to Proof of Claim and Counterclaim states three counts, each involving more than one subcount.  Counts I and II are objections to OneUnited's claim, both in the nature of setoff.  In Count I, Charles Street asserts rights of setoff arising from its State Counterclaims, of which there are five; but of the five, only one remains, the counterclaim under chapter 93A for wrongful origination of the Construction Loan, Charles Street having expressly indicated that it is not proceeding on the other four. In Count II, Charles Street asserts rights of setoff arising under MASS. GEN. LAWS ch. 93A for unfair and deceptive use of a collection action and foreclosure process. Count III asserts the same rights as does Count II, but this time as counterclaims, not simply as defenses.  Charles Street has since indicated that it is no longer seeking relief for OneUnited's prosecution of the collection action, and therefore Counts II and III are now based solely on OneUnited's alleged pretextual employment of foreclosure process. In summary, the Court must determine the merits of two claims under chapter 93A being asserted by Charles Street against OneUnited, one for wrongful origination of the Construction Loan and the other for pretextual employment of foreclosure process, and must consider both as objections in the nature of setoff and the latter also as a counterclaim.

Each party initially demanded a jury trial but later dropped its jury demand.  The matter was accordingly tried without a jury.

At Charles Street's request, the trial was bifurcated into separate phases for liability and damages (especially the attorney's fees portion thereof).  At this juncture, only liability is before the Court.

After trial, Charles Street submitted a post-trial brief, OneUnited submitted proposed findings of fact and conclusions of law, and the Court later heard closing arguments.

---

Procedure). Accordingly, the counterclaim must be filed in an adversary complaint.  When, as here, the counterclaim is joined with an objection to claim, the objection to claim may be included in the adversary proceeding. Fed. R. Bankr. P. 3007(b). Accordingly, Charles Street's objection to claim and counterclaim are joined in an adversary complaint filed under the rules of Part VII of the Federal Rules of Bankruptcy Procedure.

**JURISDICTION**

The matters before the Court are objections to a claim against the estate (Count I and II) and a

counterclaim (Count III).

The claim against the estate and Charles Street's objections to it arise under the Bankruptcy

Code, see 11 U.S.C. §§ 501 and 502 (governing the filing and allowance of proofs of claim), and in a

bankruptcy case and therefore fall within the jurisdiction given the district court in 28 U.S.C. § 1334(b)

and, by a standing order of reference (codified in the district court's local rules at L.R. 201, D. Mass.),

referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). The objection to claim is a core

proceeding within the meaning of 28 U.S.C. § 157(b)(1). 28 U.S.C. § 157(b)(2)(B) (core proceedings

include allowance or disallowance of claims against the estate). The bankruptcy court accordingly has

authority to enter final judgment on the counts that are objections to claims.

Charles Street's counterclaim does not arise under the Bankruptcy Code but is undisputedly

related to this bankruptcy case and therefore falls within the jurisdiction given the district court in 28

U.S.C. § 1334(b) and referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a).  28 U.S.C. §

1334(b) (giving district courts original jurisdiction of all civil proceedings "related to cases under title

11"); *Pacor, Inc. v. Higgins*, 743 F.2d 984 (3rd Cir. 1984) ("related to" jurisdiction extends to any matter

that conceivably may have an effect on the estate in bankruptcy).  As a counterclaim, it is by statutory

designation a core proceeding.  28 U.S.C. § 157(b)(2)(C) (core proceedings include "counterclaims by the

estate against persons filing claims against the estate"). The same statute authorizes a bankruptcy court

to hear, determine, and enter judgment as to a core proceeding.  28 U.S.C. § 157(b)(1). The Supreme

Court has determined that this authorization is unconstitutional and that a bankruptcy court, as a non-

Article III tribunal, may not enter a final judgment as to a counterclaim *unless* the action at issue "would

necessarily be resolved in the claims allowance process." *Stern v. Marshall*, __ U.S. __, 131 S.Ct. 2594,

2618 (2011). In this instance, the same state-law claim that constitutes the Count III counterclaim also

forms the basis of Charles Street's Count II objection to claim. In order to resolve the objection to claim,

the court must adjudicate Charles Street's state law claim—to determine whether, and in what amount,

it gives rise to liability that Charles Street may set off against OneUnited's claim. Accordingly, this is an

instance in which the counterclaim would necessarily be resolved in the claims allowance process, and

therefore *Stern* does not invalidate § 157(b)(1) as to this counterclaim. The Court may therefore enter

final judgment as to it.

**POSITIONS OF THE PARTIES**

a.      **Wrongful Origination of Construction Loan**

Charles Street asserts its claim for wrongful origination of the Construction Loan under MASS.

GEN. LAWS ch. 93A. Within chapter 93A, Charles Street contends, this matter is governed by § 9, not § 11,

the latter being limited to situations where both parties are engaged in business; Charles Street

maintains that it was not engaged in business because construction of the RRC was, for Charles Street,

part of its charitable purpose, and Massachusetts law states that where the activity in question is at

least incidental to a nonprofit corporation's purpose, the conduct is not considered to arise in a business

context. Section 2 of chapter 93A makes unlawful any "unfair or deceptive acts or practices in the

conduct of any trade or commerce," and § 9(1) permits any person injured by such an unlawful act,

other than one entitled to proceed under § 11, to bring an action for such violation.

Charles Street contends that, by its origination of the Construction Loan, OneUnited committed

an unfair act or practice in the conduct of trade or commerce.  In its closing argument, Charles Street

made clear that it is not alleging any "deceptive" act or practice as the gravamen of its claim. The

gravamen of Charles Street's claim is that OneUnited decided to approve and then fund the

Construction Loan with knowledge that the loan was doomed to fail, that the Church could not repay it.

The cases on which Charles Street relies for the proposition that the making of a loan doomed to failure

is an unfair act within the meaning of chapter 93A have uniformly involved consumer residential loans,

6

but Charles Street maintains that the holding is not limited to that context.  As evidence that OneUnited

knew the loan was doomed to fail, and underwrote it for  improper reasons, Charles Street would have

the Court find that OneUnited (i) knew at the outset that the Church did not have adequate cash flow to

service the Loan; (ii) failed to assess whether the Church's rental income projections for the RRC were

realistic or update those projections to reflect changes in the project; (iii) made advances on the Loan

despite the Church's inability to provide necessary equity in the project; (iv) knowingly disregarded

deficiencies in the value of the collateral securing the loan; (v) ignored regulatory guidance about the

propriety of the loan; (vi) made the loan to garner business and good will in the Church's neighborhood,

where OneUnited was then opening a branch; and (vii) made the loan primarily in reliance on the

guaranty of the First Episcopal District, and in particular upon OneUnited's understanding that, as a

matter of AME doctrine and discipline, the bishop of the First Episcopal District could, at will, reach the

resources of the any of the District's 330 member churches to honor the District's guaranty.

OneUnited takes the position that the construction of the RRC was business on the part of

Charles Street and therefore that this claim is governed by § 11 of chapter 93A (but OneUnited does not

indicate how, if at all, this affects the analysis that should otherwise be applied). OneUnited also denies

that it knew or should have known the loan was doomed to failure; it acknowledges that the loan had

known weaknesses but maintains that the loan also had strengths that, on balance, made it likely to

succeed and an appropriate candidate for underwriting. OneUnited maintains that the loan failed not

because of any fault on its part but because the Church ignored limits that OneUnited imposed on the

project by expending its available funds, and incurring additional debt, on expansions of the scope of the

project, expansions of which OneUnited was kept unaware.  OneUnited further points out that the cases

on which Charles Street relies—for the proposition that the making of a loan doomed to failure is an

unfair act within the meaning of chapter 93A—have involved, exclusively, consumer residential

purchase-money loans.  The Massachusetts Supreme Judicial Court has not extended their holding to

non-consumer, non-residential construction loans, and it could not do so without undermining

considerable case law holding that no cause of action lies for negligent underwriting.

Not least, OneUnited also argues that on three occasions after the events occurred that gave

rise to these claims, Charles Street expressly waived any claims and setoffs it may then have had against

OneUnited. Charles Street argues that the waivers are ineffective for two reasons:  they are, in effect,

*anticipatory* waivers, which, as a matter of public policy, Massachusetts does not recognize; and they

were extracted under economic duress of OneUnited's creation. Regarding economic duress, OneUnited

replies that *economic* duress is not a valid defense in Massachusetts, that in any event its requirements

are not satisfied here, and that even if the waivers were initially invalid for economic duress, Charles

Street later ratified them. Charles Street responds that there can have been no ratification while, as

here, the conditions that constituted the duress persisted.

**b.**    **Pretextual Foreclosure**

For its second theory, Charles Street makes its claim of pretextual foreclosure under section 9 of

chapter 93A; and here too OneUnited argues that OneUnited was engaged in business and therefore

that section 11 governs. The gravamen of this count is that, as Charles Street alleges, OneUnited

employed foreclosure process against the properties that secured the Church Loan, including and

especially the Church Building itself, without intention to foreclose on the Church Building but solely to

exert pressure on the First Episcopal District to pay the Construction Loan. Charles Street argues that

this conduct caused damage in the form of diminishment of the financial stability of the Church,

diminishment of the Church's fundraising, and diminishment of the value of the RRC due to delay in

construction. Charles Street argues that Massachusetts case law recognizes that the use of foreclosure

process in this manner, for an ulterior purpose, is an unfair and deceptive act within the meaning

Chapter 93A.

OneUnited disputes both the facts and the law. Regarding the facts, it contends that the

evidence fails to establish that OneUnited did not intend to foreclose.  Regarding the law, it argues that,

in any event, under governing Massachusetts law, a pretextual foreclosure violates Chapter 93A only in

extreme situations, where the mortgagor's actual intent is to achieve an end that is either criminal or

otherwise clearly in violation of public policy; but the facts alleged here are not so extreme, and

therefore this count fails even to state a claim on which relief can be granted.

**FINDINGS OF FACT**

The Court now makes the following findings of fact.[2]

**A.      Charles Street, its Mission, and its Plan for the RRC**

1.      Incorporated as a nonprofit religious corporation under Massachusetts law in and since

1839, Charles Street has been and remains a congregation, or local church, of the African Methodist

Episcopal (A.M.E.) Church. The Church originally met at a location on Charles Street in Beacon Hill—

hence its name—but in 1939 moved to its present location at 551 Warren Street in the Grove Hall

district of the Roxbury section of Boston. Most of its roughly 1200 members live in Roxbury and

neighboring Dorchester and Mattapan.

2.      Charles Street is one of 330 member churches of the First Episcopal District of the

A.M.E. Church ("the District"). The District is an unincorporated association that geographically

encompasses the northeast of the United States and is based in Philadelphia. The District is comprised of

seven "Annual Conferences," including the New England Annual Conference.  In membership and

---

[2] As a preliminary matter, I make the following observations about the evidence. First, though the wrongful underwriting claim involved allegations and counter-allegations about the uses and sufficiency of loan proceeds and of supplemental funding for the Project, neither side attempted to provide the Court with a comprehensive accounting of available funds (from the loan, the V2V Campaign, the Church) and the uses to which they were put; and though the evidence includes the general contractor's requests for disbursement of loan proceeds, the evidence included virtually no guidance on understanding them. Second, though the evidence included several reports of examination by state and federal banking examiners, these proved to be of no use in the task at hand, and the findings set forth here are in no part based on them. Third, the testimony of the Church's expert witness was helpful only for its confirmation of findings that the Court would have made, on the basis of other evidence, even without the expert's testimony.

assessments, Charles Street is the largest church in the New England Annual Conference and among the top ten in the District.

3.      The District, and each episcopal district of the A.M.E. Church, is presided over by a bishop. Under A.M.E. polity, the pastor of each local church within a district is appointed annually by the district's bishop, who also has the power to remove pastors.

4.      By appointment of the bishop, Reverend Gregory G. Groover first became pastor of Charles Street in 1994 and, by successive reappointments, has continued in that capacity through the present.

5.      Community Service has long been important and integral to the religious mission and self-understanding of the A.M.E. Church. *The Doctrine and Discipline of the AME Church,* the A.M.E. Church's compilation in manual form of its doctrine and polity, states that the A.M.E. Church has preached both "salvation from sin *and* deliverance from bondage" (emphasis added) and "stands in defense of disadvantaged and oppressed peoples in the 21st century." *The Doctrine and Discipline* continues: "Whether in schools, seminaries, hospitals or social service centers, the AME Church has lived the gospel outside its sanctuaries. This mandate still informs its ministry, vision and mission in the Church's third century of existence."

6.      Charles Street, too, has believed and continues to believe emphatically that its purpose as a church is to serve its community.  To that end, Charles Street has, at all times relevant to this proceeding, operated a number of community service programs:  the Women's Missionary Society, which performs missions throughout the community and adopts children for Christmas events; a food pantry that serves over 200 families twice a month; the Roxbury Senior Care Program, for the elderly; Narcotics Anonymous, for which the Church provides a meeting place; the Hamilton-Garrett Music and Arts Academy ("HGMAA"), an after-school program for community youth; the Marcheta Taylor Life Enrichment Center, an after-school computer literacy program; and the Maafa Middle School Project, a

mentoring project pairing Northeastern University students of color with Boston public-school middle-school students of color. These programs serve primarily the Roxbury, Dorchester, and Mattapan neighborhoods of Boston, Massachusetts; and 70-80 percent of the youth and elderly participants in these programs are not members of the Church.

7.      Needing more space for these programs, and hoping to expand them and to provide a new center for community life in Grove Hall, Rev. Groover had "a vision from God" for the Church to acquire a long-vacant building located two doors from the Church, the so-called "Sky-Cap Plaza" at 575 Warren Street ("575 Warren Street," "the Sky-Cap Building," or "the RRC"), and to develop it into a community center. He proposed this to the Church's membership, which after much discussion, prayer, and consideration, and mindful of the hard work and sacrifice it would require of them, overwhelmingly adopted this project as its own.

8.      The date of Rev. Groover's vision is not in evidence, but it is clear that in furtherance of its realization, Charles Street acquired the Sky-Cap Building on April 1, 1999. At a rally on a single Saturday afternoon after the property came on the market, the Church raised $50,000 from its membership for the down payment. Rev. Groover said, "at that time . . . the energy level, the enthusiasm, the commitment and zeal to this project was without question." The Church borrowed the balance of the purchase price from the First Episcopal District Economic Expansion and Development Group ("FEDEEDG"), a separate nonprofit controlled by the District, and gave the FEDEEDG a mortgage on the property to secure the indebtedness. Rev. Groover said the purchase price was "I think . . . in the high 300,000s."  At its acquisition, the 575 Warren Street property was a shell and in some disrepair. It would need considerable renovation for use as the Church envisioned.

9.      Over the next six years, the Church refined its plans for the building/community center, which at some point the Church named the Roxbury Renaissance Center ("RRC"). The RRC would house and provide office space for some of the Church's existing community services. It would also include a

large ballroom/function hall that could be used by the Church as a conference hall and, when not in use

by the Church, could be rented out as either a conference hall or a ballroom, such as for the many

weddings that were performed at Charles Street. Plans included a large kitchen in the basement level

that could be used in conjunction with the ballroom for weddings and other functions requiring food. It

would also include office space for Church programs, meeting spaces for community workshops, and

recording studios for use by and rental to aspiring young musicians in the neighborhood. Charles Street

envisioned that these and other rental uses of the building would help defray the cost of paying for and

operating the RRC.

10.     When the Church acquired the building, it did not have the funds necessary to renovate

it. The Church planned to finance the renovation with a construction loan and with capital raised

through both internal and external efforts. In the early 2000s, the Church instituted a campaign to raise

money from the Church's membership; this internal campaign was known as the Vision-to-Victory

Campaign, or "V2V." Rev. Groover testified that its goal was to raise $2 million over three to four years.

It was run by co-chairpersons from the congregation until around 2005, and during this initial period it

raised approximately $1.5 million. Thereafter V2V was run by a hired, professional fund raiser. The

Church also sought to raise money from sources outside its membership; there is almost no evidence

about these outside efforts and their results.

11.     The $1.5 million that was raised in the initial phase of V2V was used at least in part to

engage a project architect, Michael Washington ("Washington" or "the Architect"), and to fund

"preconstruction activities." The evidence does not include a full description of the preconstruction

activities performed in this period or even a rough accounting for expenditure of the initial $1.5 million.

However, the preconstruction activities at least included Washington's development of architectural

plans over an unspecified period, the performance of engineering studies of the building by a structural

engineer, and some preliminary construction work first by the FEDEEDG and then by Thomas

Construction Company ("TCC").

12.     TCC, whose president and chief executive officer (CEO) is Frank Thomas ("Thomas"), has

its offices across the street from the Charles Street church. Though not a member of the Church,

Thomas was married at Charles Street and considers the Church his neighbor. TCC first became involved

in the project in 2004. On August 16, 2004, TCC issued to Charles Street a written proposal for

preconstruction work on the RRC, with a $100,000 segment and a $150,000 segment. At the time, TCC

was not yet the contractor on the job.  Rather, the contractor until that time was the FEDEEDG, one of

whose functions was to provide construction advice and assistance to District churches. TCC's August

2004 proposal was not accepted, but the work it involved was performed by TCC later, after the Church

signed a more comprehensive construction contract. At some point in 2005, Charles Street stopped

using FEDEEDG on the project and transitioned to TCC as its construction planner/adviser and eventually

general contractor.

13.     The engineering studies of the building were performed by structural engineer Rene

Mugnier in January 2005. By letter of January 21, 2005, Mugnier informed Washington of various

structural defects that would need to be addressed, including (among others): that the footings for the

support columns were inadequate, that floor joists were inadequate, that the soil under the basement

should be tested, and that the building would require an under-the-slab drainage system to prevent

basement flooding. Mugnier prepared reports of his findings; it is not clear when Thomas received

these, but not before March 2006.

14.     At some point before May 2005, the Church formed a separate non-profit corporation

known as the Charles Street African Methodist Episcopal Roxbury Renaissance Center, Inc.

("CSAME/RRC"). The Church envisioned that though the Church would own the RRC, CSAME/RRC would

be its principal tenant and operator and oversee the various programs that would be operated out of it.

The contractual and leasing arrangements for this relationship were never fleshed out and completed.

Rev. Groover was chairman of CSAME/RRC's board of directors; the members of the board included

members of Charles Street and nonmembers.

15.     In May 2005, CSAME/RRC hired Dennis Lloyd, a member of the Church, as its executive

director. In that capacity, Lloyd reported regularly to CSAME/RRC's board of directors. At some point in

2005 or 2006, CSAME/RRC took over responsibility for running the V2V Campaign by hiring Carolyn

Weeks, a member of the Church, to serve as the campaign's coordinator. Lloyd's salary as executive

director and Weeks's salary as campaign coordinator were paid from proceeds of the V2V Campaign.

16.      Before he started with CSAME/RRC, Lloyd had many years' experience in business

management positions. His experience also included three years in which he worked for the Boston

Redevelopment Authority as city planner for Roxbury and Mattapan. In that position he had formal

training in project management, especially of neighborhood development projects. His duties included

interacting with developers, reviewing plans and costs projections, and evaluating the feasibility of

projects.

17.     Separate and apart from his work as executive director of CSAME/RRC, Lloyd also served

as the Church's project manager for construction of the RRC ("the Project"). It is unclear when Lloyd

became project manager; he started in this position only after the architect and general contractor had

started, but he was in his position at least as early as May 2005. As project manager, Lloyd worked for

the Church, not for CSAME/RRC; CSAME/RRC's responsibilities included the raising of funds for RRC

construction but *not* management of the construction. As project manager, Lloyd was charged with

guiding the RRC construction project to completion, including dealing with the architect and general

contractor, securing financing, and keeping the Project within budget. In this capacity, he answered

directly to the Church's Trustee Board and reported regularly to it. He also reported regularly to Rev.

Groover and kept him informed of all matters requiring his attention.

18.     The Church's Trustee Board has oversight of the temporal aspects of the Church's affairs, including maintenance and renovation of its buildings. At least during the relevant periods, the Trustee Board had 18 or 19 members, all elected by the congregation from among individuals nominated by the pastor. It included individuals of financial and managerial experience and was regarded by Lloyd and Rev. Groover as a source of advice and counsel.

19.     By early 2005, Lloyd, working with Thomas, had determined that renovation of the Sky-Cap Building into the RRC would require a construction budget of approximately $4.7 million. The Church accordingly set out to borrow approximately $5 million. No later than the early months of 2005, Charles Street approached and was turned down by several banks. It also approached one or two lenders that dealt exclusively with churches and religious institutions. One of these expressed willingness to lend the full amount, but the Church, uncomfortable with the loan package, rejected the offer. The terms of the offer and reasons for the Church's discomfort are not in evidence.

**B.     OneUnited Bank**

20.     Around this time, an official in the City of Boston's Department of Neighborhood Development, Reginald Nunnally, met with Rev. Groover about financing options for the RRC. Nunnally was familiar with OneUnited Bank and its record of financing development in Grove Hall. He suggested to Rev. Groover that OneUnited might be a good fit for the Church's project. Rev. Groover expressed interest, and Nunnally communicated that interest to someone at OneUnited.

21.     OneUnited Bank is a Massachusetts trust company, chartered by the Massachusetts Commissioner of Banking. It operates under Massachusetts banking laws and is regulated both by the State of Massachusetts and by the Federal Deposit Insurance Corporation ("FDIC").

