UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

EASTERN DIVISION

| | |
|---|---|
| In re<br><br>CHARLES STREET AFRICAN METHODIST EPISCOPAL CHURCH OF BOSTON,<br><br>　　　　　　　　Debtor<br><br>CHARLES STREET AFRICAN METHODIST EPISCOPAL CHURCH OF BOSTON,<br><br>　　　Plaintiff-in-Counterclaim<br><br>v.<br><br>ONEUNITED BANK,<br><br>　　　Defendant-in-Counterclaim | Chapter 11<br>Case No. 12-12292-FJB<br><br><br><br><br><br>Adversary Proceeding<br>No. 14-1138 |

## MEMORANDUM OF DECISION ON REMAND

**Background**

On November 2, 2016, this Court entered judgment in the above-captioned adversary proceeding, overruling the objections of plaintiff and chapter 11 debtor Charles Street African Methodist Episcopal Church of Boston ("the Church") to the proof of claim of OneUnited Bank ("the Bank") and dismissing the Church's counterclaim against the Bank on its merits. The Church appealed from the judgment to the United States District Court. For reasons it set forth in a Memorandum and Order of May 19, 2017 ("Memorandum and Order"), the District Court has now vacated in part the order overruling the Church's objection to OneUnited's proof of claim and remanded the matter to this Court for the limited purpose of explaining the relationship of the Court's findings to one of two theories underlying the Church's wrongful underwriting count: that the Bank's underwriting of the Construction

Loan was unfair under MASS. GEN. LAWS ch. 93A, § 2(a) because the Bank made the loan in reckless disregard of facts showing that the loan would or was likely to fail.[1] In its Memorandum and Order, the District Court articulated, to an extent, the standard for making this determination and then charged this Court as follows: "[O]n remand, the Bankruptcy Court need only apply the standard articulated above to determine whether OneUnited acted unfairly by making this loan with reckless disregard for facts which made it likely that the loan would fail. It can do so, in part, by clarifying the relationship between its detailed historical findings and the reckless disregard standard." Memorandum and Order, p. 22. And the Court may make "any additional factual findings it deems necessary." *Id*.

The District Court has indicated that it is assuming without deciding (i) that section 9 of Chapter 93A governs and (ii) that the Supreme Judicial Court would, in an appropriate case, extend *Fremont*[2] to lending transactions outside the home mortgage context. Memorandum and Order, p. 13. I understand that, for purposes of the above charge on remand, this Court too may, at least initially, proceed on the basis of these assumptions. On remand, the Court is required to address these issues—that is, determine whether the conduct in question is subject to section 9 and not section 11 of Chapter 93A, and determine whether the Supreme Judicial Court would extend the rule of *Fremont* beyond the residential mortgage context—only if it concludes that the Church has made out a claim under the reckless disregard theory. Memorandum and Order, p. 22 fn. 10.

Regarding the standard to be applied, the District Court made the following observations. First, *Fremont* and its successor cases establish that Chapter 93A prohibits "the origination of a home mortgage loan that the lender should recognize at the outset that the borrower is not likely to be able to repay." *Drakopoulos v. U.S. Bank Nat'l Ass'n*, 465 Mass. 775, 786 (2013) quoting *Fremont*, 452 Mass. at

---

[1] The Court has not been asked to address the other theory of wrongful underwriting on which the Church relied, that the Bank made the loan *with knowledge* that it would fail. Nor does this remand concern the count for pretextual foreclosure.
[2] *Commonwealth v. Fremont Investment & Loan*, 452 Mass. 733 (2008).

749; *see also Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51, 56 (1st Cir. 2011) ("The holding of *Fremont* was that Chapter 93A prohibits 'the origination of a home mortgage loan that the lender should recognize at the outset the borrower is not likely to be able to repay.'"). Second, loans of this sort fall within the penumbra of the concept of unfairness established in the Massachusetts Predatory Home Loan Practices Act because of their fundamentally predatory nature. *See Fremont*, 452 Mass. at 748-749.