22.     Kevin Cohee is OneUnited's CEO, chairman of its board of directors, owner of 45 percent of its stock, and, with his wife, Teri Williams, who is the Bank's president and chief operating officer, the driving force behind the Bank's creation and expansion. As Cohee explained, though OneUnited is very

small as banks go, it is nonetheless "the largest black-owned bank," and its mission is "to garner the

spending power of Black America and to re-channel it back into our communities so that we could

protect ourselves." "We wanted to unite all of the small minority banks across the country under one

common umbrella so that we would have the financial strength and expertise in our community to be

able to promote economic growth and to protect ourselves." OneUnited seeks to make its banking

capital and financial services and expertise available to low-to-moderate income borrowers and

communities. It is certified by the U.S. Department of the Treasury as a Community Development

Financial Institution ("CDFI"); to have this designation, at least sixty percent of a bank's lending and

other activities must be in low-to-moderate income and distressed communities. OneUnited is also

recognized by the FDIC as a Minority Depository Institution.

23.     By merger with at least two other banks of similar character, OneUnited now has offices

in Boston, Miami, and Los Angeles. Though headquartered in Boston, its lending operations are

conducted principally from Los Angeles.

24.     In addition to consumer residential lending, OneUnited has also focused on multi-family

residential lending (apartment buildings) and commercial real estate and construction loans. OneUnited

has made many loans to African-American entrepreneurs, business owners, and real estate developers,

and to African-American churches and non-profit organizations as well.

25.     When Nunnally introduced Charles Street to OneUnited in 2005, OneUnited was

planning to open a branch in the Grove Hall neighborhood of Boston. During this same period, the

Bank's business-development strategy included targeting of minority churches in low-to-moderate

income neighborhoods, to develop deposits from the churches and their congregants and lending

relationships with the churches. When Nunnally mentioned to OneUnited that Charles Street was

looking for a bank to finance the construction of its community center, OneUnited saw this as just the

type of project it would like to finance—consistent both with its community development mission in

Grove Hall and with its business development strategy in the same neighborhood.

26.      The Church's two points of contact at OneUnited during the pre-closing period[3] were

Michael Miller, who was a loan officer based in OneUnited's Boston offices, and Arman Walker, who was

OneUnited's Chief Lending Officer (CLO) and based in Los Angeles. For Charles Street, Dennis Lloyd

handled the day-to-day communications with Miller and Walker.

27.      When Charles Street started discussions with OneUnited, it stopped considering other

lenders.

**C.      The Underwriting Process**

28.      On April 8, 2005, Walker sent to Rev. Groover a letter expressing OneUnited's interest in

negotiating a construction loan (the "Letter of Interest"). This was not a commitment letter, only an

expression of interest in further discussions, issued before the loan had been put through the Bank's

internal underwriting strictures. The letter nonetheless specified three pages of terms. Chief among

them was that the Bank was interested in lending "an amount not to exceed $3,200,000.00."  The Bank

had thus already determined and communicated to the Church that it would not consider lending more

than $3.2 million, in effect refusing to fund a significant portion of the planned $4.7 million renovation.

The letter also indicated that the contemplated lending would be contingent on the Church's making a

cash equity contribution of $800,000, or 20 percent of the total project budget of $4 million, prior to any

construction loan advances.

29.      The Letter of Interest further indicated that the contemplated lending was also

contingent on the loan's being fully and unconditionally guaranteed by the District. The District had

previously financed projects of member churches through the FEDEEDG, and it had on other occasions

guaranteed loans of member churches.

---

[3] The closing eventually occurred on October 3, 2006.

30.     The Letter of Interest further indicated that the loan would be contingent on

OneUnited's receipt of a first and exclusive mortgage lien on 575 Warren Street. This meant that the

project would require satisfaction, removal, or subordination of the FEDEEDG's mortgage on that

property to OneUnited's satisfaction, at whatever cost to Charles Street that might entail.

31.     Notwithstanding that the Letter of Interest made clear that this loan would not bring

the project to completion, Charles Street continued to work exclusively with OneUnited toward the

contemplated construction loan, understanding all the while that, upon final approval of a loan,

OneUnited would fund only a portion of the construction, and the Church would be required to fund the

balance from other sources, especially its V2V Campaign.

32.     There is no evidence of the substance of the discussions that transpired between

Charles Street and OneUnited before the issuance of this letter. Nor has evidence been submitted as to

how OneUnited arrived at this early decision to limit the amount of the loan under consideration.

33.     Bank CEO Kevin Cohee testified at some length that the Bank worked with the Church

during the loan origination process to craft a sequential, two-phase approach to the Project. The first

phase ("Phase 1") would be funded by the Bank's loan and enable the RRC to obtain a certificate of

occupancy but would not fully complete the Project. Among other things, there would be no "fit-up" of

the basement level. Cohee explained that "once you get the building to the point where it has a

certificate of occupancy, then you create a substantial value in the collateral," in this instance increasing

its value from approximately half a million dollars to just over $3 million. Once the Project reached this

point, "then we would reevaluate the Project," Cohee testified. He elaborated that at that point "we

would know several things: do you have the capacity to raise the money to support this project, as an

example; what's the state of the economy; is it different than what we were thinking; have you changed

your mind about whether you want to move forward or not because you still have that option, because

we . . . built value into the collateral, into the property." Depending on the answers to these questions,

the Church could, in a second phase ("Phase 2"), and if its fund raising and cash flow and the state of the economy and other factors permitted, complete the Project with its own funds. Or, in the alternative, if completion of the Project appeared at that point to be beyond the Church's means, then the Church could elect to walk away and sell the building in at least partial satisfaction of the loan. This is the strategy that Cohee says the Bank worked out with the Church.

34.     I credit Cohee's testimony as evidence of how he and the Bank viewed the loan, the Project, and the attendant risks. In particular, the Bank quickly concluded that a loan that would cover the full construction cost of $4.7 million—with pre-funded interest and a contingency reserve, the loan would likely exceed $5.2 million in total—was too risky for both the Bank and the Church. The Bank worked with the Church to reduce the transaction to one that was manageable and economically sound. They hit upon the strategy of a loan that would take the project only part way, to a certificate of occupancy, and leave the fit-out and completion to a tentative second phase. The second phase would be funded entirely by the Church's capital campaign, would not proceed until the Church had successfully completed the first phase and was satisfactorily servicing the resulting debt, and would proceed only if, at that point, the Bank and the Church felt comfortable with proceeding. During the first phase, all construction efforts would focus exclusively on obtaining a certificate of occupancy, and the Church would work on the second phase only by raising funds for it. This was the Bank's understanding of the loan they were considering

35.     The Church was largely but not entirely on the same page. At all times from and after the Bank's issuance of its Letter of Interest, the Church understood (i) that the Bank would lend only a portion of the construction costs, (ii) that the loan proceeds would fund only certain identified parts of the Project that were necessary to obtain a certificate of occupancy, and (iii) that it was the Church's obligation to raise the funds necessary to fund the balance of the project.

a. However, there is no indication that the Church believed or understood that it should not proceed with the Church-funded portion of the project just as soon as it could, that this work should await the receipt of a certificate of occupancy, or that any such phasing or sequencing was a condition of the construction lending. The Bank adduced no evidence of communications, much less agreement, between the Bank and the Church against working on Phase 2 items before Phase 1 was completed. The Bank did not establish that Cohee had first-hand knowledge, or any knowledge at all, of any such communications between the Bank and the Church that preceded the loan commitment.

b. Nor does the Church appear to have shared Cohee's understanding that Phase 2 was somehow tentative, that the Church might conceivably not proceed with it. It is implausible that the Church would have agreed to incur debt of $3.6 million only to find itself with a still unusable building and the possibility of walking away from the Project, in effect abandoning at least $1.5 million in congregational giving.  Projections supplied by the Church to the Bank showed that the Church expected the RRC to begin generating rental income in the second year after occupancy; but the Bank knew that rents could not begin to flow until after fit out of the RRC, and in the final draft of the Bank's own underwriting memorandum for this loan, discussed below, the Bank itself cites rents from the RRC as an anticipated source of cash flow to fund debt service on the Construction Loan or its take-out loan. In other words, the Bank itself was not treating Phase 2 as tentative.

36.     When the Construction Loan was being considered, the process of approving a commercial loan at OneUnited involved several stages. First the loan originator, who in this instance was Michael Miller, gathered necessary information, principally from the borrower but also from other

sources as necessary, such as appraisers. The originator then forwarded the information to an

underwriter. An underwriter analyzed the information provided, maybe requested additional

information, assessed the strengths and weaknesses of the proposed loan, and wrote up his or her

analysis in an underwriting memorandum but made no decision on the loan. The loan as presented in

the underwriting memorandum was then discussed with the whole lending team, and especially with

the CLO, after which the CLO either approved the loan or disapproved it.  When a loan that the CLO

approved exceeded a certain threshold in amount, as did the Construction Loan, the CLO was required

to bring it to the Senior Loan Committee ("SLC") for further approval. The SLC was comprised of Walker,

Bank president Teri Williams, and Bank vice-president for lending Wanda Smith. And if an SLC-approved

loan exceeded $3 million, as did the Construction Loan, the SLC was required to bring the loan to yet

another authority—either the CEO or the board of directors—for still further approval. The Construction

Loan went through this entire process and was approved by Walker as CLO, by the SLC, and finally by

either the CEO or the board of directors as required.[4]

        37.     From the date of the Letter of Interest, the approval process took approximately

fourteen months, and closing of the loan took another four. There is no evidence of what, if anything,

occurred in the first eight months. The Bank obtained appraisals of the RRC on December 30, 2005.  The

first draft of an underwriting memorandum was generated and circulated to Walker and others on

March 7, 2006.  Further drafts were issued on May 1 and May 4. The May 4 version, without its

addendum and six exhibits, was signed by two members of the underwriting staff on May 22, 2006. The

precise dates on which the loan received its approvals are not in evidence, but it is clear that the CLO

---

[4] Kevin Cohee, the CEO and chairman of the board of directors, signed a document indicating that the loan had
been approved. It is unclear precisely what Cohee's signature indicated: that he had approved the loan in his
capacity as CEO or that the board, of which he was chairman, had approved the loan. There is conflicting evidence
from various bank employees as to which of these two approvals was required at the time. In any event, no one
disputes that the Construction Loan was approved at every required level.  And either way, Cohee had a weighty
say in the final decision, either as CEO or as a member of the board.

and SLC both acted on or before May 18, 2006.  On June 6, 2006, Walker, as CLO, sent to Rev. Groover a

commitment letter for the Construction Loan, and on June 13, 2006, Rev. Groover, for Charles Street,

accepted the Bank's offer of the loan, which then closed only on October 3, 2006.

38.     By letter of June 21, 2005, while the loan was making its way through the underwriting

process, Dennis Lloyd, as project manager for Charles Street, formally retained TCC to serve as the

Church's general contractor for rehabilitation of the RRC building "as previously agreed" and "subject to

ability to obtain funding to complete construction work." At some point between the Charles Street's

initiation of discussions with OneUnited and December 20, 2005, Frank Thomas developed an undated

"Uses of Funds" budget[5] for redevelopment of the RRC that he forwarded to Dennis Lloyd.  On

December 20, 2005, Lloyd forwarded this budget to Michael Miller at OneUnited, who in turn supplied it

to the Bank's appraiser for use in appraising the RRC. The budget shows a subtotal of $3,269,993 for

work on the structure and an additional $392,000 for work on the grounds.

39.     On December 31, 2005, while the construction loan was still under consideration,

Charles Street deposited at OneUnited $850,000 that it had received as a grant from the Lilly

Endowment for use exclusively in funding a pastoral residency program. The funds belonged to Charles

Street but were restricted in the use to which they could be put. The deposit took the form of a 15-

month certificate of deposit that was subject to an agreement with the Bank that permitted the Church

to withdraw up to $150,000 at any time for use in the program. When the Church made this deposit,

Charles Street and OneUnited contemplated that the certificate of deposit would later serve as

collateral for the construction loan, but only until the certificate of deposit matured. Rev. Groover

testified credibly that, though he was not generally involved in day-to-day communications between

---

[5] The Uses of Funds budgets, of which Thomas produced more than one iteration, do not identify the discrete
projects to which the funds are to be applied (such as build-out of offices, replacement of column footings, etc.).
Rather, they merely identify how much money is allocated in total to each of various categories of labor or
material (such as for concrete, drywall, rough carpentry, etc.).

Charles Street and the Bank, he did weigh in "to make sure that the bank had clarity and was in sync with the purpose of the deposit. . . . I needed to make sure . . . that we all understood that that money . . . could not be drawn down, could not be spent. It was intended for a deposit and collateral, which was agreed on by the bank." I find that the Bank received this message and understood that the funds were restricted—though it is quite possible that the information, once received, was not shared effectively with the underwriting staff. Given this borrower's problems with insufficiency of cash flow and debt coverage and the Construction Loan's excessive loan-to-value ratio (both of which will be discussed below), I find it highly improbable that the Bank would have agreed to accept the certificate of deposit as collateral for only a limited time—as it clearly did—if it had not known the funds to be of restricted use, effectively unavailable for a longer time or even for real use as collateral.

40.    In January 2006, OneUnited President Teri Williams made a marketing report to the Bank's board of directors in which she touted that "we secured a $850,000 deposit in our future Grove Hall branch from Charles Street Church in Roxbury." At the time, the Bank was pleased to have the large deposit, not for collateral—its value as collateral was mostly illusory—but to boost its overall deposits and to have a large institutional relationship on which to establish its branch in Grove Hall.

41.    On March 9, 2006, at a meeting of the CSAME/RRC board of directors, with Rev. Groover present, Dennis Lloyd reported on the status at that time of loan negotiations and construction plans. He explained that under proposals then being considered, he projected that the loan proceeds available for construction, after payoff of the balance owed on the FEDEEDG mortgage, would be just $2,900,000, which amount, he continued, "will not cover the original estimate submitted to the bank." "The strategy," he said, "is to modify the construction plans to meet the bank loan amount. The modifications would include not completing the lower basement level," approximately 37 percent of the square footage of the RRC. "This would create a savings of $1,200,000. The strategy is to add back into the project modification[s] that were changed from the original scope. These add-ins will be paid for from

the Capital Campaign fund." He went on to state that the proposed modifications would not affect the

projected income that the RRC would generate while completed. Minutes of the meeting show that Rev.

Groover recommended that the Church's Trustee Board should be informed "because major

modifications to the plans and specifications are being considered."

42.      On March 24, 2006, a meeting of the construction team—project manager Dennis Lloyd,

contractor Frank Thomas, and architect Michael Washington—was held to review the status and cost of

the RRC project. At the meeting, Thomas presented to Lloyd a proposal letter from TCC to Charles

Street, also dated March 24, 2006, for the RRC renovation project in the total amount of $3,199,744 and

an itemized Use of Funds budget for the same total. The Use of Funds budget specifies total

expenditures for the various types of labor and materials that the project will entail, but it does not

specify the portions of the project, the discrete tasks, in which the labor and materials will be used. It

does not permit a reader to determine which parts of the project the budget was intended to fund.

Minutes of the meeting indicate that "Frank Thomas provided numbers to Dennis for documentation for

the bank to move the process forward." That same day, Dennis Lloyd forwarded the revised $3.2 million

itemized budget to Michael Miller at OneUnited, saying "Attached you will find the revised estimate

from our contractor. He came in right on target."

43.      This new bid was an attempt by TCC to, within the $3.2 million construction budget that

OneUnited's loan would fund, design a loan-funded phase of the construction project that would, upon

completion, qualify the RRC for receipt of a certificate of occupancy. Frank Thomas fashioned this new

proposal, a reduction from his original bid and of the work it proposed to accomplish, by value-

engineering and studying the architect's plans and specifications, to determine what could be deferred

and what was necessary to obtain a certificate of occupancy. The proposal was distributed and

discussed at the meeting. Washington's minutes of the meeting show that Lloyd, Thomas, and

Washington agreed on a phased approach to construction, with a first, $3.1 million, loan-funded phase

of clearly identified items, and a second phase for up to the balance of "the original $4.3 million,"

provided the Church raised money to pay for the balance. The minutes indicate that Washington

insisted that "the [Church, Bank and TCC] agree that the $3.1 million budget must be clearly identified

because of the worst case scenario, no additional funding becomes available." "All agreed that the

revised approach will include the original, 4.3 million, complete scope with phasing that clearly shows

exactly what the 3.1 million scope is."

44.      By April 2006, Dennis Lloyd, Frank Thomas, and Michael Washington, collectively the

project team, were meeting weekly.

45.      On May 14, 2006, Dennis Lloyd sent a letter to Michael Miller at OneUnited supplying

information requested for the loan application. The letter said that the Church was at work on the third

phase of its V2V Campaign ("Phase III"); that the goal of Phase III was to raise $2,000,000 over a two-

year period; that this would be accomplished by having 1000 church members and individuals pledge to

contribute $2000.00; that Phase III was launched in June, 2005; and that as of March 31, 2006, 566

individuals had signed pledge cards. The letter did not indicate how much had been donated (as

opposed to merely pledged) to date in Phase III or otherwise account for the receipts, expenditures, and

balance of the overall campaign.

46.      On May 16, 2006, Dennis Lloyd and an attorney for (and member of) the Church, Fred

Dashiell, met with an attorney for TCC, Paul Hogan. The purpose of the meeting was to work out an

agreement under which $284,000 of the $3.2 million loan-funded construction budget could be diverted

to pay off the FEDEEDG mortgage. (The Church evidently had reason to believe at this time that the

FEDEEDG would accept $284,000 in full satisfaction of its claim and mortgage on the RRC property.)  The

meeting resulted in some points of agreement (though not a full final agreement, as more drafting was

contemplated): (i) Lloyd would approach the Bank about the prospect of using $284,000 of the loan

proceeds for compromise and payoff of the FEDEEDG mortgage by diverting a portion of the loan

proceeds that would otherwise fund construction; (ii) TCC's contract for construction of the RRC would

continue to incorporate the full scope of work detailed in the plans and specs as they existed; (iii) TCC's

compensation for the work would be reduced by $284,000 with the understanding that the lower

amount would mean reduced items of scope[6]; and (iv) the Church can buy back the items reduced or

removed with an injection of more capital, from its capital campaign.

47.     On May 18, 2006, at a meeting of the CSAME/RRC board of directors, with Rev. Groover

present, Dennis Lloyd made the following report to the board:

a.  that he was scheduled to meet with TCC and its attorney to finalize a revised and cost-

reducing construction contract;

b.  that $284,000 from one of the line items on the construction contract would be applied

to paying off the Church's outstanding debt to the FEDEEDG;

c.  that the Bank was aware of these changes;

d.  that the Bank's loan, "coupled with a $1,400,000 loan from the contractor," would make

the total construction cost of $4,600,000, excluding the soft costs; and

e.  that final approval of the loan was expected soon, and that construction was expected

to start shortly after that.

48.     Lloyd testified that no $1,400,000 loan from the contractor, TCC, ever materialized.

49.     The minutes of the CSAME/RRC board meeting of May 18, 2006, further indicated that

the average monthly intake of the V2V Campaign was $12,000 and that this was far below the expected

goal of $80,000 per month. The Campaign was at that time in the twelfth of twenty-four months of its

Phase III to raise $2 million.

---

[6] I fail to see how item (iii) (providing for reduction of scope) can be consistent with item (ii) (under which scope
and work would remain unchanged), but that is precisely how, in an email he circulated to the other participants in
the meeting, Hogan summarized their agreement; Dashiell responded that he could not have said it better.

50.     OneUnited appears to have approved the Construction Loan, at all three levels of

required approval, in or around May 2006 and certainly no later than June 6, 2006 (the date on which it

issued a commitment letter). In making their decisions to approve the loan, the CLO, then the SLC, and

then the CEO or the board of directors, had the benefit of one version or another (and maybe more than

one) of an underwriting memorandum and supporting exhibits that were prepared by the Bank's

underwriters.  A first draft of the underwriting memorandum, with an addendum and Exhibits A through

D, was produced and circulated to Walker and others in the loan department on March 7, 2006.  A

second draft, without exhibits, was circulated on May 1 (the "May 1 Draft"). Its exhibits were circulated

on May 2 (the "May 2 Exhibits"). A third and final draft of the underwriting memorandum was circulated

on May 4 (the "May 4 Draft"), again without exhibits. On May 11, the underwriters recirculated the May

4 Draft but this time with an addendum and revised Exhibits A through F (the "May 11 Exhibits"). The

email with which the May 11 draft was circulated said "I am forwarding to you the Charles Street AME

write-up with the changes discussed in today's SLC Meeting."  This email was circulated to Walker and

the other members of the SLC. It thus appears that the SLC members saw and discussed the May 4 Draft

and that they at least saw the May 11 Exhibits. The date on which the SLC approved the loan is not in

evidence, so it is not clear which of these drafts the SLC members received before they approved the

loan.

51.     OneUnited staff underwriters signed the May 4 Draft, without exhibits, on May 22,

2006; it is the only version of the underwriting memorandum that is signed, and the signed version does

not include the addendum and six exhibits. Walker testified that this signed version superseded all

previous drafts. He also testified that it was the only one seen and considered by the decision makers.

Walker's testimony on this last point is not credible because (i) emails transmitting earlier drafts (of

March 7 and May 1, 2006) show that they were circulated to Walker himself; (ii) a May 11, 2006 email

from John Estrada, a OneUnited in-house underwriter, to Walker and members of the SLC shows that

27

changes were made to the May 4 Draft in response to discussions at a meeting of the SLC held on May

11: "I am forwarding to you the Charles Street AME write-up with the changes discussed in today's SLC

Meeting"; (iii) at a meeting held on May 18, 2006, Dennis Lloyd reported to the board of directors of

CSAME/RRC had already been approved by OneUnited's "executives" and awaited only approval of the

board; and (iv) Walker oversaw the underwriting process, had knowledge of the various drafts and their

evolving details, and, as CLO, participated in the presentation of this loan to senior decision makers.