Third, "Chapter 93A usually requires a level of fault going beyond mere negligence." *Frappier*, 645 F.3d at 59; see, e.g., *Darviris v. Petros*, 442 Mass. 274, 278 (2004) ("[A] violation of Ch. 93A requires, at the very least, more than a finding of mere negligence . . . ."). *Fremont* and *Drakopoulos* evince no departure from this background principle, and the Church adopted it at trial. Although the Massachusetts courts have not defined recklessness in the Chapter 93A context, it suffices for these purposes to emphasize that reckless conduct embodies a "substantially greater" degree of culpability than mere negligence. *Boyd v. Nat'l R.R. Passenger Corp.*, 446 Mass. 540, 546 (2006), quoting Restatement (Second) of Torts, § 500.

Fourth, under Massachusetts law, "[a] ruling that conduct violates [Chapter] 93A is a legal, not a factual, determination." *Klairmont v. Gainsboro Rest., Inc.*, 465 Mass. 165, 171 (2013), quoting *Casavant v. Norwegian Cruise Line Ltd.*, 460 Mass. 500, 503 (2011). At the same time, "whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact." *Klairmont*, 465 Mass. at 171, quoting *Casavant*, 460 Mass. at 503 ("Although whether a particular set of acts, in their factual setting, is unfair or deceptive is a question of fact ... the boundaries of what may qualify for consideration as a [G.L.] c. 93A violation is a question of law . . ."). Even receiving a loan with the four "presumptively unfair" characteristics present in *Fremont* does not relieve a borrower of the obligation to prove that the loan was unfair or deceptive in the specific circumstances in which it was made. *Fremont*, 452 Mass.

3

740-741, 752. 2015). This factual inquiry is made with reference to "the circumstances of each case." K*lairmont*, 465 Mass. at 174, quoting *Kattar v. Demoulas*, 433 Mass. 1, 14 (2000).

And fifth, the factfinder is permitted to take into account the borrower's representations to the lender as part of the mosaic of facts in determining whether this particular loan was unfair. *See Klairmont*, 465 Mass. at 174. In the specific context of fundraising in the present case, the Bankruptcy Court may consider the Church's one-sided knowledge of its underperforming but crucial fundraising campaign, created in part by the incomplete answer it gave when OneUnited inquired about the progress of that campaign, just as it may consider OneUnited's failure to further delve into the details.

**Discussion**

    **a. Reckless Disregard in Massachusetts Law**

Using these observations as a point of departure, this Court is charged with specifying the relationship between its already-articulated findings, as supplemented by any further findings I may deem necessary, and "the reckless disregard standard." The reckless disregard standard is relevant here not only because it is the focus of the charge that the District Court has fashioned on remand, but, more fundamentally, (i) because it was one of two standards (the other being knowledge that the loan would or was likely to fail) by which the Church itself asked, both in its pretrial memorandum and in its proposed findings and conclusions, that its wrongful underwriting count be adjudicated[3] and (ii) because, as the Court of Appeals pointed out in *Frappier*, "Chapter 93A usually requires a level of fault going beyond mere negligence." 645 F.3d at 59. In *Fremont*, *Frappier*, and *Drakopoulos*, one searches in vain for the words "reckless disregard," or even just "reckless," much less indications of what they require to make out a *Fremont*-type claim. The Church conceded in its post-trial brief that something

---

[3] "It is fair to say that the wrongful origination claim as framed and tried was predicated on the following allegation: that the Bank made the Construction Loan with knowledge that the Church could not complete the Project and repay the loan and would inevitably default; or, if the Bank did not know that the loan was so doomed to fail, this fact was evident and the Bank recklessly disregarded it." Memorandum of Decision, p. 100.

4

more than mere negligence was required. Though it argued that it should prevail because the Bank recklessly disregarded that the loan was likely to fail, the Church did not address precisely how much more than negligence was required or specify what "reckless disregard" requires.