52.      The final version of the underwriting memorandum specified the terms of the

construction loan then under consideration.  It was to have a term of 18 months, with two 90-day

extensions at the borrower's option for normal construction delays. The principal amount of the loan

was to be $3,652,000.  Interest would start at 7.25 percent but later move with the prime rate, with a

cap of 13.25 percent. The loan would require payments of interest only during its term, with a balloon

payment due upon maturity; and, to fund the balloon payment, the memorandum further indicated that

the Bank "intends to offer the borrower permanent take-out financing," a five-year loan at prime plus 1

percent with payments during its term according to a 30-year amortization schedule. The loan would be

guaranteed by the District and secured by mortgages on the RRC and on the real property at 5 Elm Hill in

Roxbury, a single family home that at all relevant times has served as office and program space for

Charles Street.

53.      The construction loan would further be aided by the $850,000 deposit, which the

underwriting memorandum identified variously as a "reserve," a "reserve deposit," and "a certificate of

deposit in the amount of $850,000" that "the guarantor has pledged . . . for the term of the construction

loan."  The memorandum was thus unclear as to whether the $850,000 was to serve as collateral or a

mere reserve (and if the latter for what purpose and under what restrictions). The underwriters were

also wrong about the source of the deposit and its terms.  Charles Street, not the guarantor, was both

the depositor of the $850,000 and pledger of the deposit. And consistent with the agreement between

Charles Street and the Bank under which the deposit had been made, Charles Street had not agreed to pledge the deposit for the duration of the loan but only through the end of March 2007, at which time Charles Street would be free to withdraw it. The underwriters also failed to note that the deposit consisted entirely of restricted funds, funds that the Church was not free to pledge as collateral.

54.    The loan memorandum further specified the anticipated uses of the loan principal: $3,200,000 would fund construction costs, $165,000 would fund a "lender's contingency," meaning it would be available to fund construction overages upon lender approval, and $187,000 would fund an interest reserve, to fund interest payments over the term of the loan.

55.    This allocation of principal was expressly noted to be contingent upon the Church's "obtaining forgiveness or full standby" of the FEDEEDG's mortgage on the RRC property or "Contractor [*i.e.*, TCC] eliminating Line 144 of bid dated 3/24/06 (General Conditions) in the amount of $384,000."[7] This condition was intended to deal with the impediment of the FEDEEDG's mortgage on the RRC property. It makes clear that, if the FEDEEDG did not agree to voluntarily subordinate its mortgage to the mortgage that would secure Bank's construction loan, the Church would seek to fund its removal with funds from the construction loan itself, and balance the construction budget by getting the general contractor, TCC, to agree to reduce its compensation—and thus the construction budget—by the amount needed to pay off the FEDEEDG's mortgage.  This is what the May 16, 2006 meeting between TCC, the Church, and their respective attorneys was held to address.  The underwriting memorandum did not specify how the use of principal would change if this contingency were not satisfied.

---

[7] Thomas explained that the line item for "general conditions" was for "things like supervision, project management, staging, shoring, those type of items." Many were recurring, attendant to each stage of the project.

D.     **Factors Bearing on the Underwriting Decision**

56.     Each version of the underwriting memorandum contained a "Conclusions" section that, in its entirety, listed three strengths and four weaknesses of the Construction Loan and, as to each weakness, factors mitigating the weakness.

57.     The three listed strengths of the loan are identical in the May 1 and 4 versions and different by only a single word in the March 7 version.  In the May 1 and May 4 versions, the strengths read as follows:

- The property [*i.e.*, the RRC building] "As Completed" increases in value from $585K to $3.4 million providing the church with a valuable asset that can significantly increase its revenues.[8]
- The Church has a history of generating significant revenues and meeting its obligations, while fulfilling its mission.
- The guarantor(s) (FEDAME/FEDEEG) have both the cash flow and the financial resources to ensure timely payment of this debt service on this loan.

58.     The four listed weaknesses of the loan, as they appear in the May 4 version, read as follows:

- The Church does not have adequate cash flow to service this debt at the qualifying or start rate. This is can be [sic] partly mitigated by a forecast of post-construction cash flows based on new revenues from the renovated facility. It is further mitigated by an $850K reserve now deposited with OUB [OneUnited Bank], which more than covers one year's debt service at the qualifying rate. Finally it is mitigated by the guarantor's (FEDAME) financial strength.
- The Church's post-close liquidity is below OUB's minimum.  It is partly mitigated by an $850K reserve now deposited with OUB, which more than covers one year's debt service at the qualifying rate. It is fully mitigated by the guarantor's (FEDAME) financial strength.
- The LTV [loan-to-value ratio] before construction is poor at 369%. To mitigate requires tight control over the construction process through use of a Construction Manager to validate the budget and oversee the project. Lender has chosen Chuck Hasz Enterprises, Inc. and Hasz Fund control, Inc., a Fund control, Inspection and Construction Consulting company to manage this project for OUB.

---

[8] The word "significantly" did not appear in this sentence in the March 7 version.  This is the only difference between the March 7 version and the May 1 and 4 versions.

- The Appraisal "As Complete" results in a LTV of 96% which significantly exceeds OUB's maximum policy. This is mitigated by the added collateral in the form of a pledged certificate of deposit and the financial strength of the b [sic][9]

59.     The listed strengths and weaknesses of the loan raised six issues that the Bank's decision makers considered: (i) the adequacy of the Church's cash flow to service the Construction Loan or its take-out loan; (ii) the adequacy of the Church's liquidity upon entrance into the Construction Loan; (iii) the Church's ability to raise, through the V2V Campaign and external efforts, the monies need to fund (a) the balance of the construction costs that the Construction Loan would not fund and (b) debt service on the Construction Loan or its take-out loan beyond that which the Church could fund from its ordinary revenues; (iv) the extent to which the RRC would generate revenue that might help the Church meet debt-service on the take-out loan; (v) the adequacy of the collateral; and (vi) the significance of the District's guaranty in mitigating other concerns.

### 1.  Debt Service Coverage

60.     The first listed weakness was in the Church's ability to service the debt that would be created by the Construction Loan. The Bank's underwriters examined the Church's financial statements for 2003, 2004, and 2005, to determine the extent to which its income in excess of expenses in each of those years would cover debt service on the loan at both the start rate (determined using interest only) and, because the rate on this loan would adjust, at the "qualifying rate" (1% above the start rate). The analysis was set forth in Exhibit B to each underwriting memorandum. At the time of the March 7 draft, the parties were contemplating a start rate of 7 percent. By the time of the May 1 Draft, the start rate had increased to 7.25 percent.

61.     The Construction Loan was intended to be self-funding during its term. That is, until maturity, only interest would be payable, and the interest payments were to be funded from the loan

---

[9] In the May 4 version, including the copy signed by the underwriters on May 22, the fourth weakness ended just so, obviously incomplete.  This is the version that the Bank claims was presented to its decision makers. No correction or amendment was ever requested.

proceeds themselves. The Church's ability to service the debt remained a concern because, (i) if the loan required extensions beyond the point at which loan-funded interest reserves were exhausted, the Church would be obligated to fund all interest beyond that point from its own resources—indeed the Bank's practice was to require the borrower to fund interest reserves up front for the full term of the extension as a condition of agreeing to an extension; and (ii) the parties contemplated that the Construction Loan would, upon maturity, be paid by refinancing—it would be replaced by a five-year take-out loan that would require payments of principal and interest at a 30-year amortization rate over its term.

62.    The analysis in the March 7 Draft showed debt service coverage ("DSC"), a ratio of excess income (the income in excess of all other expenses) to the debt service it must cover in a given year, calculated using interest only.  In the exhibits to the March 7 Draft, the DSC was determined to be 0.52 for 2003,[10] 0.82 for 2004, and 0.74 for 2005 at the qualifying rate and 0.65 for 2003, 1.03 for 2004, and 0.93 for 2005 at the start rate. Accordingly, the first page of the March 7 Draft stated: "Debt Service Coverage: .74 and .93 based on 2005 actual church results at qualifying rate and start rate respectively." And in a section of the same draft dealing with the borrower's income and expenses, the report reiterated these findings and noted that both were "below OUB's requirement of 1.20", with DSC at the qualifying rate being "well below." And the email by which the March 7 draft of the underwriting memorandum was transmitted to CLO Arman Walker (among others) noted that "there are some real issues here." The inadequacy of debt service coverage was clearly one of them.

63.    The Bank's policy was to require a DSC ratio at the qualifying rate of at least 1.20. The policy did not absolutely prohibit the making of loans where coverage was less than 1.20, but it did

---

[10] That is, the Church's income and expenses in 2003 would have permitted the Church to pay only 52% of debt service at the qualifying rate.

require articulation of mitigating circumstances that would justify the making of the loan in the face of lower-than-policy-level DSC.

64.     The March 7 draft listed three possible mitigating factors for this weakness: "a forecast of post-construction cash flows based on new revenues from the renovated facility;" "a $250,000 reserve to be deposited with OUB, which covers one year's debt service at the qualifying rate;" and the guarantor's financial strength.

65.     In the May 2 Exhibits, the underwriter revised the DSC analysis in Exhibit B by adding back into income the amounts that the Church had expended in 2003, 2004, and 2005 to service debt on its operating loan, essentially treating this expenditure as one the Church would not incur while it was repaying the construction loan. As Arman Walker conceded at trial, the operating loan would continue to exist and need to be serviced both during construction and after completion of the RRC. It follows that there was no justification for this revision. There is no evidence as to why the underwriter made it. Nor is it clear whether Walker and other decision makers were aware of this error during the approval process.

66.     However, the faulty revision went a long way toward masking the inadequacy of debt service coverage. After revision, the May 2 Exhibits stated that the DSC ratios at the qualifying rate were 0.74 for 2003, 1.03 for 2004, and 1.13 for 2005; and the DSC ratios at the start rate (calculated in error using a start rate of 7.00%; the start rate had by this time increased to 7.25%) were 0.93 for 2003, 1.30 for 2004, and 1.42 for 2005 at the start rate.  Accordingly, the May 1 Draft (developed using the May 2 Exhibits), in its section on the borrower's income and expenses, stated that the DSC ratio was now 1.42 at the qualifying rate (based on 2005 figures) and "well above OUB's requirement of 1.20." It added, "[a]t the start rate the DSC is .93, still below OUB's requirement of 1.20. This is partially mitigated by the historical 2004 DSC at start rate of 1.30 and having a growing list of pledge commitments being developed by the borrower and fully mitigated by the financial strength of the guarantor."

67.     The May 11 Exhibits reflected a further revision of Exhibit B, using the start rate of

7.25%. This resulted in lower DSC ratios at the start rate:  0.90 for 2003, 1.25 for 2004, and 1.37 for

2005.  For two of the three years these lower ratios were still healthier than the Bank's policy limit.

Accordingly, the May 4 Draft, which is the final version of the underwriting memorandum and is based

on the May 11 Exhibits, stated that 2005 cash flow "provides a DSC of 1.37 at the interest only rate

which is well above OUB's requirement of 1.20."

68.     The May 4 Draft also stated, in its initial synopsis regarding debt service coverage:

"Based upon the consolidated projected income of the operating facility in years 1, 2, 3, 4 and 5 plus the

average of the unrestricted total cash income of the [Church] for 2004 and 2005 of $348K the DSC for

those same projected years would be 2.08, 4.01, 3.06, 2.50 and 2.16."  The May 4 Draft thus accepted at

face value the income projections for the RRC.

69.     Notwithstanding this rosy picture, the May 4 Draft continued to list as a weakness of the

loan that "the Church does not have adequate cash flow to service this debt at the qualifying or start

rate." This is perhaps attributable to a failure to amend the underwriting memorandum to conform to

the underwriters' revised analysis of DSC, as reflected in the May 11 Exhibits. Whatever the cause, the

May 4 Draft, as complemented by the May 11 Exhibits, sent erroneous and contradictory messages

regarding DSC.

70.     In none of its iterations did the underwriting memorandum address or mention two

further facts that bore on the Church's ability to service the debt arising from the Construction Loan.

First, although the May 4 Draft cited projected income from the RRC as an enhancement of the Church's

DSC, it failed even to note that the RRC could not begin to earn income until it was completed and that

the loan itself would not bring the facility to completion.  Second, it also failed to mention that in order

to complete the RRC, the Church would have to raise an additional sum—at least $1.3 million, and

probably more like $1.7 million—through its V2V Campaign and other efforts, both during the bank-

funded phase of construction and afterward, until construction was complete. This fund-raising would put extra strain on the Church's membership and essentially compete with the Church's ordinary operating budget for membership donations. Notwithstanding these omissions from the underwriting memorandum, Walker and, through him, the Bank's other decision makers were aware of both of these facts.

71.     The Bank's decision makers relied heavily on the guaranty, and what they believed was the financial strength of the guarantor, to mitigate concerns about the Church's cash flow and ability to service the debt that would arise from the Construction Loan.

### 2.   Liquidity

72.     The second weakness that each draft of the underwriting memorandum identified was liquidity. Each draft stated that "[t]he Church's post-close liquidity is below OUB's minimum." Nonetheless, in the May 11 Exhibits, the underwriter provided a revised analysis of liquidity that showed the ratio of the Church's liquid assets ($105,125) to its anticipated monthly debt service ($24,913) to be 4.22, which was healthier than the Bank's policy minimum of 3.0. Consequently, despite the announced weakness, liquidity was in fact no longer a concern or weakness in the narrow sense that the Bank measured it.

73.     The Bank's evaluation of liquidity was limited to asking whether the Church's liquid assets were at least three times the monthly debt service. The fact that the Church would need to raise at least $1.3 million dollars to complete the RRC did not factor into this particular analysis.

74.     The Conclusions section of the May 4 Draft stated that the weakness regarding liquidity was "partly mitigated by an $850,000 reserve now deposited with OUB." The underwriter was incorrect about this. The $850,000 "reserve" consisted of restricted funds and could not be used for construction or indeed for any purpose other than the Church's pastoral residency program; the Bank was aware that

the funds were so restricted; and, by agreement between the Bank and the Church, the Church had no

obligation to keep the funds on deposit after March 2007.

75.     The Conclusions section of the May 4 Draft also stated that the weakness regarding

liquidity was "fully mitigated by the guarantor's (FEDAME) financial strength." The Bank's decision

makers relied heavily on the guaranty, and what they believed was the financial strength of the

guarantor, to mitigate concerns about liquidity.

### 3.   Fund-Raising Ability

76.     The Church's ability to raise additional funds, through the V2V Campaign and external

efforts, was integral to the success of the construction project, the Construction Loan, and the RRC.

Funds would be needed for four purposes (presented here in the order in which these needs would

arise):

   a.   First, the Church would need to fund any amount by which the loan proceeds would

        prove insufficient to obtain a certificate of occupancy. The Construction Loan was being

        structured to include a contingency reserve, but the reserve might (and in fact did)

        prove insufficient.

   b.   Second, when it came time for the Church to begin servicing the Construction Loan or its

        take-out loan, the Church would need to raise additional sums to close the shortfall in

        its ability to service that debt.

   c.   Third, the Church would need to raise between $1.3 and $1.7 million to fund the

        balance of the construction costs that the Construction Loan would not fund. Without

        this funding, the RRC would remain incomplete, usable only for a limited purposes, and,

        most significantly, unable to generate rents that the Bank and the Church were counting

        on to aid with debt service.

d.  And fourth, the Church would need to raise funds to help CSAME/RRC meet its

operating expenses. CSAME/RRC supplied the Bank with projections of its income and

expenses for its first five fiscal years after occupancy of the RRC. They show that, in the

first three years after occupancy, CSAME/RRC expected that rental revenues would

underfund operating expenses (all expenses other than debt service on the Construction

Loan or its take-out loan) by $747,000 over the three years. During this period,

CSAME/RRC anticipated that it would fund this operating deficit with fundraising from

the V2V Campaign, foundation grants, and other external efforts. And CSAME/RRC

would be able to assist the Church with debt service during these years only to the

extent that its fundraising efforts exceeded the operational deficit.

|  | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Rental Income[11] | $0 | $243,000 | $364,000 | $521,000 | $756,000 |
| Expenses (other than debt service) | $446,000 | $435,000 | $473,000 | $489,000 | $506,000 |
| Operating Deficit | ($446,000) | ($192,000) | ($109,000) | $32,000 | $250,000 |
| Debt Service | $141,000 | $442,000 | $319,000 | $319,000 | $319,000 |

77.   The Bank and its decision makers were well aware of these needs for funds. Even before

they approved the Construction Loan, they repeatedly impressed upon the Church the need to raise and

save money to meet these needs. The Church understood that fundraising was imperative and did not

need to be told. Accordingly, in June 2005 the Church had launched Phase III of its V2V Campaign, with a

---

[11] Rental income is calculated without inclusion of projected "income" from the Hamilton Garrett Music and Arts Academy (HGMAA) because this item appears to constitute not new income but merely a transfer of existing income from the Church to CSAME/RRC and represents no net gain in resources.

goal of raising a further $2,000,000 over a two-year period. It planned to accomplish this goal by having

1000 church members and individuals pledge to contribute $2,000.00 each.

78.     As part of the loan approval process, OneUnited's Michael Miller requested information

about the status of the V2V Campaign. On April 14, 2006, Dennis Lloyd responded that as of March 31,

2006, 566 individuals had signed pledge cards.  Lloyd did not report how much had been pledged and

collected or note that 566 was far fewer than the 1000 pledging units that the V2V Campaign was

hoping to achieve.

79.     As of May 16, 2006, Lloyd, Rev. Groover, and the CSAME/RRC board of directors knew

that the average monthly intake of the V2V Campaign, then in its eleventh month of Phase III, was

$12,000, which the board of directors considered to be far below the expected goal of $80,000 per

month.

80.     The May 11 Exhibits included CSAME/RRC's projections, and the May 4 Draft included,

in its discussion of the Church's income and expenses, a summary of the projections, permitting any

reader to see that the budget was heavily reliant on gifts, grants, and financial campaign contributions in

its first three years.  The May 4 Draft added: "The Borrower has a growing list of pledge commitments

being developed by the borrower and the added financial strength of the guarantor."

81.      When the V2V Campaign entered into its Phase III in June 2005, it had already raised at

least $1.5 million from the Charles Street congregation in earlier phases. Nowhere does any draft of the

underwriting memorandum mention this fact or discuss the difficulty or feasibility of raising a further $2

million from the same group of people, the law of diminishing returns. The May 4 Draft addressed this

issue only obliquely, in its Conclusions section, when it listed as a strength of the proposed loan that

"[t]he Church has a history of generating significant revenues and meeting its obligations, while fulfilling

its mission." The issue did not elude Bank underwriter Tom Jones, who, in transmitting the May 2

Exhibits to Arman Walker, noted up front that the Construction Loan was "anchored on the receipt of

unprecedented lease and rental income, gifts, grants and campaign contribution (sic)[.]" Jones thus

pointed out, and Walker understood, that the loan relied heavily on projected rents and contributions

and that these were "unprecedented," meaning here speculative and based on no historical

performance record. No one at the Bank inquired into the soundness of the projections.

### 4.  Rents

82.     Noting the inadequacy of the Church's cash flow to service the debt arising from the

Construction Loan, the May 4 Draft stated that the inadequacy was "partly mitigated by a forecast of

post-construction cash flows based on new revenues from the renovated facility." These "new

revenues" are the rents that the completed RRC would generate. The projections supplied by

CSAME/RRC show that these would commence only in the second year after occupancy, which would be

at least the second year after maturity of the construction loan and the obtaining of a certificate of

occupancy. Rental income might be further delayed if the Church were delayed in raising the monies it

would need to complete the construction remaining after the loan-funded portion of the Project. The

various drafts of the underwriting memorandum included no discussion of the delay in rental income of

at least one year and possibly much longer.

### 5.  Adequacy of Collateral

83.     The Construction Loan was to be secured by mortgages on two parcels:  the RRC itself

and the single family home at 5 Elm Hill Avenue, which is located across Elm Hill Avenue from the

Church and serves as office and program space for the Church.  The Church obtained appraisals of both

properties from Robert P. Wood & Co., Inc. ("the Appraiser").  As of February 3, 2006, the Appraiser

valued the Elm Hill property at $405,000; and as of December 13, 2005, the Appraiser valued the RRC

property "as is" at $585,000 and "as complete" at $3,400,000.

84.     Using the "as complete" value, the total value of this collateral package was $3,805,000,

and the loan-to-value ratio (LTV)—a calculation of loan amount divided by appraised value of the

property securing the loan—was 95.98 percent. The Bank's policy maximum for this type of loan was 75

percent. The real estate collateral was thus considerably less valuable than the Bank's policy required.

All of this was detailed in Exhibit A of the May 11 Exhibits and in the May 4 Draft itself. Accordingly, the

May 4 Draft included among the loan's weaknesses that "[t]he Appraisal 'As Complete' results in a LTV

of 96% which significantly exceeds OUB's maximum policy."

85.     The May 4 Draft immediately after stated: "This is mitigated by the added collateral in

the form of a pledged certificate of deposit and the financial strength of the b" (sic). The additional

collateral referred to here is the $850,000 of restricted-use funds that, in December 2005, the Church

had placed on deposit at the Bank for 15 months. Though the Bank's representatives deny that they

knew the funds were restricted, they do not dispute that the terms of the deposit arrangement, and of

the pledge of this deposit as collateral, permitted the Church to withdraw the funds in March 2007. At

that point, the Construction Loan would be in only its sixth month; the loan proceeds would not be fully

advanced; and payment obligations would be, at best, a year in the future. Consequently, the pledge of

this deposit as additional collateral was largely window dressing:  it improved the loan's LTV ratio but in

fact served no true collateral purpose because it would disappear before the Bank might need to have

recourse to it.

86.     In a typographically garbled ending, the May 4 Draft also stated that the loan's poor LTV

was further "mitigated by . . . the financial strength of the b" (sic). Though the Bank's decision makers

did not ask for clarification, they appear to have understood it as a reference to the financial strength of

the guarantor, which would be consistent with three other paragraphs in the Conclusions section of the

same draft.