The question presented is one of Massachusetts law. The Massachusetts Supreme Judicial Court (SJC) has addressed the meaning of reckless disregard in numerous cases, most thoroughly and recently in *Boyd v. Nat'l R.R. Passenger Corp.*, 446 Mass. 540, 546 (2006) ("*Boyd*"). *See also Sandler v. Commonwealth*, 419 Mass. 334, 336 (1995) and *Montes v. Massachusetts Bay Transp. Auth.*, 446 Mass. 181, 185 (2006). In each, the risk in question was of death or grave bodily harm, but the relevant considerations are just as applicable where, as here, the harm is financial in nature.[4]

In *Boyd*, the father of a bicyclist who was struck by a train at a railroad crossing had sued the railroad for her wrongful death, and the lower court had granted summary judgment for the railroad, saying the evidence did not create a genuine issue of material fact as to the requisite "reckless" conduct on the part of the railroad. On appeal, the SJC reversed and, in doing so, addressed at some length the meaning of reckless disregard in Massachusetts law.

The court began by noting that in the civil context, it has adopted the definition of "reckless disregard of safety" set forth in Restatement (Second) of Torts § 500 (1965). *Boyd*, 446 Mass. at 546, and cases cited. Section 500 of the Restatement (Second) states:

> The actor's conduct is in reckless disregard of the safety of another if he does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would

---

[4] *See, e.g.*, *Safeco Ins. Co. of Am. V. Burr,* 551 U.S. 47, 71, 127 S.Ct. 2201, 2216, 167 L.Ed.2d 1045 (2007) (reckless disregard of requirement of the Fair Credit Reporting Act qualifies as a willful violation within the meaning of 15 U.S.C. § 1681n(a)); *Geffon v. Micrion Corp.*, 249 F.3d 29, 35 (1st Cir. 2001) (reckless statements of misleading facts may be actionable in securities fraud litigation under Rule 10b–5); *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 199 (1st Cir. 1999) (accepting recklessness as a method of proving scienter under the Private Securities Litigation Reform Act); *First Commodity Corp. of Boston v. Commodity Futures Trading Comm'n*, 676 F.2d 1 (1st Cir. 1982) (Commodity Exchange Act, 7 U.S.C. §§ 1-24, allows the Commission to predicate liability upon state of mind amounting to recklessness); *Hoffman v. Estabrook & Co., Inc.*, 587 F.2d 509 (1st Cir. 1978) (applying a recklessness standard in Rule 10b-5 litigation); *Adams v. Hyannis Harborview, Inc.*, 838 F. Supp. 676, 689 (D. Mass. 1993), *aff'd sub nom. Adams v. Zimmerman*, 73 F.3d 1164 (1st Cir. 1996) (recklessness satisfies scienter requirement in securities fraud litigation under Rule 10b–5).

>lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another, but also that such risk is substantially greater than that which is necessary to make his conduct negligent.

Restatement (Second) of Torts § 500 (1965). The court immediately went on to explain that "[t]he imposition of tort liability for reckless disregard of safety can be based on either a subjective or an objective standard for evaluating knowledge of the risk of harm."[5] *Boyd*, 446 Mass. at 546. "Under the subjective standard, 'the actor knows, or has reason to know . . . of facts which create a high degree of risk of physical harm to another, and deliberately proceeds to act, or to fail to act, in conscious disregard of, or indifference to, that risk.'" *Boyd*, 446 Mass. at 546-47, quoting from Restatement (Second) of Torts, supra at § 500 comment a, at 588. "Under the objective standard, 'the actor knows, or has reason to know . . . of facts which create a high degree of risk of physical harm to another,' but the actor 'does not realize or appreciate the high degree of risk involved, although a reasonable man in his position would do so.' . . . The actor 'is held to the realization of the aggravated risk which a reasonable man in his place would have, although he does not himself have it.'" *Boyd*, 446 Mass. at 547, quoting from Restatement (Second) of Torts, § 500 comment a.