### 6.  The District's Guaranty

87.     It is unclear how the District's guaranty became a part of the Construction Loan,

whether the Bank requested it or the Church and District offered it unbidden. As part of the loan

application process, the District adduced, and the Bank formed its opinion of the District's financial

strength on the basis of, two sets of financial statements from the District: one for the fiscal year ended

May 31, 2004, and another for the nine-month period ended February 28, 2005.  These statements were

"consolidated" statements, meaning that they examined the District as a whole, including the District

Office, the two "district activities" (the FEDEEDG and the District's real estate leasing activities

("Leasing")), and the District's 330 member churches. The statements showed totals for these entities

combined and also separate numbers for the District Office, the FEDEEDG, Leasing, and, as a group, the

member churches. The statements made it possible to determine, with respect to any given line item,

such as cash, how much belonged to the District Office and how much belonged to the member

churches as a group.  The statements included balance sheets (entitled "Statement of Consolidated

Financial Condition"), statements of revenues and expenses, and statements of cash flow.

88.     These statements were "reviewed," not audited; a review involves less scrutiny than an

audit. The reviews were performed by certified public accountant Ralph Alston, who prepared reports to

accompany each set of statements. In these reports Alston stated that "[a]ll of the information included

in these statements is the representation of the organization" *i.e.*, the District; that he had reviewed the

statements but not audited them; that a review consists "principally of inquiries of the personnel of the

organization and the use of analytical procedures applied to the financial data"; and that "[b]ased on my

review, I am not aware of any material modifications that should be made to the accompanying financial

statements in order for them to be in conformity with the generally accepted accounting principles."

89.     Each set of statements was accompanied by end notes, and each statement stated that

"[t]he accompanying notes are an integral part of this financial statement." In each set of statements,

Note 1, entitled "Organization," stated:  "The African Methodist Episcopal Church organization grants to

the bishop of the First Episcopal District the authority to transfer funds at his discretion between

organizations and member churches of the First Episcopal District and/or the District Central Office. This authority also extends to any organization created or controlled by the District."

90.     In its report on the District as guarantor, the May 4 Draft of the underwriting memorandum accurately distilled and reproduced the following from the financial statements of February 28, 2005: that the District had consolidated gross revenues for the nine months ended February 28, 2005 of $67.3 million; that the District's consolidated balance sheet showed total cash of $23.3 million as of February 28, 2005; that for the nine months ended February 28, 2005, the District's consolidated operating cash flows were $17.1 million, and after capital expenditures, investments and advances to member churches, excess cash flows totaled $3.6 million; that the District's consolidated net worth as of February 28, 2005 was $409 million, more than 100 times the size of the loan under consideration; and, not least, that "[t]he African Methodist Episcopal Church organization grants to the bishop of the First Episcopal District full discretion to transfer funds between organizations and member churches."

91.     The May 4 Draft listed the guaranty as one of the loan's three strengths and noted that the guarantor had both the cash flow and the financial resources to ensure timely payment of debt service on the loan. The May 4 Draft also counted the guaranty as a mitigating factor for inadequacies in debt service coverage, liquidity, and loan-to-value ratio; with regard to liquidity, this factor was deemed "fully" mitigating.

92.     The Bank's decision makers relied heavily on the District's financial statements, but no one at the Bank undertook to verify them. The Bank accepted them at face value. In particular, the Bank made no inquiry into the authority of the bishop to move funds among member churches. Kevin Cohee contends that he had studied the tenets of the A.M.E. Church and satisfied himself that a bishop did in fact have this authority. Still, no one inquired as to whether and how, in practice, this authority was ever used, and subject to what existential constraints—local church needs, resistance of clergy and laity,

effects on giving, de facto restrictions on the use of funds. Nor is it clear that the Bank at any level ever

divided the District's total cash, net assets, income, and cash flow by 330, the number of local churches

to whom the vast majority of these belonged, to see that they appeared much less impressive on a

church-by-church basis.

93.    Three of the Bank's decision makers—executives who decided the fate of this loan at

one level or another—testified at trial: CLO Arman Walker, President and COO Teri Williams, and CEO

Kevin Cohee. Each voted to approve the loan, and each made clear in testimony that without the

District's guaranty, they individually, and the Bank as an organization, would not have approved the

loan. On the basis of the financial statement summarized in the May 4 draft, they believed the District to

be an entity of overwhelming financial strength and liquidity. They also believed the District had

demonstrated an interest in the success of this loan and would not let it fail. In their view, the District

had demonstrated this interest not only by guarantying the loan, but also by financing Charles Street's

acquisition of the Sky-Cap Building, later forgiving a portion of the resulting mortgage debt, and, through

the FEDEEDG, assisting Charles Street in its early efforts to develop the RRC. They believed the District's

bishop had not only the authority but also the will, resources, and freedom to mobilize the District's

collective resources to support this loan and the RRC project in whatever way, and to whatever extent,

might prove necessary. On the basis of this guaranty, the Bank approved a loan that, but for the

guaranty, it would not have approved.

### 7.  Bank's Understanding of Likelihood of Failure

94.    The Church alleges that the guaranty was crucial because the Bank's decision makers

believed the loan would or was likely to fail. Did the Bank's decision makers believe that the loan was

likely to fail? It is important to be clear about what it would mean for this loan to succeed and to fail.

The loan would succeed if the Church were able to complete Phase 1 of construction, obtain a certificate

of occupancy within the term of the loan, and thereupon pay off the Construction Loan with a Bank-

issued take-out loan whose payments the Church proved able to service. As the loan was conceived,

success did not require full completion of the RRC, so failure to complete the RRC would not be

tantamount to failure of the loan. Failure might take any number of forms, but three are relevant to the

Church's allegations. First, the Church might complete Phase 1 of construction, obtain a certificate of

occupancy within the term of the loan, and pay off the Construction Loan with a Bank-issued take-out

loan but then prove unable to service the take-out loan. Second, the Church might prove unable to

obtain a certificate of occupancy within the term of the loan because that objective turned out to

require more construction funding than the loan and the Church's separate resources together could

fund. And third, the Church might prove unable to obtain a certificate of occupancy within the term of

the loan because of construction delays, necessitating that the Church begin making interest payments

(because prefunded interest was exhausted), which the Church proved unable to make. (The loan was

designed to fund itself during its term of 18 months; during this period the loan required only payments

of interest, and these were funded from the loan proceeds themselves. There could be no failure for

inability to make debt service in these first 18 months.[12])

95.     Walker, Williams, and Cohee each testified credibly that they believed the loan would

succeed. Each acknowledged that the loan had weaknesses that bore upon the Church's ability to obtain

a certificate of occupancy and service a take-out loan: debt-service coverage and liquidity were weak,

and the Church's ability to raise further funds was uncertain. But each also stated that the loan had

strengths that, they believed, made it likely that the loan would succeed.

96.     Cohee emphasized that the size and objective of the loan had been made manageable,

that it was not necessary to complete the RRC or to raise another $1.5 million in construction costs. The

Church had only to obtain a certificate of occupancy, and the Bank had no reason at that juncture to

---

[12] As it happened, pre-funded interest lasted longer than the original 18 months, apparently because construction and other delays caused proceeds to be advanced later and more slowly than was initially envisioned.

believe that the Construction Loan would not fully fund that objective. They did know that $284,000 of

the loan was being diverted from construction to satisfaction of the FEDEEDG's lien, leaving that much

of the construction effort unfunded; but the loan as then contemplated was contingent on either

FEDEEDG's forgiveness of the lien obligation or the general contractor's reduction of its "general

conditions" line item by $284,000; the former option would avert any diversion of funds, and the latter

would reduce the cost of obtaining a certificate of occupancy by the amount of the diverted funds,

obviating any shortfall.

97.     Doubts existed about the Church's ability to fully service the expected take-out loan, but

as Williams emphasized, the Church had the ability to make *most* of the debt service, and given its

leadership, commitment, and earlier fund-raising success, it seemed likely that the Church could raise

enough to close the gap.

98.     All three viewed the guaranty of the District not only as a secondary source of payment

in the event of a default, but also as an indication that the loan had the backing of an entity with

significant resources that wanted the loan to succeed and, if Charles Street fell short on debt service or

on construction funding, would do all within its apparently considerable financial power to avert a

default on the loan or failure of the project. This overrode any concerns the decision makers might

otherwise have had about debt service and fund-raising ability.

99.     Given the importance of the District and its guaranty to the Bank's decision—the Bank

treated the District almost as a co-borrower—it is remarkable that the Bank did not examine the District

and its finances more closely, as it would have a borrower. The Bank's own policy manual stated that

"accommodation loans to poor credits based on the strength of a good endorser" were undesirable, and

that the bank "will normally decline these loan." The manual continued: "It is urged that if the loan

cannot be justified on its own merits, the loan should be made to the endorser, who then may loan the

proceeds to the party he or she wishes to accommodate." Cohee denied that an "endorser" here

included a guarantor, but his denial was neither persuasive nor credible. In relying so heavily on the guaranty without scrutinizing the financial strength of the guarantor more closely, the Bank ignored its own standards.

100.    Still, the Church has not demonstrated that the Bank misunderstood the District's financial statements, its financial strength, or its commitment to the success of the RRC project. In any event, I find—and indeed the Church does not doubt or dispute—that the Bank did truly believe that the District was so financially strong and committed as to warrant the considerable faith that the Bank placed in it.[13]

101.    I find that the views of these three decision makers are representative of all the Bank's decision makers as a group. By virtue of their positions in the Bank and roles in the approval process, these three were almost certainly the most significant voices in the process. The record includes no evidence of disagreement from other decision makers or advisers at any level of the process.

102.    For these reasons, I find by a preponderance of the evidence that, when it approved the Construction Loan, the Bank did not believe the loan would fail or was likely to fail. I further find that, although the Bank did not exercise the diligence that a reasonable person would have exercised in investigating the guarantor and its role in the Project (among other things), the Bank was not unreasonable in so believing.

### 8.  Other Factors

103.    In deciding to underwrite the Construction Loan, the Bank also considered and was motivated by two further factors. The first was that the loan was consistent with the Bank's mission of

---

[13] As it turned out, the District did not rescue the loan and the project in the manner that these decision makers expected it would.  However, by the time rescue became necessary, the country was in the grip of the economic recession that first affected this country in the late summer of 2008. This would have taken a toll on all the District's member churches and therefore on the financial strength and options of the District as a whole. Therefore, nonperformance and hindsight are of little use here.

economic and community development in Grove Hall and Roxbury. The Bank wanted to get behind the

RRC project because the project was good for the community. The Bank's witnesses so testified.

104.     The second factor was that the loan would establish a high-profile relationship that

would create good will and thereby help the Bank in its effort to open a branch in Grove Hall and to

develop deposits and loans in the area. One of OneUnited's business development strategies was to

target and develop relationships with African-American churches. And while this loan was under

consideration, OneUnited was planning to open a branch in Grove Hall, just a few blocks from the

Church. In conjunction with this branch opening, OneUnited targeted Charles Street in particular for its

deposits and loan business and also as a means of reaching the Church's members and others who,

through Charles Street, might come to know of OneUnited. OneUnited's Grove Hall branch did not open

until June 2007, but to publicize the opening, the Bank issued a press release that referred to the Bank's

relationship with Charles Street as a "catalyst for the Grove Hall branch." The Bank viewed its

relationship with Charles Street as an important complement to the Grove Hall Branch.

### 9.  Conclusion

105.     These two factors gave the Bank motivation to work with the Church to find a way to

approve the Construction Loan if at all possible. In the end, the Bank did fashion a loan it felt

comfortable approving. The loan did not meet the Bank's lending standards in several ways:  debt-

service coverage, liquidity, and loan-to-value ratio were all inadequate by the Bank's internal standards;

the Bank's analyses of these were seriously flawed; and the Bank did not adequately investigate

whether the District could bear the weight of reliance that the Bank was placing on it. Notwithstanding

these deficiencies in the loan and in the underwriting process, the Bank sincerely believed that the

Construction Loan would likely succeed. Given the District's backing and the limited amount of the loan

and of the construction it was designed to fund, the Bank believed that the risk of default was well

within tolerable bounds and that the loan warranted approval. Whether or not there was error and

perhaps some unwitting self-deception in reaching this conclusion, the Bank honestly believed the loan would succeed.

### 10.  No Evidence of Deception

106.     The Church has stated that its case for wrongful origination under Mass. Gen Laws ch. 93A is based only on alleged unfair acts, not also on deceptive acts. In that regard, I note only that the record contains no evidence that the Bank or its officers or employees misled the Church about the feasibility of the Construction Loan or of the RRC project as a whole. The Bank rejected the loan as originally requested, when it was far more ambitious and riskier for both the Church and the Bank, and worked with the Church to structure a loan that the Bank could live with. Aside from this, the Church adduced no evidence at all of communications between the Bank and the Church regarding the structuring and feasibility of the Construction Loan as it was finally approved.

**E.**     **Commitment Letter and Church Loan**

107.     On June 6, 2006, Arman Walker, as CLO, sent a letter to Rev. Groover (the "Commitment Letter"), notifying him that OneUnited had approved the Church's application for a construction line of credit (the "Construction Loan") and a real estate take out loan.  Per the Commitment Letter:

a.   The Construction Loan would be in the maximum amount of $3,652,000; have a term of 18 months, plus a maximum of two 90-day extensions upon payment of a ¼% extension fee with each extension; and have an adjustable interest rate, with a floor of 7.00% and cap of 14.00%, and interest only payable monthly in arrears.

b.   The take-out loan would be conditioned on the Church's obtaining a certificate of occupancy for the RRC; be in the principal amount of $3,652,000; have a term of 5 years, with monthly payments during that term according to a 360-month amortization schedule; have a fixed rate of interest at the prime rate plus 1.00%; and require payment of a fee of 1.00% of the loan amount.

c.   Both loans would be secured by 575 Warren Street and 5 Elm Hill Avenue.  As

"additional collateral," the Construction Loan would also be secured by, in the words of

the Commitment Letter, "$850,000 pledged by borrower for 15 months from 12/31/05

subject to an agreement to withdraw up to $150,000 for a related program."

d.   Both loans would require a "full and unconditional completion and payment guarantee"

from the District.

e.   The Construction Loan would require investment of "[m]inimum cash equity of 20% of

the total Project Costs, which based on the most recent project budget, totals $800,000.

All borrower equity shall be funded into the project (excluding funding of developer fee

and overhead) prior to any Bank construction loan advances."

f.   Both loans would prohibit the borrower from creating or permitting to exist any other

liens on the property without the Bank's consent.

g.   Both loans would require a maximum loan to value ratio of 80%. Notwithstanding its

insertion of this requirement, the Bank knew when it issued the Commitment Letter

that the loan did not satisfy this requirement.

h.   In conjunction with the Construction Loan: "The Borrower will submit a Construction

Budget and draw schedule to Bank for review. Bank will hire, at Borrower's expense, a

construction engineer/Project Manager, to review and approve the budget in

conjunction with Bank. The Project will be funded on a requisition basis in accordance

with the approved budget, subject to periodic inspections, interim review and approval

by Bank's appointed construction engineer/Project Manager."

108.   The Commitment Letter indicated that the commitment it expressed would expire on

June 13, 2006. On that date Rev. Groover signed the letter and thus expressed Charles Street's

acceptance of the loans on the stated terms and conditions.

109.     Also on or about June 13, 2006, the Church indicated to the Bank that it would transfer

to OneUnited some seven accounts that it then had at other banks, and it also asked the Bank to

refinance the working capital loan it then had with Citizens Bank, on which approximately $1 million was

then owed. The Bank immediately expressed interest in making this additional loan, the "Church Loan."

Internal emails show that the Bank was very pleased to be getting the accounts and the refinance of the

Citizens loan. Walker in particular responded: "[Y]es we are interested in their church loan, we may

actually reduce our risk by doing this loan and benefiting from the added collateral value." He

understood that there was excess value in the three properties that would secure the Church Loan, and

that, by virtue of cross-collateralization provisions, this excess value would strengthen what he knew to

be a weak loan-to-value ratio on the already-approved Construction Loan.

110.     The Bank began the underwriting process for the Church Loan immediately. This process

moved more quickly than did the Construction Loan's but still delayed closing on both loans until

October 3, 2006.

111.     In the meantime, the Church made progress on plans to satisfy and remove the

FEDEEDG lien on the RRC property. The District agreed to accept a payment of $284,000 from Charles

Street in exchange for full release of its lien, which secured debt of $520,000. On June 7, 2006, the

District's Chief Financial Officer, Clarence Fleming, sent a letter to Michael Miller of OneUnited,

informing the Bank of this agreement. The agreement left unresolved the issue of when, and with what

funds, the Church would pay the $284,000.

112.     Also on June 7, 2006, the Church entered into a memorandum of understanding (the

"MOU") with TCC. The MOU was intended to address two issues: in view of the fact that the

Construction Loan would not fully fund the RRC project, to clarify the scope of the work that TCC was

being retained to complete; and to specify the accommodation that TCC would make in its general

contract to help divert $284,000 of loan proceeds from construction compensation to satisfaction of the

FEDEEDG lien. The MOU was drafted by TCC's attorney and signed by Frank Thomas for TCC and Rev.

Groover for the Church.

113.    The MOU recited that whereas the project, in its entirety, was estimated to cost $4.7

million, and OneUnited had agreed to lend $2,915,744 [the $3.2 million slated for construction funding

minus the $284,000 that would be diverted to satisfaction of FEDEEDG's mortgage], and the Church had

demonstrated an ability to raise funds and intended to timely raise the balance of the $4.7 million, and

TCC was desirous of performing the work and was willing to work to facilitate the funding of the Project,

therefore (1) TCC "is prepared to complete the entire Project for $4,633,617"; (2) "Thomas understands

that if the Church is unable to produce supplemental funds to the Bank loan, certain deletions and

reductions in the work will have to occur to produce a viable renovated structure corresponding to the

amount of funding available, and, even if the Project is not entirely funded, and must be reduced, the

Church will still be able to obtain a Certificate of Occupancy and use the facilities as intended"; (3)

"Thomas acknowledges that initially, at the start of the Project, $284,000 of its general condition funds

will be used by the Church to satisfy certain encumbrances on the Project land; and the Church will then

work to replenish this amount during the Project with funds raised privately"; and (4) "The Church

pledges to work diligently to raise the funds needed for the entire Project, and to apprise Thomas of the

status of its fund raising during the Project so that Thomas will be in position to modify the Project as

discussed above should the Church fail to provide full funding."

114.    Regarding the uncertainty of funding beyond that which the Construction Loan would

supply, Thomas testified that the MOU established that TCC was obligated first to complete construction

to the point of a certificate of occupancy, and that TCC's obligation to complete construction beyond

that point would be contingent on the Church's ability to raise funds to pay for these further efforts.

This testimony was credible and consistent with the MOU.  It shows that Frank Thomas was not intent

on proceeding with Phase II parts of the project without assurance that his efforts and investments in

materials and subcontracts on Phase II would be funded. He understood phasing to be necessary to

protect his company's own interest. Far from being in contravention of the phasing that the Bank

contends it had insisted upon (but of which there no evidence, even in the Commitment Letter), it

furthers and is consistent with a phased approach to construction.

115.    Regarding the diversion of $284,000 to fund the payoff of the FEGEEDG mortgage, the

MOU amounted to an accommodation by TCC, permitting this amount to be taken from loan proceeds

that otherwise would have funded $284,000 of the "general conditions" line item in TCC's general

contract. However, the MOU also established that TCC was not waiving this $284,000 of compensation

but merely agreeing to defer payment on it until the Church could pay it with funds raised privately. On

June 19, 2006, Frank Thomas, as president of TCC, sent a letter to OneUnited, notifying the Bank of this

agreement, saying "Thomas Construction Company Inc. acknowledges that initially, at the start of the

Project, $284,000 of its general condition funds will be used by the Church to satisfy certain

encumbrances on the Project land; and the Church will then work to replenish this amount during the

Project with funds raised privately."

116.    On June 20, 2006, Dennis Lloyd sent an email to Michael Miller at OneUnited, with

copies to CLO Arman Walker and Rev. Groover, requesting that $284,000 of the $850,000 that Charles

Street then had on deposit with OneUnited be released to the Church for "emergency purposes." The

email explained that FEDEEDG had agreed to accept $284,000 from Charles Street as full payment of

$520,000 owed to FEDEEDG; that the Church intended to use the released $284,000 to pay this

settlement amount; that the $284,000 withdrawn from deposit would be replaced—i.e., the account

would be replenished—at the time of the closing on the Construction Loan (presumably from loan

proceeds, but the email did not specify a source); and that this request was an emergency because the

FEDEEDG needed the money by July 1, 2006 to fund another project, which was time sensitive and

would result in a loss if not timely funded. Nothing in the email indicated that the funds in question

were restricted and not available for the use to which the Church was proposing to put them. It is

unclear whether the Bank granted this request.[14]  Despite this request, the Bank did not reconsider or

question its opinion of the District's resources and liquidity.

117.     On July 13, 2006, at a meeting of CSAME/RRC's board of directors, with both Dennis

Lloyd and Rev. Groover in attendance, Carolyn Weeks, coordinator of the V2V Campaign, expressed

concern about the failure of the V2V Campaign to realize its fund-raising goal. Though minutes of this

meeting supply no details, it appears that the Campaign remained far off its target pace.

118.     On August 11, 2006, OneUnited's underwriters completed the underwriting

memorandum for the Church Loan. It shows that the Church Loan as then contemplated would be in the

amount of $1,115,000.  Of this sum, the parties contemplated that $1,040,000 would pay off the existing

loan from Citizens Bank, $72,250 would fund repairs to the roof of the church, and $2,750 would fund

other repairs.  It was to be a five-year, fixed-rate loan with payments of interest only until maturity,

when principal would be due in full.  This loan would be secured by mortgages on three Church-owned

properties:  the church building itself (the "Church Building"), which the Bank valued as of 7/21/06 at

$1,250,000; the adjacent property at 553-565 Warren Street (the "Storefronts"), consisting of

storefronts that the Church was renting out as office space, which the Bank valued as of 7/21/06 at

$700,000; and a single-family residence at 70 Sumner Street in Milton, Massachusetts (the "Milton

Property"), which the Church was also renting out, and which the Bank valued as of 7/19/06 at

$465,000. This loan would have no guarantor.