The SJC then went on to specify requirements that apply regardless of the standard by which knowledge of risk is determined. "With respect to both the subjective and objective standards for evaluating whether conduct is reckless, 'the actor must know, or have reason to know, the facts which create the risk . . . the risk must itself be an unreasonable one under the circumstances,' and the conduct 'must involve a risk of harm to others substantially in excess of that necessary to make the conduct negligent.'" *Boyd*, 446 Mass. at 547, quoting from Restatement (Second) of Torts, § 500

---

[5] It is clear that the SJC understands the definition in Restatement (Second) § 500 to include both a subjective and an objective standard. *Sandler v. Commonwealth*, 419 Mass. at 336 ("Liability in tort for reckless disregard of safety is defined, on the other hand, in Restatement (Second) of Torts § 500 (1965), as including either an objective or a subjective element of knowledge of the risk"). But this has been the law of the Commonwealth since well before the 1965 promulgation of the Restatement (Second) of Torts. *See Commonwealth v. Welansky*, 316 Mass. 383, 398-99 (1944).

6

comment a. "More specifically, the conduct at issue 'must involve an easily perceptible danger of death or substantial physical harm, and the probability that it will so result must be substantially greater than is required for ordinary negligence.'" *Boyd*, 446 Mass. at 547, citing *Montes v. Massachusetts Bay Transp. Auth.*, 446 Mass. 181, 185–186 (2006) (the risk must be "known or reasonably apparent"). "While negligence may result from 'inadvertence, incompetence, unskillfulness, or a failure to take [adequate] precautions,' recklessness 'requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man.'" *Boyd*, 446 Mass. at 547, quoting from Restatement (Second) of Torts, § 500 comment g, at 590. "[R]eckless conduct involves a degree of risk and a voluntary taking of that risk so marked that, compared to negligence, there is not just a difference in degree but also a difference in kind." *Boyd*, 446 Mass. at 547-48. The SJC continued: "Over the years, 'this court has been careful to preserve the distinction between negligence and gross negligence, on the one hand, and wanton or reckless conduct on the other.'" *Boyd*, 446 Mass. at 548, quoting from *Commonwealth v. Welansky*, 316 Mass. at 400. After concluding that the evidence adduced against summary judgment sufficed to create a triable issue, the court reiterated: "for a plaintiff to be successful on a claim alleging recklessness, the risk created by a defendant's conduct must be substantially greater than that which would constitute negligence, and the risk must be one involving an easily perceptible danger of death or grave physical harm." *Boyd*, 446 Mass. at 553, citing Restatement (Second) of Torts, supra at § 500 & comment g. "This is a significant distinction, and our decision should not be interpreted as diminishing in any way the high evidentiary standard that must be satisfied in order to establish reckless conduct, rather than negligence." *Id*.

    **b. The Standard Applied**

This Court's rulings of law, simple as they were, were intended to address as economically as possible the two principal allegations/theories on which the wrongful origination count was predicated:

7

(i) that the Bank made the Construction Loan with knowledge that the Church could not complete the Project and repay the loan and would inevitably default; and (ii) if the Bank did not know that the loan was so doomed to fail, this fact (that the loan was doomed to fail) was evident and the Bank, in proceeding to make the loan, recklessly disregarded it.  Memorandum of Decision, p. 100.  Correspondingly, the Court made two rulings/dispositive findings:  (i) "When it made the loan, the Bank did not know the loan would fail," which disposed of the first theory; (ii) "nor was it evident that the loan would fail," which disposed of the second. Memorandum of Decision, p. 101.