119.     The underwriting memorandum recommended approval of the Church Loan, and the

Bank did approve it. The date of approval is not in evidence.

---

[14] At the closing of the construction loan, loan proceeds were disbursed to "replenish $850,000 pledge
Agreement," but the amount disbursed for this purpose was only $182,628.09, leaving an unexplained discrepancy
of approximately $100,000. There is no other evidence on this point.

F.      **The Closing**

120.    On September 21, 2006, Dennis Lloyd issued a report as Executive Director of

CSAME/RRC, including a "Closing/Construction Update." In this update, Lloyd stated that the closing of

the Construction Loan was scheduled to occur between September 29 and October 6, 2006. He also

stated that "the current available cash flow of the RRC is low"—Lloyd did not specify how low—and "[a]s

a result the RRC presently does not have sufficient cash on hand to cover all the obligations needed to

cover all closing cost and construction soft cost (sic)." He went on to list the following closing costs and

construction costs that would not be funded by the loan:

Closing Costs not covered in loan amount:

| | |
|---|---|
| 1) Builders Risk Insurance | $ 62,000 (due at closing) |
| 2) Hazard Insurance | $ 7,890 (due at closing) |
| 3) Legal fee -B&S | $ 10,000 (est. due at closing) |
| 4) Potential Tax Liability | $123,000 |
| Total | $202,890 (due at closing) |

Construction Soft Costs:

| | |
|---|---|
| 1) Architectural Fees | $ 80,000 |
| 2) Engineering Fees | $ 20,000 |
| 3) Structural Underpinning | $ 140,000 |
| 4) GC General Conditions | $ 284,000 |
| 5) Add back Construction Cost | $1,200,000 |
| Total | $1,724,000 |

121.    This report does not indicate precisely how inadequate CSAME/RRC's cash resources

were to meet these collective needs.  However, the report establishes that two weeks before the closing

of the Construction Loan, the Church already owed some $240,000 in existing "construction soft

costs"—for architectural and engineering fees and another unexplained item identified as "structural

underpinning"—that would not be covered by Construction Loan proceeds and that the Church and

CSAME/RRC were expected to fund from their own resources. Lloyd also listed two further amounts that

were not then due but that the Church would eventually have to fund. The first was $284,000 to pay TCC

for that portion of its "General Conditions" line item that would be earned in Phase 1 of the project but
not funded from the Construction Loan; by agreement, payment of this amount was due only when the
Church raised the money to pay for it. The second was $1,200,000, which was Lloyd's estimate of the
amount that would be needed to fund Phase 2 of the Project; this sum would not be needed until after
Phase 1 was completed.

122.    The closing of both the Construction Loan and the Church Loan occurred on October 3,
2006.

123.    The Church Loan was a five-year loan in the principal amount of $1,115,000, with
interest at the fixed rate of 7.875 percent. It required payment of interest monthly in arrears, with the
entire principal balance payable as a balloon payment on December 2, 2011, its maturity date. To secure
this loan the Church gave the Bank mortgages on the Church Building, the Storefronts, and the Milton
Property.  The proceeds of the Church Loan were used to pay in full the Church's existing loan from
Citizens Bank; and the balance of $75,000 was paid out to the Church in cash.

124.    The Church had sought this additional $75,000 to make repairs to the Church Building,
mostly to its roof. However, closing costs for one or both of the loans turned out to be considerably
steeper than anticipated, or at least than the Church was otherwise able to fund, and therefore the
Church instead used these funds to pay closing costs on one or both of the loans. The Church
consequently was unable to make its repairs at that time. The Bank contends that this diversion of loan
proceeds from their stated purpose amounted to a breach of the Church Loan agreement, but the Bank
has cited no provision in the Church Loan agreement that required expenditure of these funds in
accordance with the purposes for which they had been sought, and I have found no such provision.
However, this diversion of loan proceeds from its original purpose does demonstrate that, even as early
as the closing, the Church's liquidity was challenged and inadequate.

125.     The Church Loan agreement also included the following provision regarding cross-

defaults:

> Any default of the Borrower's obligations hereunder shall constitute a
> default of all other instruments, documents, agreements and
> obligations of the Borrower with the Lender, including but not limited to
> that certain loan arrangement between the Borrower and the Lender in
> the original principal sum of $3,652,000.00, dated the date hereof and
> secured by a mortgage on property located at 565-575 Warren Street
> and 5-15 Elm Hill Avenue, Roxbury, Massachusetts, and any default of
> the Borrower's obligations (which shall include any other related entity
> of Borrower) under or pursuant to any other obligations or instruments
> with or to the Lender shall constitute a default of Borrower's obligations
> hereunder.

126.     The Construction Loan, a non-revolving line of credit, was in the maximum principal

amount of $3,652,000. It had a term of 18 months, with an expiration date of June 1, 2008, but could be

extended for two additional periods of 90 days each at the Church's option upon payment for each

extension of a fee equal to 0.25 percent of the then outstanding principal balance.  The entire principal

balance was due upon maturity. The interest rate was fixed at 8.00 percent for the first six months and

thereafter would float with the prime rate, subject to a floor of 7 percent and a cap of 14 percent.

Interest was payable monthly in arrears and, for the term of the loan, as extended (if applicable), such

interest payments would be funded from the loan proceeds themselves through an interest reserve (an

agreed arrangement under which the borrower prepays interest that the lender holds and pays to itself

in monthly installments as interest comes due).  To secure it, the Church gave the Bank mortgages on

the RRC Property and the Elm Hill Property and a pledge of its $850,000 deposit of restricted funds. The

District gave the Bank a guaranty of the Construction Loan.

127.     In conjunction with the closing of the Construction Loan, Rev. Groover, on behalf of the

Church, signed a pledge agreement that pledged the Church's $850,000 cash deposit as collateral for the

Construction Loan (the "Pledge Agreement"). The pledge thus effected was temporary: the Pledge

Agreement stated that "as long as the Borrower is not otherwise in default under any of its obligations

with the Lender, hereunder, or under any other loan documents delivered to the Lender in connection

with a certain $3,652,000 promissory note and/or a $1,115,000 promissory date (sic), both dated the

date hereof, the Lender agrees to release all Collateral held hereunder to the Borrower by March 31,

2007."[15] This provision is evidence, and I find, that the Bank knew and understood that the funds in

question were restricted. Nonetheless, the same Pledge Agreement, signed by Rev. Groover but

prepared by the Bank's attorney, stated: "The borrower represents the collateral is held and owned by

the Borrower free and clear of all liens, encumbrances, attachments, security interests, pledges, and

charges[.]" It is not clear whether Rev. Groover read this document before signing it or understood it to

mean that the funds in question were not restricted.

128.    The Construction Loan agreement included covenants obligating the Church, as

borrower, "[t]o complete the IMPROVEMENTS in accordance with the BUDGET and have them ready for

occupancy on or before the Maturity Date as contained in the Note" and (ii) "[n]ot to construct any

improvement on the PREMISES additional to those described in the BUDGET, without, in each instance,

the prior written approval of the LENDER."  Arman Walker testified that the latter provision was critical,

that unauthorized improvements can cause trouble in many ways. Nonetheless, and notwithstanding

that the Construction Loan would only partially fund a larger project that it knew the Church was eager

to complete just as soon as it could, the Bank adduced no evidence that this provision was ever

mentioned, much less emphasized, to the Church before, at, or after the closing.  It did not appear in the

Letter of Interest or the Commitment Letter. I have no reason to believe that the Church would have

known of it except by a close reading of this one of many lengthy closing documents that Rev. Groover

signed on October 3, 2006. It is unclear that Rev. Groover or Dennis Lloyd or anyone at the Church ever

took note of this covenant.

---

[15] It is undisputed that the Church did withdraw the funds around this date without objection.

129.     The Construction Loan Agreement also included the following provision regarding cross-defaults:

> [A]ny default of the Borrower's obligations hereunder shall constitute a default of all other instruments, documents, agreements and obligations of the Borrower with the Lender, including but not limited to that certain loan arrangement between the Borrower and the Lender in the original principal sum of $1,115,000.00, dated the date hereof and secured by a mortgage on property located at 551 Warren Street, Roxbury, MA, 553-565 Warren Street, Roxbury, MA and 70 Sumner Street, Milton, MA, and any default of the Borrower's obligations (which shall include any other related entity of Borrower) under or pursuant to any other obligations or instruments with or to the Lender shall constitute a default of Borrower's obligations hereunder.

130.     The Construction Loan agreement, promissory note, and mortgages each included a choice of law provision specifying that they it would be governed by Massachusetts law.

131.     At the closing, and in conjunction with the Construction Loan, the Church also entered into an agreement, entitled Project Owner's Representative Agreement, with OneUnited, Hasz Fund Control, Inc. ("Hasz"), and TCC.  (Only the Church signed the agreement at the closing; the other parties signed later.) This agreement created an independent fund control process, a protocol to be followed each time TCC, as general contractor, requested a disbursement of loan proceeds for materials and services that the loan was intended to fund. The function of Hasz, as the funds control agent, was to ensure that construction was being completed in accordance with the Bank-approved budget and plan and that subcontractors were being paid and not placing liens on the project property.

132.     The Church would have the Court find that "[t]he Bank never actually provided a commitment for take-out financing in the final loan documentation." This is true and I so find.  However, I also find that the Bank's commitment to the take-out financing was expressed in the Commitment Letter, which upon acceptance became binding on the Bank and did not require reiteration at the Closing.  Nor should the take-out loan have been issued at that time: the commitment to make a take-out loan was contingent on the Church's first completing construction to the point of obtaining a

58

certificate of occupancy. The absence of a take-out loan, or of a further commitment to such a loan, in

the closing documents is hardly evidence that the Bank believed the Construction Loan could not be

completed.

**G.      Construction: October 2006 to May 2008**

133.      On November 1, 2006, the Church entered into an agreement with TCC as general

contractor to construct the RCC for $2,915,744. The drawings and specifications that are referred to in

this contract are amended from an earlier iteration and are designed to get RRC only to a certificate of

occupancy. Dennis Lloyd confirmed that the Church had two contracts with TCC:  one for the

construction that would be paid for through the construction loan, and another that included additional

work of approximately $1.4 million that the Church would have to fund through other means. The

November 1, 2006 contract governed the project as Lloyd managed it.

134.      Once the Construction Loan had closed, the Architect still needed to file the new

building plans with the city of Boston's Inspectional Services Division for approval.

135.      After November 1, 2006, the Project immediately ran into delays and overruns.  These

were occasioned primarily by four preliminary construction issues that, for reasons that are not clear,

were not addressed in the construction contract on which the Bank's budget had been based or indeed

in any iteration of the contract between the Church and TCC. As Rene Mugnier's engineering studies of

January 2005 had pointed out, the footings for the support columns were inadequate and would need

to be replaced; the floor joists were inadequate and would need to be replaced or strengthened; and

the building would require an under-the-slab drainage system to prevent basement flooding.  Also, soil

tests that Mugnier had recommended found hazardous material in soil under the building, requiring

remediation. These matters needed to be and were addressed before work on the budgeted items could

commence. All were necessary for obtaining a certificate of occupancy.  Their precise cost is not in

evidence; nor is it clear how these were funded, from the construction contingency portion of the loan

proceeds or from the V2V Campaign. There is evidence that at least a part was funded from the V2V

Campaign, but the extent of this is unclear.

136.    The early months of construction were also affected by difficulties that TCC was having

with Hasz, the funds control agent. TCC's first application for payment, for $330,525, is dated January

12, 2007 but does not appear to have been submitted to Hasz until sometime in March 2007. Hasz and

the Bank did not finally approve and fund it until August 2, 2007. The precise issues between TCC and

Hasz at that juncture are unclear, but it is clear at least that Hasz requested considerable supporting

documentation that Thomas was slow to provide. Dennis Lloyd eventually saw the problem as placing

the Bank's construction funding in jeopardy. By email to Frank Thomas of April 11, 2007, he attempted

to set up a meeting to address this and another issue. Lloyd wrote: "This issue has to be resolved

immediately. Further delay by Thomas Construction in submitting the documents requested by [Hasz]

will place the construction financing provided by OneUnited Bank to Charles Street . . .  in jeopardy for

non-compliance." The issues were resolved, and, in general, subsequent applications for payment went

more smoothly on TCC's part, though payments still were slow in coming.

137.    On January 11, 2007, at a meeting of CSAME/RRC's board of directors, Dennis Lloyd

noted again that the V2V Campaign had underperformed, creating a risk of potential difficulties for the

RRC, and that he was particularly concerned that construction costs had increased much above earlier

estimates.

138.    In his email to Frank Thomas of April 11, 2007, Dennis Lloyd also sought to set up a

meeting of himself with Thomas, Michael Washington, Rev. Groover, the Church's Trustee Board, and

the CSAME/RRC's board of directors to address a second issue: "[s]caling the Roxbury Renaissance

Construction Project back to be in-line with the $2.9 million construction funding provided by

OneUnited Bank." Lloyd elaborated: "A meeting was recently held with OneUnited Bank and it was

agreed Charles Street Church should step back from the estimate of $4.2 million to complete the

Roxbury Renaissance Center Project and move forward to complete the project within the $2.9 million

construction funding provide by OneUnited. We realize there are possibilities the project will run more

than $2.9 to complete and to gain a Certificate of Occupancy. Charles Street Church will assume the

obligation for cost overruns in-line with a $2.9 million project. However, Charles Street has to back away

from its commitment to raising an additional $1.4 million to complete the Roxbury Renaissance Project,

at a total project cost of $4.2 million. Moving forward Charles Street will make improvements to the

Renaissance Center in phases to meet the original $4.2 million plan expectation as funding permits."

There is no other evidence in the record of the meeting with OneUnited that Lloyd refers to here, nor is

there evidence of whether the meeting that Lloyd was attempting to set up ever occurred and, if so,

what transpired. This email at least makes clear that from Lloyd's perspective, the Church faced enough

of a funding challenge just completing Phase 1 of the Project. As he would many times over the term of

the Construction Loan, Lloyd was bringing fund-raising needs and inadequacies to the attention of

Church leadership.

139.    According to minutes of a meeting of CSAME/RRC's board of directors held on June 7,

2007, the Board's members voiced further concern about the poor performance of the V2V Campaign

and determined that the Church's membership "should be informed that they're responsible for raising

funds to make up the difference between" the Bank's funding and the total cost of the project, including

overruns. Lloyd nonetheless testified that as of this time, the membership already knew of its obligation.

140.    In May or June 2007, OneUnited opened its new branch in Grove Hall, and Charles

Street hosted an event to celebrate and promote the opening. Two days before the official opening of

the branch, and at the Church's invitation, Bank CEO Kevin Cohee and other Bank officials attended

Charles Street's Sunday worship service. The attendees included Bank directors Melvin Miller and

Richard Carr. At the close of the service, Cohee spoke from the pulpit to the congregation. Afterward,

there was a reception, at which Rev. Groover ceremonially presented a physically large check to the

Bank, representing the $850,000 the Church had deposited at OneUnited at the very end of 2005. (By the time of this event, the Church had already withdrawn those funds from OneUnited.) Following the reception, Cohee, Rev. Groover, Dennis Lloyd, and a few others, with a number of parishioners, walked up to the branch, where members were given an opportunity to open deposit accounts at the Bank. The next day, Teri Williams told her team that the event had been a big success.

141.    On December 20, 2007, Dennis Lloyd issued a CSAME/RRC executive director's report. It provided an overview of construction work completed as of December 19, 2007, said that TCC was moving construction forward rapidly, and estimated that completion would occur in or by September 2008. Of the total loan proceeds of $2,915,000, he estimated that requisitions of $1,225,000 were either paid or pending, leaving a balance of $1,690,070.  He also indicated that the Church would have to raise $224,396 to cover some "hard and soft costs not covered by the Construction Loan."  It is clear from the items listed and the amount at issue that he was speaking of monies needed to complete Phase 1. Lloyd testified that at least by the end of 2007, he understood and had communicated to the CSAME/RRC board of directors that there were financial issues that threatened the ability of the Project to be completed before expiration of the Construction Loan.

142.    By the end of January 2008, anxiety about Project funding had spread to OneUnited. On January 29, 2008, Wanda Smith, who was then the construction finance manager for OneUnited, sent an email to Dennis Lloyd, saying: "I am very concerned however with how this project is going to be completed given the dollars available. To date, we have not received an accounting of the contribution promised by the Church that is intended to support any shortfall in the construction budget." She asked Lloyd to send her an accounting of funds raised to date and monthly updates going forward. She also requested that all supplemental construction funds be placed on deposit at OneUnited: "In view of the fact that the deposits held here at the bank for the church have declined substantially, we are requesting a separate account be set-up for the building fund only."

143.     On February 21, 2008, Dennis Lloyd issued another CSAME/RRC Executive Director's

Report and presented it to his board of directors. In it he said that the Project was approximately 44

percent complete, proceeding rapidly, and scheduled to be completed by early fall 2008, his best

estimate at the time. But he went on to say "the project is facing a major problem, and if not addressed,

we'll have adverse consequences to the point of slowing down or possibly stopping the project."  Here

he was talking about fund-raising problems. The report also indicates that the V2V Campaign was being

used not only to fund construction but also the administrative costs of running the RRC, including the

salaries of Lloyd as executive director and Carolyn Weeks as director of the V2V Campaign. The report

also indicated that from June 12, 2005, through February 21, 2008, some $416,000 had been raised, of

which $250,000 had gone to necessary administrative costs and the remainder, $166,000, to pay hard

and soft costs of the Project. Lloyd also indicated that (i) the Church was establishing a new "Capital

Campaign Account" at OUB, into which all monies raised by the internal (V2V) and external capital

campaigns would be deposited, and (ii) that a committee had decided that a portion of the monies

raised both internally and externally should be set aside for the RRC's administrative costs. He also

projected that the amount that the Church still needed to raise, over and above the $166,000 expended

to date, was $1,030,891, which included completion of the basement.

144.     In February 2008, the Church started to pay some Project expenses from its own budget

because the resources of the V2V Campaign were, if not entirely exhausted, at least inadequate. From

February through June 2008, the Church paid $117,471.33 for Project expenses, approximately $85,000

of which was for architectural fees.

145.     From March 20 to 24, 2008, Dennis Lloyd engaged in an extended email exchange with

Wanda Smith concerning the need for the Bank to expedite processing of a then-pending change order

request. Smith said that the request "would be depleting the Contingency Balance substantially." "[I]t's

rare that we see a need to disburse the majority of [the Contingency Fund] at this stage in the

construction process and for such a major item. I have concerns about the scope of work originally

presented and if there are additional problems identified, where the funds will come from." She closed:

"I do not see the fund raising deposits necessary to cover any additional problems that might be

discovered. Please advise of the status concerning this activity."

146.    In April 2008, Amanda Feng, who had commenced in OneUnited's employ just two

months earlier, took over from Wanda Smith as the Bank's "asset manager" in charge of Charles Street's

Construction Loan.  Her responsibilities included monitoring the construction project, reviewing and

approving disbursements of loan proceeds and communicating with Hasz regarding the same, and

requesting and reviewing the Church's and the guarantor's financial statements. She had frequent

communications with Dennis Lloyd. The first disbursement request she dealt with was the Project's

seventh. By email of April 10, 2008, she introduced herself to Lloyd and requested "an update on the

regular fund raising activities to prepare for any increase in the construction cost," and she asked "when

you will be planning to make deposits for the reserves and operating account." It is clear from the

frequency with which first Smith and then Feng asked about the status of the Church's fund-raising

efforts that Lloyd was not being forthcoming about their sorry state.

147.    In a CSAME/RRC executive director's report dated May 22, 2008, Dennis Lloyd reported

on a May 7, 2008 meeting between Frank Thomas and the Church's Trustee Board. Thomas stated that

construction on the project was moving forward but also that he had concerns about the ability of the

Church to meet its financial obligations.  Lloyd stated that, at that time, amounts due for soft costs

included $70,640 to Thomas, $29,159 to the architect, and $118,441 in all.  Thomas told the Trustee

Board that if CSAME did not raise enough money to keep pace with construction hard and soft costs, the

project could be delayed or stopped.  Thomas still anticipated completing construction by September

2008.

**H.**    **Two Optional Extensions: June 2008 through November 2008**

148.    The expiration date of the Construction Loan was June 1, 2008.  As that date

approached, it appeared that construction would be at least three months from complete, and

therefore the Church elected to exercise its contractual option to extend the loan by an additional

ninety days. The only requirement for exercise of this option was payment of a fee equal to one-quarter

of one percent of the then-outstanding loan balance. The Church accordingly paid a fee of $5,175.53,

and, by Rev. Groover, signed a form of extension agreement that had been drafted and supplied by the

Bank (the "First Extension Agreement"). Dated May 21, 2008, it extended the maturity date to

September 1, 2008.

149.    The First Extension Agreement contained the following language, inserted by the Bank:

"The Borrower represents and warrants to the Bank, and agrees, that the Borrower has no defenses,

setoffs or counterclaims to the payment of their respective liabilities and obligations to the Bank under

the Loan Documents including without limitation the Note, if any.  To the extend [sic] any such defenses,

setoffs or counterclaims ever existed, Borrower hereby irrevocably waives them, and the Borrower

hereby releases, remises and forever discharges the Bank, its agents, directors, officers, employees and

attorneys." Before Rev. Groover signed the First Extension Agreement, he and the Church could have

consulted with an attorney but did not. Nor did they protest or attempt to negotiate about the inclusion

of this language as a condition of exercising a contractual option.