### i.    Not Easily Perceptible

By the latter finding, that it was not "evident" that the loan would fail, the Court understood itself to be addressing and ruling out reckless disregard of any type, subjective or objective.  The operative understanding of Massachusetts law was this: that reckless disregard of a high degree of risk of serious financial harm to another is not possible when that risk is not, in the words of *Boyd*, "easily perceptible," there for the actor, or a reasonable person in the actor's position, to have readily realized or appreciated.   In other words, there can be no disregard, reckless or otherwise, of that which is not evident, there to be seen or appreciated, either by the actor or a reasonable person in the actor's position, if only they care to see it.  In *Boyd*, the SJC stated:  "the conduct at issue 'must involve an *easily perceptible* danger of death or substantial physical harm.'" Transposed to the present context, the Court was required to determine whether approval of the loan posed an "easily perceptible danger" that the loan would fail. I found that no such danger was easily perceptible to the Bank when it approved and entered into the Construction Loan. If, upon approval of the loan, there existed a high degree of risk that the loan would fail, that fact simply was not easily perceptible, either to the Bank or to a reasonable person in the Bank's position. The standard applied and implicit in the word evident was essentially an objective one:  a reasonable person in the Bank's position could not easily have seen a high degree of risk that the loan would fail.  However, the same standard also effectively ruled out reckless disregard of

8

the subjective variety: if, upon approval of the loan, the loan was likely to fail, that fact was no more perceptible to the Bank than it would have been to a reasonable person in the Bank's position.[6] Reckless disregard was therefore impossible, and, without need of my addressing any other element that a *Fremont*-type analysis would otherwise require, I concluded that the Bank was entitled to judgment as a matter of law.[7]

The Court set forth in detail the findings on which this conclusion was based. At the highest level, two were most significant in supporting the conclusion that it was not evident or easily perceptible that the loan would fail. First, though the underwriting itself uncovered a number of weaknesses in this proposed loan, the loan was based on a strength that, in theory at least, rendered the weaknesses of little consequence: the role of the District as supporter of the project and loan. The Church did not prove that the Bank's reliance on the support of the District was misplaced, much less that it was evident that the District's support did not merit the reliance placed on it. Second, the Bank knew that the Church's own liquidity—the cash it could raise without recourse to the District—was highly dependent on the V2V Campaign and inquired into the campaign's progress but was given an answer that effectively hid from the Bank the most consequential red flag in the run-up to this loan, the campaign's alarming degree of underperformance. The point here is not to ascribe fault but only to make clear that, notwithstanding its inquiry into campaign's performance, the Bank did not have this important information.

---

[6] If reckless disregard of the subjective kind was not fully disposed of by the finding that the Bank did not know the loan would fail and by the subsidiary findings made in support of that conclusion, I now clarify and further find that the Bank neither (i) appreciated nor realized that there existed a high degree of risk that the loan would fail nor (ii) made the loan in *conscious* disregard of, or indifference to, any such risk.

[7] In view of the factual findings, I saw no need to opine, and good reason not to, on an unsettled question in Massachusetts law: whether the SJC would extend *Fremont*-type lender liability from the residential consumer context to a construction loan to a non-profit corporation.

9

### ii. No High Degree of Risk that Loan Would Fail

The standard for reckless disregard set forth in § 500 of the Restatement (Second) of Torts and adopted in *Boyd* required proof that the facts that the Bank knew or had reason to know, when it made the loan, would lead a reasonable person to realize that the underwriting of the loan would create an unreasonable risk of serious financial harm to the Church, and that such risk was substantially greater than that which is necessary to make the Bank's underwriting of the loan negligent.  On the facts known or available to the Bank at the time of underwriting, was the loan likely to fail? The Church needed an affirmative answer to this question in order to succeed on any reckless disregard theory, whether subjective or objective. In the Memorandum of Decision, the Court made numerous findings that were relevant to this question[8] but did not finally answer it, largely because the Court's dispositive findings made an answer unnecessary.  The charge on remand, to address more fully the reckless disregard standard, requires an ultimate finding on the issue.

The Court did find that a high likelihood of failure was not, on the facts then known or available to the Bank, evident. The factual issue I mean to address here is more basic: not whether a high degree of risk of serious financial harm was evident or easily perceptible, but whether, given the facts that the Bank knew or had reason to know when it entered into the Construction Loan, a high degree of risk of serious financial harm existed at all.