150.    On July 22, 2008, Amanda Feng sent an email to Dennis Lloyd requesting (i) the original

construction plans together with specifications and draw schedule, (ii) the 2007 financial statements and

tax returns of both the Church and the District, and (iii) a fund raising report. On August 1, 2008, Feng

had received no response and sent a follow-up request. On August 6, 2008, with still no response, she

sent a second follow-up, adding: "As you are aware, the loan is currently due on 09/01/2008. Therefore

if you plan to exercise your last extension option, it's highly recommended for you to send in such

request in writing so the Loan Service Department can respond in a timely manner." On August 15,

2008, with still no response, Feng sent yet another follow-up, adding: "I do need answers on the

questions in order for me to approve the pending disbursement request."  On August 21, 2008, Lloyd

finally responded: "I'm in the process of pulling this information together. I will have it to ASAP (sic). I

apologize for the delay."

151.     In this same month, August 2008, the national economy descended into a recession.

152.     On September 1, 2008, the Construction Loan reached its maturity date as extended by

the First Extension Agreement.  Construction still was not complete, and therefore the Church elected to

exercise its option for a second ninety-day extension. Again, the only requirement for exercise of this

option was payment of a fee equal to one-quarter of one percent of the then-outstanding loan balance,

in this instance $6,262.43. The agreement for this extension (the "Second Extension Agreement")

extended the loan to December 1, 2008. It is dated September 26, 2008, but Rev. Groover signed it only

on Nov. 20, 2008 because the Church did not have the funds to pay the fee earlier. As the RRC was not

at that time close to ready to receive a certificate of occupancy, a further extension would be required

in just ten days. Though the loan had been matured for some 81 days before the Church effectively

exercised its option for a second 90-day extension, the Bank worked with the Church and did not declare

a default, call the loan, or otherwise take enforcement action during this period. The Second Extension

Agreement contained the same waiver language as the first. Again, the Church could have consulted an

attorney but signed the extension agreement without consulting an attorney and without negotiation or

push-back over the waiver.

153.     On October 25, 2008, in the latter half of the second loan extension, Dennis Lloyd sent

an email to Rev. Groover about the Project's financial situation. He informed Rev. Groover that the

capital campaign had a balance of $2,000 to address existing debt of $100,000, including $61,000 to TCC

for sub-contractor work not covered by the Construction Loan, $5,200 for liability insurance, and $6,252

to fund the second extension of the Construction Loan (under which they were then operating but for

which they had not yet paid); that payroll of four RRC staff members was due and unfunded; that he

expected income and fundraising to stagnate and potentially decrease because the economy was in a

recession with no end in sight and the months of November through February are difficult months to

raise money; and that debt will continue to accrue. He added: "My prognosis is if the capital campaign

(both internal & external) do not increase the pace and amount of money raised to support the RRC we

will have a financial meltdown. With the risk of sounding negative but truthful, I believe the RRC in Its

current financial situation is already in a financial meltdown. However, the reality of the impact from the

meltdown has not been fully felt." Rev. Groover shared this assessment with the Church's Trustee Board

and congregation.

154.    On November 5, 2008, Frank Thomas sent a short email to Rev. Groover and Dennis

Lloyd: "Rev. Groover and Dennis, This is where we are right now.  I need to get people paid NOW.  Past

Due $61,419.00.  Now due to sub. [subcontractors] $35,780.00.  Total Due NOW $97,199.00." He added

that this total did not include amounts owing for general conditions, which he said would be

approximately $40,000 by November 30, 2008.

155.    On November 20, 2008, the same day the Church paid the fee for the second extension,

Dennis Lloyd authored a memorandum to Rev. Groover and Rev. Opal Adams regarding RRC

"Project/Administration Finances." It shows that as of that date, CSAME/RRC had a total of $2,470.50 in

its capital campaign and accounts and $156,475 in pending or overdue construction and administrative

costs.

156.    On November 26, 2008, Amanda Feng emailed Dennis Lloyd with a summary of

documents and information that the Church would have to provide her before the Bank could approve

and pay TCC's then-pending eighth disbursement request. These included "cost breakdown and

narrative explanation of payment resources," "estimated completion date," "fund raising status and

available documents to support such," and "detailed interest reserve resources in the event that

another extension is required at loan maturity."

**I.      Three Loan Modifications: December 2008 through November 2009**

157.     Near December 1, 2008, the end of the second optional loan extension, the Church

appealed to the Bank for more time. The Bank prepared and offered the Church a modification

agreement (the "First Modification Agreement,)" which Rev. Groover signed for the Church on

November 28, 2008 without negotiation or modification. The First Modification was contingent on

payment of a modification fee of $12,525.09 by November 30, 2008, but the Church was able to make

the payment only on December 9, 2008, and the Bank accepted the payment when made. The

modification agreement extended the maturity date to February 28, 2009. OneUnited's internal policies

and procedures required that the First Modification Agreement be approved by the Bank's Internal

Asset Review Committee ("IARC").

158.     The First Modification Agreement included waiver language that was nearly identical to

the waiver clauses in the two extension agreements: "The Borrower represents and warrants to the

Bank, and agrees, that the Borrower has no defenses, setoffs or counterclaims to the payment of their

respective liabilities and obligations to the Bank under the Loan Documents including without limitation

the Promissory Note, if any. To the extend [sic] any such defenses, setoffs or counterclaims ever existed,

Borrower hereby irrevocably waives them, and the Borrower hereby releases, remises and forever

discharges the Bank, its agents, directors, officers, employees and attorneys." Before Rev. Groover

signed the First Modification Agreement, he and the Church could have consulted with an attorney but

did not. Nor did they attempt to negotiate about the inclusion of this language.

159.     On December 1, 2008, the Church's Trustee Board held a specially called meeting

regarding the critical state of the Project. Dennis Lloyd presented a construction update and said the

Project was facing past-due bills of $161,700 (including $12,525 for the loan modification fee) that

needed to be paid for construction to continue without interruption. The Trustees were concerned

about construction stopping, which they felt would have been devastating. Rev. Groover proposed

foregoing all Church holiday gift-giving and celebrations and instead asking all Church members to

provide a special Christmas gift to the V2V Campaign of $300 or more. This proposal was voted on and

approved unanimously.

160.      On January 7, 2009, Dennis Lloyd, describing himself as "a clarion of bleak news," sent

another email to Rev. Groover about the state of Project finances. As he related, TCC had stopped

construction and was refusing to continue until approximately $100,000 then owed to TCC was paid.

Lloyd also pointed out that internal fund raising for the Project had essentially dried up; that members

just didn't have the money, especially in the economic crisis that then existed, to meet the needs then

existing and that would arise; and that the Church had no strategy for continued internal fund raising.

He reported that the "Christmas Gift Campaign" had fallen short of its goal to raise $100,000, reaching

to date just $44,376. He said the Church had made a request for a further extension of the Construction

Loan to June 30, 2009, and that OneUnited had indicated that if they underwrote that further extension,

it would be the last.  He further pointed out that upon the completion of construction, the Construction

Loan would be replaced by a permanent loan requiring payments of $30,000 per month, but the Church

had "never raised $30,000 on a continuous basis."  Lloyd added that this could result in "legal problems"

with OneUnited. This was the first time Rev. Groover became aware of potential legal problems—on top

of the extreme financial challenges, of which he was already well aware.

161.      On January 12 and 14, Frank Thomas sent two further emails to Dennis Lloyd. In the first

Thomas told Lloyd in no uncertain terms that TCC would not continue work on items outside the bank-

financed scope of work—he did not specify what these were—without proof of financing for the work.

In the second, he made clear the effect of the Church's nonpayment on TCC and the subcontractors:

"Dennis these people are getting sick and tired of waiting for money. I need it now. . . .  Suppliers are

shutting me and my subs off for lack of payment.  Finance charges are being assessed at a high rate due

to your failure to fulfill your obligation. . . .  I can no longer hold people off."  Attached was an email to

Thomas from one of his subcontractors, saying he needed payment to meet that week's payroll.

162.     By late January 2009, the Church was operating on a Sunday-by-Sunday basis.  Its

Budget Planning Committee was meeting to implement strict control of expenses. The Church had

concerns with heating, air conditioning, and capital maintenance that it did not have funds to address.

163.     On or around February 10, 2009, Amanda Feng called Clarence Fleming, the District's

CFO, to inquire about the total amount of debt the District was then guarantying.  In a letter to Feng

dated February 10, 2009, Fleming's response included the following: "As discussed with you today The

First Episcopal District does not track loan Guarantees. The reason is that our practice is to rescue any

one of our churches that is troubled, for that reason we view each church as having a 'built in'

guarantee."

164.     At a meeting of the Church's Trustee Board on February 17, 2009, Dennis Lloyd

circulated a report on the status of the RRC. It stated: TCC was refusing to continue work until the past

due amount owed to TCC was paid; TCC was owed a total of $246,000, of which $141,000 was owed by

the Church and $105,000 was the subject of a pending disbursement request to the Bank; OneUnited

was withholding further disbursements until the interest reserve was replenished with $120,000  to

cover the duration of  a further extension to complete the Project; if the Bank did not agree to a further

extension beyond February 28, the Church could face foreclosure efforts by OneUnited; and in addition

to the amount it owed TCC, the Church also owed $46,028 to other entities for the Project.

165.     On February 28, 2009, the Construction Loan as extended by the First Modification

Agreement matured with the RRC still not ready for a certificate of occupancy. Though the Church had

requested a further extension and, prior to February 25, 2009, had deposited at OneUnited $120,000 to

replenish the interest reserve, which was a condition of the further extension, the Bank had not yet

forwarded an agreement for signature. On March 10, 2009, Amanda Feng forwarded an agreement (the

"Second Modification Agreement") to Dennis Lloyd, and Rev. Groover signed it that day. The Second

Modification Agreement extended the maturity date by four months to July 1, 2009, and it contained

the same waiver language as appeared in the First Modification Agreement. Before Rev. Groover signed

the Second Modification Agreement, he and the Church could have consulted with an attorney but did

not. Nor did they attempt to negotiate about the inclusion of this language. Rev. Groover explained that

the Church obtained the $120,000 for the interest reserve from two sources: "$80,000 of it was given to

us through a grant arranged and assisted by the late Mayor [of Boston] Thomas Menino. The other

$40,000 came from a transfer from the Lilly Endowment." That is, the $40,000 was paid with restricted

funds, funds the Church was bound by agreement not to use for this purpose.

166.     On March 18, 2009, Amanda Feng emailed Dennis Lloyd. The email included the findings

from a property inspection of the Storefronts, one of the three properties that secured the Church Loan,

to the effect that its roofing had exceeded its expected life-span and was in rough shape. "I would also

like to find out how the $72,250 cash out at loan closing, which was supposed to be used to repair the

roof, was/is utilized as it doesn't seem like it was used for the designated purpose. Please be reminded

again that this is a serious matter and we would like to see immediate actions taken to cure the deferred

maintenance." Feng was wrong about the purpose of the $72,250:  its intended use had been to repair

the roof of the Church Building, not of the Storefronts. Nonetheless, Lloyd looked into the matter and

determined that the Church had not used the funds on the Church Building's roof because it had used

them instead to cover unanticipatedly high closing costs for the Church Loan, including payoff of the

Citizens loan. Payoff of the Citizens loan had cost about $10,000 more than had been anticipated,

leaving cash out of only $65,000, which was fully consumed by closing costs.

167.     Around this time, the Church's properties needed repairs. Roofs were leaking in the

Church Building, the Storefronts, and the Milton Property. The latter two properties, both of which were

rental properties and sources of income for the Church, suffered serious water damage from heavy rains, necessitating that their tenants move out and leaving both buildings in need of extensive repair. As Rev. Groover testified, the Church had no money to address these because everything that did not fund the Church's operational expenses of was going into the RRC.  Also, the loss of tenants in these properties deprived the Church of the monthly income these properties had previously generated.

168.    In the twelve months ended May 31, 2009, the Church expended $263,906.70 from its own operational budget to pay Project expenses. Only one item on the itemized list of these expenses appears to have been for work that was not within the scope of Phase 1: a September 2008 payment of $20,000 for an item designated as "Audio Systems." Frank Thomas testified, credibly I find, that the only work that he or his subcontractors did that would be considered Phase 2 work was the installation of wiring for audio-visual systems at a total cost of $80,000. He decided to do this—presumably in consultation with Dennis Lloyd, but there is no evidence on that point—because it would have cost much more to install the wiring later, after the walls were sealed up. The sealing of the walls *was* part of Phase 1. However reasonable this decision may have been, the Church did not first obtain the Bank's authorization to do it or even notify the Bank that it was doing it. Though this item was paid in September 2008, it is unclear when the underlying work was done.

169.    On June 2, 2009, the Church's Trustee Board met and authorized the Church to secure a loan from Tremont Credit Union ("Tremont") in the amount of $400,000 for the purpose of making repairs to Church property and paying RRC-related expenses. This borrowing was intended to provide, among other things, $85,000 to replace the roof of the Church Building, $121,000 to replenish the interest reserve in conjunction with a further extension of the Construction Loan, and $50,000 to pay down (in part) the debt to TCC. The Church did request and Tremont did approve a loan to the Church of $400,000. The date on which the loan closed and its funds were disbursed is not in evidence; nor are the terms of the loan. The Church obtained this loan without notice to or permission from OneUnited.

170.    In May 2009, Dennis Lloyd requested a further three-month extension of the

Construction Loan, from July 1, 2009 to September 30, 2009. On June 9, 2009, in response to an inquiry

from Dennis Lloyd about the status of the request, Amanda Feng asked for information she would need

to process the request and added: "You are strongly recommended to plan enough time for the

conversion period [for conversion to the take-out loan] as the conversion requirements take time to

materialize. Therefore, I am recommending 5 months extension if you are certain the construction will

be completed in 3 months. The total interest reserves in need will be $106,516.67. Should the

conversion happen before the end of 5 months period, the interest reserves will be used to reduce

principal balance." Lloyd communicated to her that the Church was requesting a five month extension,

as she had recommended.

171.    On June 30, 2009, Dennis Lloyd prepared an update on the RRC for the Church's Annual

Conference of that same date.  In it he stated: construction work will be completed in early fall; three to

four months of work remain, and this timeline "is based on the church raising funds to support

construction in a timely manner"; OneUnited is willing to give the Church a further five-month extension

that will require $106,095 to replenish the interest reserve and $13,579 as an extension fee, a total of

$120,095; and Charles Street owes some $213,270 is past due bills for the project, including $161,274 to

TCC.

172.    On July 1, 2009, the maturity date as extended by the Second Modification Agreement,

the RRC still was not ready for a certificate of occupancy. That same day Dennis Lloyd notified Amanda

Feng that the Church anticipated being able to pay the requisite modification fee and replenishment of

the interest reserve on or about July 22 or 23. Notwithstanding the Church's inability to fund the

modification costs until later, OneUnited took no action to enforce or call the loan after July 1 but before

the modification became effective. Only on September 10, 2009, did OneUnited forward a further

modification agreement (the "Third Modification Agreement") to the Church, and only on September

19, 2009 did Rev. Groover sign it. The reasons for these delays are not in evidence. The Third

Modification Agreement extended the maturity date five months, to December 1, 2009.  For this

extension the Church paid $106,516.67 to replenish the interest reserve and $13,579.27 as an extension

fee, and it funded this payment with proceeds of the loan from Tremont.

173.     The Third Modification Agreement contained the same waiver language as appeared in

the two earlier modification agreements. Before Rev. Groover signed the Third Modification Agreement,

he and the Church could have consulted with an attorney but did not. Nor did they attempt to negotiate

about the inclusion of this language. With respect to each modification and extension agreement, Rev.

Groover believed there was no room for negotiation about terms. He also believed he had no choice but

to obtain these extensions and to plow ahead with the Project to completion. He believed that anything

else would have been disastrous for the Church, the morale of the congregation, and the Project.

174.     As planned, the Church used $50,000 of the Tremont loan's proceeds to pay down its

debt to TCC. Nonetheless, on September 28, 2009 TCC sent an invoice to the Church for a balance owing

(after application of the $50,000 payment) of $224,025.68. The invoice stated that failure to pay the

invoice within 14 days "will cause a delay in completing the work in a timely manner." And "all expenses

must be paid in full before a certificate of occupancy will be issued." The invoice indicated that the

completed work for which payment was sought was in most cases over one year old. Approximately

$180,000 of the total was for general conditions; it appears that Frank Thomas now felt free to disregard

TCC's agreement to wait for payment of its general conditions until the Church had raised the money to

pay for them. The listed items included nothing that appeared to be Phase 2 work.

175.     On November 4, 2009, Dennis Lloyd sent an email to Amanda Feng requesting a further

extension, of another five months, beyond the December 1 maturity date.  He reported that

construction was approximately 90 percent complete but would not get to a certificate of occupancy by

November 30, 2009. "The construction work should be completed before the April 30, 2010 date." This

email did not explain why the Project was not yet complete.

176.     Despite many requests from Feng and others at OneUnited, Lloyd never informed the

Bank of the amount it owed to TCC beyond that which the loan would fund, of the inability of the

Church's fund raising to keep pace with the demands of the Project, and of TCC's refusal to perform at

least some of the necessary work for nonpayment. Nonetheless, until this time the Bank consistently

worked with the Church to extend the loan. As a result, the Construction Loan had reached a term of 36

months: the original 18, two optional extensions of 3 months each, and three agreed modifications

adding 3, 4, and 5 months respectively.

**J.      Construction Loan Matures: December 2009 to July 2010**

177.     On December 1, 2009, the maturity date as extended by the Third Modification

Agreement, the RRC still was not ready for a certificate of occupancy. Though a request for further

extension remained pending, and negotiations continued for some time, the parties never agreed on a

further extension. The reason is unclear. A further extension would at a minimum have required a

$120,000 replenishment of the interest reserve, and it is doubtful that the Church could have paid that

sum. Around that time, the Bank was also demanding that remediation be completed on the Storefronts

and the Milton Property, and that too was financially impossible. Also, the Bank believed that the

Church was not being forthcoming about the progress and finances of the Project.

178.     In any event, as of December 1, the loan became due and payable in full, and the Church

did not pay it. The Church had counted on a permanent take-out loan to pay off the Construction Loan,

but without a certificate of occupancy, the Bank would not make a take-out loan.

179.     When payment was not made, the loan went into default. Nonetheless, the Bank did

not then declare a default or otherwise take collection action. Bank president Teri Williams participated

in efforts to try to work the situation out.  She organized a meeting between Dennis Lloyd and

representatives of the Boston Symphony Orchestra to try to organize a concert to try to help support

the RRC.

180.     When the loan matured, TCC's tenth application for payment from the loan proceeds,

in the amount of $238,399, was still pending with Hasz. It was dated November 2, 2009, and had been

submitted within the month before the loan matured. OneUnited never funded this application

because, before it was finally acted upon, the Construction Loan went into default and never re-

emerged. This had the effect of increasing the Church's arrearage to TCC by the amount of the

application; the Church now was TCC's only source of compensation for all amounts owing.  Also, at the

time of default, approximately $800,000 of loan availability remained undistributed; the default meant

that the Church would need to find alternate financing for this entire amount, not just the $238,399 for

which TCC had already done the work and filed an application.

181.     In December 2009 or January 2010, with the Church unable to pay its considerable

arrears to TCC, TCC stopped work on the Project entirely. Construction stopped and never resumed.

182.     At Charles Street, the stoppage of construction had a pronounced effect on the

congregation's morale, attendance, and giving. The energy, enthusiasm, willingness, and trust level of

parishioners dropped. Rev. Groover testified credibly that members were deeply hurt, that confidence

in leadership was "understandably low;" he called it "a very dark period" at Charles Street. Attendance

at services dropped by over a quarter: before, the Church had needed 550-600 bulletins for Sunday

services, but after construction stopped, 400. Giving dropped by about 17 percent: from 2007 through

2009, average annual tithes and offerings were $969,000, or $81,000 per month; and from 2010 through

2014, they were $800,000, or $67,000 per month.

183.     Sometime in the winter of 2010, Rev. Groover spoke to Clarence Fleming, chief financial

officer of the District, to inform him and the District that the Construction Loan was in default. Rev.

Groover did not ask for the District's help in paying off the loan. He expressed to Fleming that Charles

Street believed it would be able to work out something agreeable with OneUnited.

184.     In the spring of 2010, Rev. Groover spoke with Bank CEO Kevin Cohee approximately

five times—mostly from April 15 to 21—and Groover and Cohee became the principal negotiators and

points of contact for their respective institutions. Though he preferred to work in collaboration with

others, Cohee had final authority with respect to the Construction Loan within the Bank. Before April 15,

2010, Amanda Feng, who until then had had authority to contact and communicate with the Church at

her discretion, stopped having that authority. Cohee had required that all dealings with the Church at

that point be channeled through him.

185.     Rev. Groover was hoping to come to an agreement under which the Bank would

advance a further $800,000 to finish the Project. Cohee indicated that he was calling the Construction

Loan and was unwilling to make new advances. He indicated that he would however be willing to

refinance the outstanding balance on the conditions, among others, that the District guaranty both the

new loan and the Church Loan and that the Church put up a $1 million deposit to serve as collateral. He

believed the District had this amount of money sitting in deposits somewhere and could easily move it

to OneUnited as collateral. This proposal, if acceptable, would stave off default and collection action

and, though it would not fund completion of the Project, would buy the Church time to fund completion

from other sources. Though Rev. Groover initially accepted the offer, feeling he had no choice in the

matter, nothing came of it—the Church did not have $1 million at its disposal from any source. It

became clear to Rev. Groover that there was not going to be a resolution with OneUnited short of full

repayment, and therefore that it would be necessary to find take-out financing elsewhere.