The Court now finds that the Church did not carry its burden of proof on this issue. In reaching this conclusion, the crucial role of the District and its guarantee in the Bank's underwriting decision loom large.  The Court found:

> Three of the Bank's decision makers . . . made clear in testimony that without the District's guaranty, they individually, and the Bank as an organization, would not have approved the loan. On the basis of the financial statement summarized in the May 4 draft, they believed the District to be an entity of overwhelming financial strength and liquidity. They also believed the District had demonstrated an interest in the success

---

[8] See especially ¶¶ 50-105 and 229-238 of the Memorandum of Decision.

>	of this loan and would not let it fail. In their view, the District had
>	demonstrated this interest not only by guarantying the loan, but also by
>	financing Charles Street's acquisition of the Sky-Cap Building, later forgiving
>	a portion of the resulting mortgage debt, and, through the FEDEEDG,
>	assisting Charles Street in its early efforts to develop the RRC. They
>	believed the District's bishop had not only the authority but also the will,
>	resources, and freedom to mobilize the District's collective resources to
>	support this loan and the RRC project in whatever way, and to whatever
>	extent, might prove necessary. On the basis of this guaranty, the Bank
>	approved a loan that, but for the guaranty, it would not have approved.

Memorandum of Decision, Findings ¶ 93. The Bank relied on the guaranty in two ways:  not only to give the Bank recourse against the District in the event the loan failed, but also as a supporter, virtual partner in, and insurer of the success of the RRC construction project.  The Bank believed that in view of the District's demonstrated commitment to the success of the project of which this loan was a part, the loan was well-protected against failure, all its deficiencies notwithstanding.

	This view was not unreasonable. The District *had* demonstrated considerable commitment to and support for the project.  And its financial statements, together with the representation in Note 1 of each about the power of the bishop to marshal resources within the District, did give cause to believe that the District had the wherewithal to provide considerable assistance if the need arose.

	To establish that the loan was likely to fail, the Church needed to show that what the Bank believed about the District's commitment, role, and wherewithal was false or grossly overstated.  The Church presented almost no evidence on this issue.

	The Church emphasized, and the Court found, that the Bank did virtually nothing to test the accuracy and reliability of the District's financial statements, of the representation in Note 1, or even of the Bank's beliefs about the District's commitment to and involvement in the project.  But the Bank's failure in this regard is not at all proof that the financial statements, the representation, and the Bank's beliefs about the District were not fundamentally sound, only that they were not investigated at the time.

11

The only other evidence consisted of the fact that, in the end, the District did not come to the aid of the project. Neither party adduced evidence as to why not. From the fact that the District did not aid or rescue the project, it does not necessarily follow that, when the Bank entered into the Construction Loan, the District lacked the commitment and wherewithal on which the loan was predicated. The evidence supplied two reasons not to jump to that conclusion. First there was no evidence that the Church ever *requested* help of any kind from the District or, until very late in the day, even kept the District informed of the project's status, its cost overruns, the under-performance of the V2V campaign, or the Church's need for supplemental funding to keep the project on track. If the District did not know, then its failure to assist is hardly evidence of inability or lack of commitment.[9] Second, between the date on which the loan was made and the point at which the loan went into default—during the period in which supplemental funding from the District could have made a critical difference—the economy slid into a recession that may well have dramatically lessened the ability of District and its member churches to help. Though the evidence does not quantify the effect of the recession on this ability, it at least cautions against leaping to the conclusion that failure to perform in 2008 was indicative of inability or unwillingness to perform in 2006.

The Church presented no other evidence about the soundness (or not) of the beliefs about the District on which the loan was predicated. It still is unclear why the Church did not seek and obtain help from the District early on. The evidence suggests that an early infusion of a relatively small amount of cash, through a junior loan or donation, to the effort would have averted much of the difficulty that prevented the Church from getting to a certificate of occupancy.

On this record, the Church has not established that the District's wherewithal and commitment did not merit the reliance that the Bank placed on them, much less that they were dramatically or

---

[9] Perhaps it is evidence that the Bank misunderstood the degree of involvement of the District in this project, but I have no other evidence to support this conclusion, much less that this error (if it was an error) was more than negligence, if even that.

obviously deficient. Given the critical role that these played in the overall justification of this underwriting, the absence of evidence on this point leads me to find that the Church has not carried its burden of proving that, when the loan was underwritten, it was likely to fail.