186.     The Church contends that Cohee's offer somehow shows evidence of bad faith on the

part of the Bank. I find no bad faith in this offer. The Bank had worked with the Church for a year longer

than it needed to—the cumulative duration of the three loan modifications—each time with an

unfulfilled promise of completion by the end of the extension. During the term of the loan as extended,

the recession had tightened liquidity for everyone and given the Bank cause for concern about possible

depreciation of its real estate collateral. And now the Bank believed that the Church was not being

entirely forthcoming or cooperative about the status and finances of the Project. The Bank had no

obligation to forbear at all, much less to make new advances and thereby to increase its risk and

exposure. And Cohee did not know that the District could not come to the aid of the Church with the

support that Cohee's offer would have required.

187.    On April 19, 2010, in the midst of the foregoing negotiations, OneUnited sent to the

Church a demand letter for payment in full of the Construction Loan, a total of $2,860,196.53, on or

before May 15, 2010. It further advised that failure to pay in full by the specified date would constitute a

default, permitting the Bank to foreclose its mortgages on the RRC and Elm Hill properties. The Church

did not pay the loan in full by May 15, 2010.

188.    On June 11, 2010, and in response to the demand letter, Rev. Groover wrote to the

Bank, asking for forbearance on the Construction Loan until December 31, 2010 on the condition that

the Church make monthly interest payments at the then current rate of 7 percent per annum. Rev.

Groover also stated: "we wish to inform you that we are actively working with a leading private

investment firm to secure a permanent take out loan. The above requested forbearance provides us the

sufficient time to complete the transaction."  A permanent take out loan from a third party was certainly

of interest to the Bank.

189.    The decision whether to forbear rested with the IARC, whose members included Kevin

Cohee, Amanda Feng, and Cecelia Isaac. In December 2009 Ms. Isaac had become OneUnited's new CLO

and senior vice president. The IARC decided not to grant the request but nonetheless continued for the

time being to forbear.

190.    In the twelve months ended May 31, 2010, the Church expended $292,820 from its own

budget for Project expenses.  Approximately half of the total was for replenishment of interest reserves.

**K.    The Falling Out: August 2010 to November 2011**

191.    In February 2010, Rev. Groover approached Steven Pagliuca of Bain Capital ("Bain") in

Boston for advice or help regarding the financial state of the Construction Loan and the Project. How

Rev. Groover was acquainted with Pagliuca is unclear. This led to a meeting between Rev. Groover,

Dennis Lloyd, and Pagliuca in February 2010. There is no evidence as to what transpired at the February

meeting, but it led ultimately to another meeting on July 30, 2010. The July 30 meeting was held at the

Boston offices of Bain and was attended by Dennis Lloyd, Pagliuca, and Ryan Cotton, who was also from

Bain. Rev. Groover did not attend.

192.    The meeting began with Lloyd's making a presentation in which he requested that Bain

take out the current $2.8 million Construction Loan and lend an additional $800,000 to be used to pay

off outstanding bills and finish the RRC. Bain or Pagliuca[16] agreed to attempt to take out the loan and

lend an additional $800,000 on the condition that they first attempt to negotiate with OneUnited to buy

the loan at a discounted rate. The discount in acquiring the loan would result in a lowering of the

Church's debt on the take out loan. The Bain people felt strongly—because the Construction Loan was

troubled and OneUnited was thought to be facing liquidity issues—that there might be room for

negotiation with the Bank. Whether at this meeting or later, the Church agreed to this strategy (though

not necessarily to the manner in which it was executed). And, to that end, the Church scheduled a

meeting with OneUnited officials for August 6, 2010.

193.    The August 6 meeting was telephonic. The attendees were Cotton and Rev. Groover,

both participating from Bain's offices in Boston, Robert Cooper, the Bank's general counsel, participating

from his office in Boston, and Bank CLO Cecelia Isaac and Amanda Feng, both members of the IARC and

---

[16] The evidence is unclear as to whether the commitment was made by Bain or by Pagliuca personally.

participating from Bank offices in Los Angeles. Bank CEO Kevin Cohee, also a member of the IARC, had

planned to attend but at the last minute could not. The meeting lasted about 15 minutes. Cotton did

most of the talking and offered to settle the Church's $2.8 million obligation on the Construction Loan

for $1 million. The Bank participants perceived Cotton's presentation as threatening (especially of

negative publicity), talking down, and dictating terms. All were surprised at the attempt to purchase the

Bank's position at a discount; they had believed the purpose of the meeting was to hear about the

prospect and time frame of a loan that would pay off the Construction Loan in full. Isaac said Cotton

made it hard to get a word in edgewise, but she finally responded, "Not going to happen." The Church

says that it intended this offer as an opening, fully expecting a counteroffer and further negotiation, but

there was no counteroffer or discussion. Cooper then told Cotton to put the offer in writing and that the

Bank would then consider it.

194.    The Church never reduced the offer to writing, but when the offer was discussed later

that day among Cooper, Isaac, Feng, and Cohee, it was a nonstarter. They were not inclined to accept

less than payment in full, and they concluded that the Church was running away from its obligation to

pay the debt in full and no longer acting in good faith. They concluded that legal action would be

required to collect the debt.

195.    Later that day, the Bank sent a letter to the Church, stating that the Bank would not

entertain any offer for less than the full amount due; that the Bank expected to receive written

confirmation by August 10, 2010 that the Church would pay the loan in full; that in exchange for more

time to repay the loan, Charles Street must also commit to continue making monthly interest payments

until such time as the loan is paid in full; and that if such written confirmation were not received by

August 10, 2010, the Bank would initiate legal action against Charles Street and the District.

196.    The Church immediately retained legal counsel, the firm of Ropes & Gray LLP, who, on

August 10, 2010, responded for the Church, requesting an opportunity for constructive dialogue. The

Church sent the Bank no confirmation of intent to pay in full or commitment to payment of monthly

interest. Because the letter indicated that the Church had retained counsel, the Bank did not thereafter

communicate directly with the Church.

197.     During August 2010, the Bank considered what legal action to take. The decision needed

to be made by the IARC, so the discussion was largely among its members, especially Cohee, Isaac, and

Feng, and general counsel Robert Cooper, who was not a member but advised the others. The board of

directors and outside counsel were consulted as well. The overriding consideration proved to be the

collective belief that the District was the source from which the Bank was most likely to obtain payment

in full. They believed the District was flush with cash, had ample resources to bail out the Church, and

had a policy of supporting member churches when they were in trouble. Until that point, the District

had not been brought into the discussion, the Church having repeatedly insisted that it would work this

out on its own. The Bank determined that it was time to involve the District. Foreclosing on the

collateral was less desirable because, without a certificate of occupancy, the RRC's value was quite

limited, and therefore the Bank believed that liquidation of it and the Elm Hill Properties would not likely

have fully abated the debt.[17] Foreclosure would also have torpedoed the Project for good, an

undesirable result if there were another way to collect the debt. The IARC accordingly decided to bring

suit against the Church and the District to enforce the loan and the guaranty.

198.     Accordingly, at some point in August 2010, the Bank made demand on the District to

honor its guaranty. And on September 2, 2010, the Bank ended its forbearance and filed suit against the

Church and the District in Massachusetts Superior Court (the "State Court Action"). The Bank did not

attempt to foreclose on the Construction Loan collateral, either at that time or ever.

---

[17] Arman Walker testified that foreclosing on an uncompleted construction loan puts the lender in a "tough, tough
situation." A later appraisal of the RRC Property that the Bank commissioned bore this out. It showed that the "as
is" value of that property as of February 29, 2012 was only $1,300,000.

199.     On October 1, 2010, the Church filed an answer and a five-count counterclaim, including the count being asserted in this proceeding under MASS. GEN. LAWS ch. 93A for wrongful origination of the Construction Loan, for which the Church sought treble damages and attorneys' fees and costs. The District also filed a counterclaim, the nature of which is not in evidence.

200.     Over the next fifteen months, the State Court Action made little progress. The Bank hoped that in the early phase of the Action there would be an attempt to work things out. Bank general counsel Robert Cooper testified: "The First District we expected fully to come to the table and pay off the debt." But as time wore on, this did not happen.

201.     On December 10, 2010, Rev. Groover received a threat from Melvin Miller, who was at the time a member of OneUnited's board of directors and had long been publisher of the *Bay State Banner*, a weekly newspaper of the African-American community in Boston. At Miller's request, Rev. Groover agreed to meet with Miller at Rev. Groover's church office. Rev. Groover did not know the purpose of Miller's request; nor did he know until the meeting that Miller was on the Bank's board of directors. At the meeting, Miller told Rev. Groover that he had long been a director and had invested a lot in OneUnited, and he made it clear that the Church owed the Bank money and had an obligation to pay it back right away. Then he said that if the Church did not pay the money back, he would use his newspaper to tear down both the Church and Rev. Groover personally.

202.     Miller denied that he had visited Groover as a director or representative of the Bank, but when asked whether he had told anyone at the Bank that he was going to speak with Rev. Groover about the loan, he said he didn't remember; and he said the same when asked whether he had discussed the meeting with anyone at the Bank after it happened. Miller's testimony at deposition on these questions and many others was highly evasive and not credible.  Still, there is no affirmative evidence that Miller made his threat with the knowledge of or at the behest of the Bank or its officers.

203.     At some point in the first eight or nine months of 2011, the IARC considered whether,

on account of the default on the Construction Loan, to call a cross-default on the Church Loan. The IARC

looked into whether a default on the Construction Loan also constituted a default on the Church Loan

and consulted outside counsel. "We absolutely considered it," CEO Kevin Cohee testified. Cecelia Isaac

studied the loan documents and believed they were cross-defaulted, but Cohee was not convinced and

wanted outside counsel to advise them on the question. In the end, the Bank never did call a cross-

default of the Church Loan. In the last few months of 2011, when the Church defaulted on the Church

Loan, it became a moot point.

**L.     Default on the Church Loan and Foreclosure Efforts: December 2011 to March 2012**

204.     The maturity date of the Church Loan was December 2, 2011, on which date the Church

was obligated to make a balloon payment of the principal, $1,115,000, and any outstanding interest.

205.     Throughout 2011, and especially as the maturity date approached, the IARC considered

what to do if, upon maturity, the Church defaulted on its payment obligation on the Church Loan. The

decision whether to foreclose on a loan belonged to the IARC. As Cohee testified, the decision was made

before the maturity date, and it was not made at a single meeting of the IARC but was vetted through

the board of directors and by the entire management team and talked about consistently over a long

period of time.

206.     Before the maturity date, the IARC decided that immediately upon maturity and

nonpayment, the Bank would send the matter to outside counsel to foreclose on the three properties

that secured the Church Loan:  the Church Building, the Storefronts, and the Milton Property. If the

Church were to pay the Church Loan or make an acceptable offer of settlement before the foreclosure

occurred, the foreclosure could be called off. In that sense, the decision to foreclose would not be final

until foreclosure actually occurred. But absent an intervention of that nature, the process would

continue to foreclosure without need of further instruction or authorization from the Bank.

83

207.     On the maturity date, the Church failed to pay the principal and the outstanding

interest; at the time the Church was two months in arrears on interest payments. That same day the

Bank referred the matter to foreclosure and, no later than December 19, 2011, issued a demand letter

to the Church, demanding payment of the balance in full.

208.     In mid-December, 2011, the Church made payment at OneUnited's Grove Hall branch of

the two-month interest arrearage on the Church Loan. Upon learning of this payment, Amanda Feng

instructed another employee of OneUnited to return it and not to accept any further payment that did

not pay the loan in full: "The Bank has issued a demand letter to the borrower demanding the entire due

balance to be paid off in full. The payment received by our branch is insufficient to satisfy the demand.

Please return the fund back to the borrower today. In addition, please find out and let me know how the

system should be flagged so future payments will be blocked on this particular account." In early

January, the Church received from OneUnited a bank check returning the payment.

209.     At some point in 2011, OneUnited had filed a motion in the State Court Action to

dismiss the counterclaims that had been filed therein by the Church and the District. On January 5, 2012,

the Superior Court granted that motion and dismissed the counterclaims. This was an interlocutory

order as the Bank's own claims in that action had not yet been adjudicated. On February 3, 2012, the

Church and the District filed a joint petition under MASS. GEN. LAWS ch. 231, § 118 requesting review and

reversal of the order.

210.     Only on February 11, 2012 did Rev. Groover first learn of OneUnited's plan to foreclose

on the Church Building; he learned of it from a colleague at a meeting. Then on February 14, 2012, a

member of the Church called to say that she had seen an on-line announcement informing the public

that the Church Building, the Storefronts, and the Milton Property would be auctioned at foreclosure on

March 20, 2012 at 10:00 a.m. for the Church Building and Storefronts and at 12:00 p.m. for the

Storefronts. The Bank had made these on-line postings of the foreclosure auction by the middle of

February.

211.    In the congregation the news triggered considerable anger, disappointment, shame, and

embarrassment. The Church made attempts over the next few weeks to have third-parties and public

officials intervene on its behalf with the Bank. Professor Charles Ogletree of Harvard Law School offered

any assistance that the Bank and the Church thought might be helpful and, after speaking with Bank

general counsel Robert Cooper, set up a meeting with both parties, but OneUnited never showed up.

Cooper contends no meeting had been scheduled and that Bank concerns about the terms of a meeting

had not been satisfied. The Bank's level of trust for Rev. Groover, the Church, and their partisans was

very low.[18] This was only intensified by extensive Church-orchestrated publicity of the threatened

foreclosure, which the Bank saw as an attempt to control the Bank with misrepresentations about the

Bank's actions and the history of the loan.

212.    On February 23, 2012, OneUnited, through outside counsel, issued notice to the

Church of its intention to foreclose on the three properties securing the Church Loan at the times that

had already been posted online.

213.    On February 27, 2012, a Single Justice of the Massachusetts Appeals Court issued an

opinion and order reversing the Superior Court's dismissal of the Church's and District's counterclaims.

214.    On March 7, 2012, the Bank, its attorneys and the auctioneer it had retained to conduct

the foreclosure sales were drafting an "ad and possible advertising" for the sales. The auctioneer

emailed a draft to Amanda Feng and outside counsel, saying "[p]lease let me know of any changes to the

ad or advertising schedule you may want." Regarding the schedule of the three foreclosures, the

attached draft ad listed first the Church Building at 10:00 a.m., then the Storefronts also at 10:00 a.m.,

---

[18] By this point in time, Dennis Lloyd had ceased to be the executive director of CSAME/RRC. It is not clear when this occurred or what if any role he continued to have in the Project.

and then the Milton Property at 12:00 p.m. The Bank made no changes to the schedule. The Church

Building and Storefronts are contiguous properties. The Milton Property is some distance away.

**M.    The Bankruptcy Filing**

215.    On March 20, 2012, with the foreclosures only two days off, the Church filed in this

court a petition for relief under chapter 11 of the Bankruptcy Code, thereby commencing the

bankruptcy case in which this proceeding arises.

216.    On March 22, 2012, the foreclosure auctions did not go forward, the bankruptcy filing

having automatically stayed them. Instead, the Bank adjourned them to July 19, 2012 and on that date

finally canceled them.

217.    At a meeting of the executive session of OneUnited's board of directors on March 23,

2012, CEO Cohee told the board that management was not currently negotiating with Charles Street and

had declined offers from outside third parties to mediate the dispute. According to minutes of the

meeting, he stated that this strategy had positioned the Bank "to better retain its control over the

proceedings," including both formal legal proceedings and "the public conversation once it is afforded

the opportunity to speak publicly." Then after noting that consensus was important, given the

substantial media and public attention to the matter, Cohee asked the board for its opinion on this

strategy. In response the board voted unanimously to continue the strategy of "no negotiation" with

Charles Street.

218.    Bank president Teri Williams testified that this strategy was motivated by three

concerns. First, she said the Bank believed "there was no way to negotiate with Charles Street because

they were providing false and misleading information, and we were not going to be able to provide

anyone who would have come in, a third party, with confidential information about the loan." That is,

the Bank felt bound not to use information about the Church's finances against it in public, or in the

presence of third-parties, but without recourse to that information, any conversation involving third

parties or the public would unfairly hamstring the Bank. I find that this was in fact a concern of the Bank,

but it explains only the unwillingness to conduct negotiations through third parties. The other reasons

foreclosed any negotiations at all: that the Church now had two loans that it was refusing to pay, and

that the Bank believed the Church was operating in bad faith. Cohee emphasized the bad faith, as

evidenced (in the Bank's view) by the Church's attempt with Pagliuca to "cram down" the loan, its

prosecution of bogus counterclaims, its public misrepresentations about the loan and attacks on the

Bank's reputation and business in attempts to bring the Bank to heel, all after the Bank had bent over

backward to make the Construction Loan a success. Cohee concluded: "We certainly couldn't have a

continuing financial relationship with them."

219.     According to minutes of the same meeting of the Bank's board of directors on March 23,

2012, Cohee also told the board that "the openness of the bankruptcy process would bring Charles

Street's financial controls to light, which will not only better position the bank to collect on the loans but

also strengthen Charles Street so that it can continue its mission going forward." It is not at all clear

what Cohee meant by this, or even that the minutes accurately reproduced what he had said.  The

Church would have me find that, insofar as this statement anticipated that the Bank would be

strengthened to continue its mission, and that the Church could not "continue its mission" after losing

its building to foreclosure, "the Bank clearly had other means of collection in mind," specifically,

payment by the District. The statement is far too cryptic to permit this finding. Also, the statement

appears to characterize the Bank's expectations or hopes of what would occur *in the bankruptcy case*. I

see no reason to read it as evidence that, prior to bankruptcy, the Bank did not intend to foreclose.

220.     Early in the bankruptcy case, the Bank filed a motion to terminate prematurely the

period in which the Church, as the debtor, enjoyed the exclusive right to file a plan of reorganization. To

this motion the Bank appended a copy of a plan that it would file if the motion were allowed. The plan

provided simply that all debts of Charles Street would be paid by the District. The Court denied this

motion.

221.    Since the commencement of the bankruptcy case, the Bank has never moved for relief

from the automatic stay to continue its foreclosure efforts. However, the Bank has twice moved for

dismissal of the bankruptcy case, first in May 2012 and again in March 2013. Both motions were denied,

but allowance of either would have freed the Bank of the bankruptcy impediments to its foreclosure

efforts.

222.    In July 2013, at a hearing on the Bank's second motion to dismiss the bankruptcy case,

the Court posed the following question to counsel for OneUnited, Lawrence Edelman: "the bank should

be here telling me why it's in the best interest of the creditors and the estate to dismiss this case

because something else is going to happen. . . .  What is it? What does the bank want to do if I dismiss

the case?" His answer consumed several pages of transcript, but the central point was this: "My client is

free to work with this debtor and work with the guarantor, hopefully to reach an agreement, but

ultimately, it has rights under the terms of its mortgages." In other words, armed with the leverage it

has by virtue of its power under the mortgages to foreclose, OneUnited would attempt and prefer to

reach a consensual resolution with the Church and the District but foreclose if no satisfactory offer were

forthcoming.

**N.    Sales of RRC Property, Storefronts, and Milton Property**

223.     In 2014, the Church, by exercise of its powers as a debtor-in-possession under the

Bankruptcy Code, sold the RRC Building and the Storefronts (which are contiguous properties) together

as a unit at auction for $2.9 million, of which $350,000 was allocated to the Storefronts and the balance

to the RRC Building.

224.    When the Church moved for authority to sell these two properties together, OneUnited

objected to the proposed sale, in part on the basis that the Church had not test-marketed the sale of the

"core properties"—the RRC Building, the Storefronts, and the Church Building, all three being

contiguous properties on Warren Street—as a single campus. In support of this objection, OneUnited

stated: "OneUnited's good faith belief is that the Core Properties will fetch a substantially higher sales

price if sold together, potentially to a purchaser that wishes to use the properties as an integrated

campus, rather than piecemeal." The Court overruled this objection and permitted the proposed sale to

go forward.

225.     Bank President Teri Williams testified that the Bank had probably always had the belief

that the three core properties would have been worth more if sold together as a unit. When asked why

then the Bank had not, in 2012, sought to foreclose on all three core properties together as a unit, she

answered that while the Bank's chosen strategy—of foreclosing on the Church Building and Storefronts

but not also the RRC Building—may not have maximized value, it was nonetheless "the best workout

approach for the Bank." She did not explain why the Bank considered piecemeal foreclosures to be a

better work-out strategy but also was not asked to explain.

226.     In a separate sale, again by exercise of its powers as a debtor-in-possession under the

Bankruptcy Code and this time after marketing through a broker, the Church sold the Milton Property

for approximately $385,000.

227.     From June 2010 through the sale of the RRC Building in 2014, a period in which

construction was entirely stopped, the Church nonetheless paid an additional $172,293.81 in Project

expenses from its own operating budget, mostly for building security. After sale of the RRC Building, the

Church received reimbursement from the sale proceeds for $34,221.71 of this total, the total of

amounts expended to preserve the property.

228.     From the date in 2008 on which it began paying Project expenses from its own budget

through the last such payment in July 2014, the Church paid a total of $812,270.88 (after application of

the $34,221.71 credit) on Project expenses. This total does not include, and the record includes no

accounting for, Project expenses paid by CSAME/RRC from the V2V Campaign.

**O.      Findings on Wrongful Origination**

229.      When OneUnited approved the Construction Loan in May 2006, it did not believe that

the loan would or was likely to fail. The loan was structured to provide all the funding necessary to get

the Project to a certificate of occupancy. At the time, the Bank knew that $284,000 of the sum needed

for this purpose might be used instead to pay off the FEDEEDG mortgage, but to address that possibility,

the Bank's loan commitment was made contingent on the general contractor's agreeing to reduce its

compensation by an equal sum, preserving the equivalence between Project cost and loan funding. The

Bank knew that the Church's cash flow and liquidity might be inadequate on their own to supply any

supplemental monies that might be needed during construction and, eventually, to fund monthly debt

service on the take out loan. However, the Bank also reasonably believed that the Church would be able

to raise through its capital campaign any amounts that might be needed for these purposes. And the

Bank also believed that should the Church's own resources and those of its capital campaign prove

inadequate, the District was willing and well able to provide any further funding that might be

necessary.