### iii. No Conscious Disregard or Indifference

In its subjective form, reckless disregard requires the actor to have acted "in conscious disregard of, or indifference to," a high degree of risk. I have already found that the Church has not established (i) that there existed a high degree of risk that the loan would fail, (ii) that a high risk of failure was easily perceptible to the Bank, and (iii) that the Bank appreciated or understood that there existed a high risk of failure. To these I now add that the Church also has not established that the Bank acted in "conscious" disregard of or indifference to any high risk that the loan would fail. This finding flows unavoidably from the three enumerated findings above. But it is also based on the further finding, which I now make (but which is based on many subsidiary findings made earlier), that the Bank had every reason to care, and no reason not to care, about whether this loan would fail. Unlike in *Fremont*, where the lender was alleged to have operated on a business model that, in essence, was indifferent to whether a borrower could repay the loan, the Bank was not operating on any such model. Failure of the loan was absolutely inconsistent with the Bank's interests, and the Bank well appreciated this. First, for the Bank, this was a loan of significant size; if it failed to perform, that by itself would pose a problem. Second, the Bank knew this to be a high-profile loan in the community in which it was trying to establish its new branch. Failure of this loan, loss of the Church's investment in the RRC, not to mention foreclosure on the Church itself or the RRC, would all be highly counter-productive to the Bank's effort to build goodwill in the community. Third, this was a construction loan; until construction was complete to the point of a certificate of occupancy, the value of the RRC to the Bank at foreclosure would be significantly disadvantageous to the Bank. Consistent with these interests the Bank took many steps to

ascertain whether the risks of failure fell within normal tolerances. The Bank was mindful of each of these considerations and did not lend in *conscious* disregard of or indifference to high risk of failure.

### iv. Degree of Risk and Fault

Massachusetts law on reckless disregard, as articulated in *Boyd*, emphasizes that reckless disregard requires a degree of risk "substantially in excess of that necessary to make the conduct negligent.'" *Boyd*, 446 Mass. at 547. "[R]eckless conduct involves a degree of risk and a voluntary taking of that risk so marked that, compared to negligence, there is not just a difference in degree but also a difference in kind." *Boyd*, 446 Mass. at 547-48. Therefore, in order to find recklessness, the Court was required to find more than that, in deciding to underwrite this loan, the Bank acted with less than the care that one would normally expect from a rightly-motivated lender, one whose business model was based on the ability of the borrower to repay the loan. Recklessness would have required a degree of risk, and a lack of care about ability to repay, so marked as to be different not only in degree but also in kind. The Court finds that the Bank acted with the motivations of a rightly-motivated lender and that, if the Bank exercised less than the care that a reasonable lender would have exercised, its shortcomings were by no means so greatly deficient as to amount to recklessness. At worst, this was a lack of care akin to simple negligence,[10] nothing more.

### c. Conclusion as to Reckless Disregard

For the above reasons, the Court concludes that Church has not carried its burden of proving that the Bank underwrote the Construction Loan in reckless disregard, either subjective or objective, of a high risk that the loan would fail. Indeed, the Bank has failed to prove even that, when the Bank underwrote the loan, there existed a high degree of risk that the loan would fail. In relevant part, the Church proceeded on a theory of the case in which the unfairness required by Chapter 93A lay in the

---

[10] To be clear, I make no finding as to whether the Bank or its officers acted negligently. Rather, I find only that any deficiency in the care they brought to this effort was less than recklessness.

14

alleged fact that the Bank acted with reckless disregard that the loan would fail.  The Church having failed to prove by a preponderance of the evidence the reckless disregard on which this count was predicated, judgment must enter for the Bank on the matter remanded.

Date:  July 19, 2017

_____
Frank J. Bailey
United States Bankruptcy Judge

15