230.      When the Construction Loan finally closed, it was clear that $284,000 of its proceeds

that would otherwise have funded construction would indeed be needed to pay off the FEDEEDG

mortgage (or at least to replenish funds that had been used for that purpose). The Bank also knew that

the general contractor, TCC, had not agreed to reduce its compensation by an equal sum but had

instead agreed to receive this portion of its compensation directly from the Church when and as the

Church, through fundraising, became able to pay for it. The Bank believed that this arrangement

adequately addressed its contingency and accordingly went ahead with the loan. Because TCC was

willing to wait for its compensation, there is no reason to find that this development should have caused

OneUnited's decision makers to reconsider, or change their belief about, the feasibility of the loan. And

there is no evidence that they did change their belief.

231.      The loan ultimately failed for lack of sufficient funds to address construction

contingencies when and as they arose. There were three principal causes.

232.      First, from the start, the Project encountered construction needs that were essential to

obtaining a certificate of occupancy but that had not been addressed in the loan-funded construction

budget. Though the structural engineer had flagged at least some of these, they did not make it into the

construction budget on which the feasibility of the loan was appraised; the Bank did not know of these

issues.[19] At least four were costly structural items that needed to be addressed before any other work

could be undertaken. Collectively they significantly increased the cost of the Project, and not just by the

cost of the extra work. They directly delayed the start of other work, and they depleted funds that might

otherwise have enabled TCC to remain current, or at least much more current, on its accounts with TCC.

This caused more delays when, for lack of payment, TCC became unwilling to continue work in the later

stages of the Project. Together these delays greatly extended the length of the Project and,

consequently, increased the Church's interest obligations.

233.      Second, the Church and CSAME/RRC proved unable to raise funds to keep up even with

the needs of Phase 1 of the Project. Both the Bank and the Church had construed the earlier success of

the V2V Campaign as evidence that much more could be obtained from the congregation. Instead it

turned out that the congregation had already done most of what it could. Months before the

Construction Loan closed, Dennis Lloyd and Rev. Groover were aware that Phase III of the V2V

Campaign, which was then about half-way through its two-year term, was averaging only $12,000 per

month, well off its target rate of $80,000 per month. Phase III was designed to fund the Project to

---

[19] These problems came as a surprise to the Church as well. It is not clear when Frank Thomas learned of them and why the need to address them was not taken into account earlier.

completion of the RRC; it may not have been clear at the time that $12,000 per month, sustained over

24 months, would not be sufficient to get the Project just to a certificate of occupancy. Still, there was

cause for concern. There is no evidence that the Church shared this information with the Bank, before or

after the loan closed.

234.     Third, the District did not come to the rescue. Neither party adduced evidence as to why

not. A relatively small loan from the District in 2007 might have obviated many problems down the line,

but there is no evidence that Charles Street ever sought help of any kind from the District. In January of

2010, after construction had stopped and the Construction Loan had gone into default, Rev. Groover

notified the District of these facts, but still he did not ask the District for help and instead told the

District that he believed Charles Street could work something out with the Bank. Aside from this, there is

no evidence of the extent to which the District monitored, otherwise concerned itself with, or was kept

abreast of the Construction Loan and the Project from closing to the start of litigation. In any event, on

this factor, the Bank seriously misjudged the aid and value that the District would bring to the Project,

but it was just a misjudgment. There is no doubt that OneUnited made the loan believing that the

support and involvement of the District would provide a backstop against failure.

235.     Without the extraordinary extent of unbudgeted contingencies that needed to be

addressed, the deficiencies in fund raising and in assistance from the District might well not have

mattered. Improbably, three things went wrong together, and their confluence, a "perfect storm," was

itself a factor.

236.     OneUnited did not foresee or anticipate any of these three factors.

237.     OneUnited has alleged that the failure of the loan was attributable to the Church's

undertaking Phase 2 of the project simultaneously with Phase 1. This allegation is not borne out by the

evidence. Except for a single item, the Church confined its work to Phase 1 tasks. It had a contract with

TCC for completion of the entire project, but all evidence indicates that both the Church and TCC viewed

the work as phased, with initial efforts being confined to Phase 1, the work necessary to obtain a

certificate of occupancy and, with it, a take-out loan. Their contractual obligations with respect to Phase

2 were contingent on prior completion of Phase 1 and the existence of funds to pay for Phase 2. Nor was

either the Church or TCC eager to do otherwise. Dennis Lloyd was acutely aware of funding and

budgetary challenges from the start, not eager to add to the Church's funding deficit; and Frank Thomas

had no interest in undertaking work for which his company was not ensured of being paid. The one

Phase 2 item that the Church did undertake was for audio-visual wiring in the amount of $80,000; as a

matter of construction sequencing, it should have been a Phase 1 item, which is why it was done when it

was. Installing the wiring later would have added significantly to the overall cost. Still, there is no dispute

that this wiring was not among the items the loan was intended to fund, and therefore it belonged to

Phase 2. The $80,000 expended on it was an appreciable sum. It contributed to the funding deficit that

sank the Project. However, on its own, this item was far from the difference between success and

failure. It is true that the Church found itself funding a great deal more work during Phase 1 than either

the Church or the Bank had anticipated, but the extra work was mostly for unforeseen contingencies

that were necessary to secure a certificate of occupancy. There was no systematic effort to work on

Phase 2 before completion of Phase 1.

238.    The Church does not allege that the Bank's conduct in underwriting the loan was in any

manner deceptive, and there has been no evidence of the Bank's having deceived or misled the Church

into entering into the Construction Loan and undertaking the Project. By rejecting the Church's request

for underwriting the full Project, limiting the amount of the loan, and working with the Church to

structure a more-workable loan, the Bank enabled the Church to better understand the risks.  I find that,

from the date of the closing on the Construction Loan, the Church, especially through Dennis Lloyd,

always fully understood the financial risks and hurdles that the Construction Loan and the Project

presented. The Church understood these risks at least as well as the Bank did. In at least one important

respect, the Church's understanding was better than the Bank's: the Church went into the loan closing

with knowledge that its capital campaign was grossly underperforming.

**P.    Findings on Pretextual Foreclosure**

239.    The Church would have the Court find that the Bank never truly intended to follow-

through with its planned foreclosure on the Church Building. Rather it was using the threat of

foreclosure solely to force the District to save the Church by paying the Construction Loan in full.

240.    I cannot go that far. Clearly the Bank understood from the start of its foreclosure efforts

that foreclosure on the Church Building was an existential threat to the continuance and existence of

the Church as a worshipping community and a local church of the larger A.M.E. Church, something that

both Charles Street and the District would view as catastrophic. It cannot have escaped the Bank that if

anything could move the District to honor its guaranty and otherwise bail out the Church, it was a

credible threat of foreclosure on the Church Building. The Bank believed all along that the District had

the wherewithal to effect a full bail out. Certainly the Bank hoped that the looming foreclosure would

produce this result. Despite the bad blood that had developed between these two parties, the Bank's

management would have been only too happy not to have to foreclosure on the Church Building.  I find

that the Bank hoped and intended that the threat of foreclosure would move the District to fund a

comprehensive bail out that would be acceptable to the Bank.

241.    This alone is not enough. The Church further maintains—and this is critical to the

Church's own theory of the case—that the Bank never intended to foreclose on the Church Building. The

Church maintains that if foreclosure were not averted by a last-minute bail out or a bankruptcy filing,

the Bank's intent was to stay its hand, not foreclose on the Church Building. As proof of the Bank's

alleged intent not to foreclose, the Church relies on circumstantial evidence and inferences from direct

testimony.

242.     The question is not what would or might the Bank have done had bankruptcy not
intervened. Rather, it is what did the Bank actually intend during the period in which it threatened
foreclosure, from its first publication of intent to foreclose in mid-February to March 20, 2012.

243.     There are several strong reasons to doubt that the Bank intended to stay its hand. First,
as more than one member of the IARC testified, in the case of the Church Loan, the Bank had no
guarantor to turn to, only the collateral: foreclosure appeared to be the only avenue of recovery.
Second, throughout the relevant period, the evidence shows that the Bank was pursuing a well-vetted
strategy of no-negotiation, suggesting a resolute march to foreclosure, not a game of chicken. Third, by
the time of the default on the Church Loan, the Construction Loan had been in default for two full years,
the State Court Action was entering its sixteenth month, and despite this significant passage of time,
there remained no evident prospect of payment from the Church, no movement by the District to honor
its guarantee or otherwise fund a bail out, and no satisfactory offer of help from a third party, such as
Pagliuca. The Bank might well have calculated that if the threat of foreclosure did not produce a bail-out
from either the District or another benefactor, then foreclosure was in fact the only option, the best the
Bank could hope for, and that further delay could not be justified.

244.     In support of the opposite finding, that the Bank intended to stay its hand, the Church
cites a number of facts. First is the July 2013 response of Attorney Edelman to the Court's question as to
what OneUnited would do if the bankruptcy case were dismissed: "My client is free to work with this
debtor and work with the guarantor, hopefully to reach an agreement, but ultimately, it has rights under
the terms of its mortgages." The Church says this shows that the Bank's intent, at least then in 2013,
was to obtain a bailout from the District. This is true, as far as it goes, but Edelman's answer does not
also establish that the Bank intended to stay its hand. It establishes that the Bank hoped the prospect of
foreclosure would galvanize the Church and the District into a response that would make foreclosure
unnecessary. Edelman added: "but ultimately, it has rights under the terms of its mortgages," suggesting

that foreclosure remained the default option. Even if this statement could be construed to fathom the

Bank's intent in 2012, when the Bank was threatening to foreclose, it would give no reason to doubt the

Bank's intent to foreclose.

245.    The Church next cites the Bank's pattern of conduct in the two years after the

Construction Loan went into default in December 2009: it never sought to foreclose, either on the RRC

or, by calling a cross-default, on the properties that secured the Church Loan. Rather it elected to

proceed by litigation in the hope of producing a District-funded rescue that would satisfy the Bank and

allow the Church to keep its properties. I find that this prior conduct is not strong evidence of the Bank's

intent in February and March 2012. By this time, much had changed: twenty-seven months had passed;

a second loan had gone into default; fifteen months of litigation had yielded nothing from the District;

and the Bank had concluded that the Church was acting in bad faith. It is entirely plausible that the Bank

had changed its strategy.

246.    Next the Church cites the fact that, although the Bank always believed that the three

contiguous Warren Street properties—the RRC Property, the Storefronts, and the Church Building—

would fetch a better return if sold together as a campus, and the Bank had the option of selling all three

together at foreclosure (at least by invoking cross-default provisions), the Bank nonetheless did not

include the RRC Building in the scheduled foreclosure. When asked why not, Bank president Teri

Williams responded that while the Bank's chosen course may not have maximized value, it was

nonetheless "the best workout approach for the Bank." The Church contends that Williams can only

have meant that the Bank was foreclosing to put pressure on the District.

247.    I am not persuaded that the Bank's strategy, and Williams' testimony about it,

demonstrate lack of intent to foreclose. Williams' testimony was given in a deposition. Though she

testified again at trial, the Church never asked her, at deposition or trial, to explain or elaborate upon

her answer. I have also already found that the Bank intended for the foreclosure to put pressure on the

District. The question remains what the Bank intended to do if the pressure proved ineffective. There is

very little evidence of the Bank's thoughts on the value of the campus as a whole. How confident was

the Bank in its belief? How much more valuable? Did the belief apply to sales at foreclosure or only at

arm's length? And what would have been involved—in terms of cross-defaults, cross-collateralization,

and extra time and procedure—to arrange it?  There is evidence, which I credit, that the Bank believed

that because the RRC Building was the subject of the pending State Court Action, it was not as free to

proceed against that building as it was to proceed against the three properties that secured the Church

Loan. Too much remains speculation and conjecture about the Bank's reasoning and considerations. I

therefore do not construe this evidence as proof of intent not to foreclose.

248.      The Church has also relied on allegations that the Bank elected to foreclose on the

Church Building first, not last. The suggestion is that, although foreclosure sales of the Storefronts and

the Milton Property may have sufficed to pay the Church Loan in full, the Bank wanted to auction first

the property that the Church and District most cared about, the Church Building, to heighten the *in*

*terrorem* value of the threatened foreclosures. The Church may have abandoned this line of argument

by the time of closing arguments—it was not reiterated there in the Church's litany of evidence as to

this count. To be clear, however, I find no merit in this allegation. The Church did not show that the

order of foreclosure sales was determined by the Bank (as opposed to outside counsel). Nor would it

have been possible to satisfy the Church Loan in full by foreclosing only on the Storefronts and the

Milton Property. Their combined value, especially at foreclosure and in their states of gross water-

damaged disrepair, would not have come close to paying the loan in full.  Recourse to the Church

Building would have been inevitable, and there is no reason to believe the Bank would have thought

otherwise.

249.      Next the Church contends that the auctioneer received no inquiries regarding the

advertised foreclosure sales, and therefore it is implausible that the Bank intended to go forward with

the foreclosures. I am aware of no evidence to support this allegation. Also, interest in a foreclosure sale

is best gauged by the attendance and bidding activity at the sale itself. In any event, had the Bank

elected not to go forward because of insufficient interest, that would hardly establish that it never

intended to go forward.

250.    Next the Church cites that a statement made by Bank CEO Kevin Cohee to the Bank's

board of directors shortly after the bankruptcy filing: "the openness of the bankruptcy process would

bring Charles Street's financial controls to light, which will not only better position the bank to collect on

the loans but also strengthen Charles Street so that it can continue its mission going forward." As I found

above, this statement is too cryptic and unclear to carry any weight. At best it indicates the Bank's

expectations or hopes of what would occur *in the bankruptcy case*. It is not evidence that, prior to

bankruptcy, the Bank did not intend to foreclose.

251.    Lastly, the Church cites the Bank's behavior in the bankruptcy case as evidence that it

had not intended to foreclose. Specifically: (i) the Bank never moved for relief from the automatic stay

to foreclose on the Church Building; (ii) early in the case the Bank filed a motion to terminate the

debtor's exclusive right to file a plan of reorganization, and to this motion the Bank appended a copy of

a plan that it would file if the motion were allowed, a plan under which all debts would be paid by the

District; and (iii) the Bank then filed a motion to dismiss the case, based on the thesis (as the Church

characterizes it) that Charles Street was an improper debtor and had no real legal existence and that

instead the District was the only entity truly liable for Charles Street's debts. I find nothing in this

conduct that is probative of the Bank's intent while it was threatening foreclosure. That the Bank did not

move for relief from the stay to foreclose on the Church Building is likely attributable to calculations of

the likelihood of prevailing on such a motion at that early stage, the cost of prosecuting the motion,

delay it might cause in other aspects of the case, etc. Also, if granted, the Bank's two motions to dismiss

would have had the same effect as relief from the automatic stay: the Bank would have been freed to

foreclose. It is true that during the bankruptcy case, the Bank repeatedly expressed its view that the

District should pay the Church's debts to the Bank. But this has always been the Bank's view and

preference. It does not establish that the Bank intended not to foreclose if and when, facing foreclosure

on the Church Building, the District failed to come through.

252.     The strongest evidence in the record that the Bank might have been bluffing was not

cited by the Church. Cohee testified forcefully and credibly that to hurt a black institution would be

contrary to everything he stood for. He was defending himself and the Bank against the allegation that

the Bank knowingly made a loan that it knew would fail, but it applies also to the act of electing to

foreclose on the Church Building, one that plainly may destroy the Church as a community. The

shuttering of an African-American church would also be antithetical to OneUnited's mission and reason

for existence, as these were described in testimony of at least four members of the Bank's management

team. On the other hand, the Bank indicated that it has foreclosed on churches in the past. In this

instance, the Bank did work with the Church and stay its hand for several years. And the level of rancor

and ill-will flowing both ways as foreclosure neared likely would have made it easier for OneUnited to

disregard principle in this instance.

253.     This quickly becomes an exercise in speculation, and I have no way to know for certain

the intent of Cohee and the other members of the IARC. In the end, the burden is on the Church to

establish the specific intent on which it predicates its count for pretextual employment of foreclosure

process. I am well satisfied that the evidence does not preponderate in favor of the necessary finding. It

is more probable that the Bank intended to foreclose.

**CONCLUSIONS OF LAW**

1.   **Wrongful Underwriting**

As an affirmative defense to OneUnited's claim in the Church's bankruptcy case, the Church

seeks to set off the amount of the alleged liability of the Bank to the Church under Chapter 93A for

unfair origination of the Construction Loan. Chapter 93A makes unlawful, and provides redress for,

"unfair or deceptive acts or practices in the conduct of any trade or business." MASS. GEN. LAWS ch. 93A,

§ 2.  The Church has made clear that it is not alleging, as a predicate act, that the Bank's conduct in

originating the loan was deceptive. Rather, it says the Bank's predicate act was "unfair" within the

meaning of Chapter 93A. In the Church's Objection to Proof of Claim and Counterclaim, the Church

specified the unfair act on which it predicates this liability: "OneUnited willfully and knowingly

structured the Construction Loan such that the RRC project was underfunded by at least $1.3 million at

the outset, leading predictably to the fact that Charles Street AME would (i) be unable to complete the

project and (ii) default on the Construction Loan." As refined by the Church in the pretrial

memorandum, the Church added an alternate basis of reckless disregard: "the Bank violated chapter

93A by knowingly or recklessly issuing loans that were doomed to fail from the outset." Accordingly, in

its post-trial Brief, the Church seeks ultimate findings that "the Construction Loan was doomed to fail

[and] the Bank knew or recklessly disregarded that fact." The Church has also made clear that it is not

alleging negligence, a simple failure to exercise due care in appraising the loan's prospect of success.[20] It

is fair to say that the wrongful origination claim as framed and tried was predicated on the following

allegation:  that the Bank made the Construction Loan with knowledge that the Church could not

complete the Project and repay the loan and would inevitably default; or, if the Bank did not know that

the loan was so doomed to fail, this fact was evident and the Bank recklessly disregarded it. The Bank

denies this allegation, contends that it fails to state a claim for relief under Chapter 93A, and contends

that, in any event, the Church has waived any such claim.

The matter before the court is an objection to proof of claim. A proof of claim that is properly

executed and filed constitutes prima facie evidence of the validity and amount of the claim. FED. R.

BANKR. P. 3001(f); see also *Juniper Dev. Group v. Kahn (In re Hemingway Transp., Inc.*), 993 F.2d 915,

---

[20] I make no ruling on whether the Bank had a duty of care to the Church.

925 (1st Cir.1993). A party objecting to a claim normally bears the initial burden only of producing

"substantial evidence" to support its particular challenge to the claim, and the production of substantial

evidence shifts the ultimate burden to the claimant to establish the validity of its claim.  *Id.*  ("Once the

trustee manages the initial burden of producing substantial evidence . . . the ultimate risk of

nonpersuasion as to the allowability of the claim resides with the party asserting the claim."). Here,

however, the objecting party's challenge does not go to an intrinsic element of the claim but is an

affirmative defense. Accordingly, as the Church recognizes, the objecting party bears not just an initial

burden of adducing substantial evidence but the ultimate burden of proof as to the defense. The burden

is a preponderance of the evidence.

As I found above, the Church has failed to carry its burden as to the act on which it would

predicate liability. When it made the loan, the Bank did not know the loan would fail, nor was it evident

that the loan would fail. Accordingly, I need not address the issue of whether the Supreme Judicial Court

would extend the holdings on which the Church relies to non-consumer, non-residential construction

loans. Nor need I address the factual and legal issues raised by the Bank's defense of waiver. The Church

has no claim under Chapter 93A for wrongful underwriting and accordingly no right to interpose any

such claim against OneUnited's claim by way of setoff. This objection to claim must be overruled.

**2.   Pretextual Foreclosure as Affirmative Defense**

As a further affirmative defense to OneUnited's claim in this bankruptcy case, the Church seeks

to set off the amount of the alleged liability of the Bank to the Church under MASS. GEN. LAWS ch. 93A for

threatening to foreclose on the properties that secured the Church Loan, including the Church Building,

ostensibly to enforce the Church Loan, when in fact OneUnited had no intention of completing the

foreclosure but was simply using the threat of foreclosure as leverage for collection of the Construction

Loan, especially from the District. Because this objection to claim, too, is in the nature of an affirmative

defense, the burden of proving it falls on the Church, and the burden again is a preponderance of the evidence.

Again, the Church has failed to carry its burden of proof as to the act on which it would predicate liability. Specifically, the Church has not established that when OneUnited threatened foreclosure, it had no intention of foreclosing. This fact, lack of intent to foreclose, is critical to the Church's own theory under Chapter 93A. Absent proof of it, the Church cannot hope to prevail and does not argue that it should.  Accordingly, I need not address the state and reach of Chapter 93A jurisprudence on the abuse of foreclosure process.  This objection to claim must be overruled.

### 3. Pretextual Foreclosure as Counterclaim

The Church also asserts its pretextual foreclosure claim as a counterclaim, for an affirmative recovery of damages in excess of the amount needed to fully abate OneUnited's claim. I have already found that Church has failed to prove a fact that is critical to its cause of action (insofar as it has stated one at all) for pretextual foreclosure, and therefore that the Church is entitled to no relief on this claim by setoff.  For the same reason, the Church is entitled to no recovery on this claim at all. Accordingly, the counterclaim for pretextual foreclosure must be dismissed.

### CONCLUSION

For the reasons set forth above, judgment shall enter overruling the Church's objections to claim and dismissing its counterclaim.

Date:  November 2, 2016

_____

Frank J. Bailey
United States Bankruptcy Judge